No. 03-2264C
(Judge Braden)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

A.F.T.E.R. INCORPORATED, et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant

---

# DEFENDANT'S MOTION TO DISMISS

---

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 305-7561
Facsimile: (202) 305-7643

Attorneys for Defendant

December 1, 2003

**TABLE OF CONTENTS**


DEFENDANT'S MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DEFENDANT'S BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I. Plaintiffs' Claims, as Pleaded, Are Barred by the Statute of Limitations . . . . . 10

II. The Government Actions Alleged Did Not Constitute a Breach of Contract . . 10

A. The Contracts in Question Did Not Create an Absolute, Unfettered Prepayment Right . . . . . . . . . . . . . . . . . . . . . 10

B. Under the Unmistakability Doctrine, the Contracts in Question Cannot Be Construed to Preclude Congress from Subjecting Prepayment to Conditions Such as Those Required by ELIHPA . . . . . 18

1. The Unmistakability Doctrine Applies Here . . . . . . . . . . . . . . . 19

2. The Contracts in Question Did Not Surrender the Government's Power to Amend the Applicable Statute in Order to Prevent Displacement of Tenants . . . . . . . . 26

C. ELIHPA Did Not Repudiate the Contracts in Question . . . . . . . . . . . 28

D. The Government's Alleged Actions In Implementing ELIHPA Did Not Breach the Contracts . . . . . . . . . . . . . . . . . . . . . . . 31

III. The Alleged Governmental Actions Did Not Constitute an Uncompensated Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

A. Government Infringement of a Right Arising from a Government Contract Is Not Actionable under the Takings Clause . . . . . . . . . . . . . . 34

B. The Government Did Not Effect an Uncompensated Taking under The Penn Central Test . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1. The Government's Actions Did Not Interfere with Reasonable Investment-backed Expectations . . . . . . . . . . . 36

2. The Economic Impact of the Government's Action Was Not Sufficient to Constitute a Taking . . . . . . . . . . . 37

3. The Character of the Government's Actions Does Not Indicate a Taking . . . . . . . . . . . . . . . . . . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## TABLE OF AUTHORITIES

### FEDERAL CASES

Alaska American Lumber Co., Inc. v. United States,
25 Cl. Ct. 518 (1992) . . . . . . . . . . 16

Adams v. United States, 42 Fed. Cl. 463 (1998) . . . . . . . . . . passim

Baggett Transportation Co. v. United States, 969 F.2d 1028 (Fed. Cir. 1992) . . . . . . . 33

Beatty v. United States, 144 Ct. Cl. 203, 168 F. Supp. 204 (1958) . . . . . . . . . . 17

Bowen v. Public Agencies Opposed To Social Security Entrapment,
477 U.S. 41 (1986) . . . . . . . . . . 19

Brown v. United States, 42 Fed. Cl. 538 (Fed. Cl. 1998), aff'd, 195 F.3d
1334, 1340 (Fed. Cir. 1999) . . . . . . . . . . 11, 13

Caguas Central Federal Savings Bank v. United States, 215 F.3d 1304
(Fed. Cir. 2000) . . . . . . . . . . 11

California Housing Security, Inc. v. United States, 959 F.2d 955 (Fed. Cir.
1992) . . . . . . . . . . 36

Castle v. United States, 301 F.3d 1328 (Fed. Cir. 2002) . . . . . . . . . . 33

Chancellor Manor v. United States, 331 F.3d 891 (Fed. Cir. 2003) . . . . . . . . . . 34

Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003) . . . . . . . . . . passim

Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003) . . . . . . . . . . 33, 34

Croman v. United States, 44 Fed. Cl. 796 (1999) . . . . . . . . . . 25

Croman v. United States, 49 Fed. Cl. 776 (2001) . . . . . . . . . . 26

Cuyahoga Metropolitan Housing Authority v. United States,
57 Fed. Cl. 751 (2003) . . . . . . . . . . 22, 25

Dynalectron Corp. v. United States, 4 Cl. Ct. 424 aff'd mem., 758 F.2d 655
(Fed. Cir. 1984) . . . . . . . . . . 10

Franconia Associates v. United States, 43 Fed. Cl. 702 (1999), aff'd on other grounds, 240 F.3d 1358 (Fed. Cir. 2001), rev'd on other grounds, 536 U.S. 129 (2002) . . . . . . . . . . passim

Franconia Associates v. United States, 240 F.3d 1358 (Fed. Cir. 2001) . . . . . . . . 12, 35

Franconia Associates v. United States, 536 U.S. 129 (2002) . . . . . . . . . . passim

Frazer v. United States, 288 F.3d 1347 (Fed. Cir. 2002) (Fed. Cir. 2000) . . . . . . . . . . 11

General Dynamics Corp. v. United States, 214 Ct. Cl. 607, 558 F.2d 985 (1977) . . . . . . . . . . 16

Gilbert v. Department of Justice, 334 F.3d 1065 (Fed. Cir. 2003) . . . . . . . . . . 14

Golden Pacific Bancorp v. United States, 15 F.3d 1066 (Fed. Cir. 1994) . . . . . . . . . . 36

Grass Valley Terrace v. United States, 46 Fed. Cl. 629 (2000) . . . . . . . . . . 27

Grass Valley Terrace v. United States, 51 Fed. Cl. 436 (2002) . . . . . . . . . . 19, 27

Home Savings of America, F.S.B. v. United States, 51 Fed. Cl. 487 (2002) . . . . . . . . 33

Horowitz v. United States, 267 U.S. 458 (1925) . . . . . . . . . . 20

Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060 (Fed. Cir. 2001) . . . . . . . . . . 33

In re Brown, 293 B.R. 865 (Bankr. W.D. Mich. 2003) . . . . . . . . . . 14

In re Ponzini, 277 B.R. 399 (Bankr. E.D. Ark. 2002) . . . . . . . . . . 14

Integrated Logistics Support System International, Inc. v. United States, 42 Fed. Cl. 30 (1998) . . . . . . . . . . 33

Kimberly Associates v. United States, 261 F.3d 864 (9th Cir. 2001) . . . . . . . . . . 19

Kokkonen v. Guardian Life Insurance Company of America, 511 U.S. 375 (1994) . . . . . . . . . . 10, 13

McNutt v. General Motors Acceptance Corp., 298 U.S. 178 (1936) . . . . . . . . . . 10, 13

Merrion v. Jicarilla Apache Tribe, 455 U.S. 130 (1982) . . . . . . . . . . . . . . . . . . . . . . . . 19

Montana Power Co. v. United States, 8 Cl. Ct. 730 (1985 ) . . . . . . . . . . . . . . . . . . . . . . 16

P.J. Maffei Building Wrecking Corp. v. United States, 732 F.2d 913
(Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Parkridge Investors, Ltd. v. Farmers Home Administration, 13 F.3d 1192
(8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978) . . . . . . . . . . 35

Scan-Tech Security, L.P. v. United States, 46 Fed. Cl. 326 (2000) . . . . . . . . . . . . . . . . 33

Sun Oil Co. v. United States, 215 Ct. Cl. 716, 572 F.2d 786 (1978) . . . . . . . . . . . . . . . 33

United States v. Mitchell, 445 U.S. 535 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Sherwood, 312 U.S. 584 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Testan, 424 U.S. 392 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Winstar v. United States, 518 U.S. 839 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 28

Yankee Atomic Electric Co. v. United States, 112 F.3d 1569 (Fed. Cir. 1997),
cert. denied, 524 U.S. 951 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**FEDERAL STATUTES**

Emergency Low Income Housing Preservation Act, Pub. L. No. 100-242,
101 Stat. 1877 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Financial Institutions Reform, Recovery, and Enforcement Act of 1989,
Pub. L. No. 101-73, 103 Stat. 183 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Housing Act of 1949, §§ 515, 521, 42 U.S.C. §§ 1485, 1490a . . . . . . . . . . . . . . . . . . . 1

Housing and Community Development Act of 1980, Pub.
L. No. 96-399, 94 Stat. 1614 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Housing and Community Development Act of 1992, Pub. L. No. 102-550,
106 Stat. 3672 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Housing and Community Development Amendments of 1979, Pub. L. No. 96-153, 93 Stat. 1101 (1979) . . . . . 5, 23

Senior Citizens Housing Act of 1962, Pub. L. No. 87-723, 76 Stat. 670 (1962) . . . . . 15

Pub. L. No. 87-723, 76 Stat. 670 (1962) . . . . . 4

Pub. L. No. 89-754, § 804, 80 Stat. 1255 (1966) . . . . . 4

Pub. L. No. 90-448, § 1001, 82 Stat. 551 (1968) . . . . . 4

Pub. L. No. 100-242, § 202(b), 12 U.S.C. § 1715l note . . . . . 25

Pub. L. No. 100-242, § 241, 101 Stat. 1886 . . . . . 6

Pub. L. No. 102-550, § 712, 106 Stat. 3841 (1992) . . . . . 7

28 U.S.C. § 2501 . . . . . 10, 13

42 U.S.C. § 1437f . . . . . 22

42 U.S.C. § 1472(c)(4)(A), (B) . . . . . 8, 29

42 U.S.C. § 1472(c)(4)(A) . . . . . 8, 29

42 U.S.C. § 1472(c)(5)(A)(i) . . . . . passim

42 U.S.C. § 1472(c)(5)(A)(ii) . . . . . 29, 31

42 U.S.C. § 1472(c)(5)(G)(ii)(I) . . . . . 37

42 U.S.C. § 1472(c)(5)(G)(ii)(II) . . . . . 37

42 U.S.C. § 1472(c)(5)(H) . . . . . 8

42 U.S.C. §§ 1485 . . . . . 1, 4

42 U.S.C. § 1490a . . . . . 1

## FEDERAL REGULATIONS

53 Fed. Reg. 13245 (April 22, 1988) . . . . . . . . . . 8

7 C.F.R. Part 1900, Subpart B . . . . . . . . . . 9

7 C.F.R. § 1965.90 (1989) . . . . . . . . . . 8

7 C.F.R. § 1965.215 . . . . . . . . . . 9

7 C.F.R. § 1965.215(c)(1)(ii) . . . . . . . . . . 37

7 C.F.R. § 1965.215(c)(1)(iii) . . . . . . . . . . 37

7 C.F.R. § 1965.215(g) . . . . . . . . . . 9

7 C.F.R. § 1965.216 . . . . . . . . . . 37, 38

7 C.F.R. § 1965.216(a) . . . . . . . . . . 9, 10

## MISCELLANEOUS

H.R. Conf. Rep. No. 100-426, at 198 (1987), reprinted in 1987 U.S.C.C.A.N. 3458 . . . . . . . . . . 30

H. Rep. No. 96-154, 96th Cong., 1st Sess. 43 (1979), reprinted in 1987 U.S.C.C.A.N. 2317 . . . . . . . . . . 5, 23

H. Rep. No. 100-122(I), at 53 (1987), reprinted in 1987 U.S.C.C.A.N. 3317 . . . . . . . . 24

S. Rep. No. 2049 (1962), reprinted in 1962 U.S.C.C.A.N. 2737 . . . . . . . . . . 15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| A.F.T.E.R. INCORPORATED, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 03-2264C |
| | ) | (Judge Braden) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims, defendant respectfully requests the Court to dismiss plaintiffs' complaint for lack of jurisdiction or for failure to state a claim upon which relief can be granted. In support of this motion, we rely upon the complaint[1] and the following brief.

DEFENDANT'S BRIEF

Nature Of The Case

Plaintiffs are 116 property owners who allege that they entered into loan agreements with the Farmers Home Administration, United States Department of Agriculture ("FmHA"),[2] pursuant to sections 515 and 521 of the Housing Act of 1949, 42 U.S.C. § 1485, 1490a, to provide rental housing for low- and moderate-income individuals and families in rural areas. Complaint ¶¶ 1, 17. Plaintiffs allege that the Government breached these agreements, or effected a taking of plaintiffs' property without just compensation, through the enactment and

[1] For the purposes of this motion only, the factual allegations contained in plaintiffs' complaint will be treated as true.

[2] The Rural Housing Service is the successor agency to the Farmers Home Administration. For purposes of this brief, "FmHA" refers to the Farmers Home Administration or the Rural Housing Service, where appropriate.

implementation of two statutes: the Emergency Low Income Housing Preservation Act, Pub. L. No. 100-242, 101 Stat. 1877 (1988) ("ELIHPA"), and the Housing and Community Development Act of 1992, Pub. L. No. 102-550, 106 Stat. 3672 (1992) ("the 1992 Act").

Specifically, loan agreements contained various provisions designed to ensure the low-income affordability of the projects. These provisions included restrictions as to the tenants to whom the plaintiffs could rent, the rents plaintiffs could charge, and the profits plaintiffs could receive, as well as requirements regarding the maintenance and financial operations of each project. Complaint ¶ 17. In connection with these loan agreements, each plaintiff executed a promissory note and real estate mortgage. Complaint ¶ 18. According to plaintiffs, these documents also provided plaintiffs with the option of prepaying their mortgages, and thereby discontinuing the low-income affordability restrictions, at any time, Complaint ¶¶ 18-19, except that, in the case of loans into which plaintiffs entered after December 21, 1979, plaintiffs were required by the terms of the loan documents to maintain the low-income affordability of the housing for a 15 or 20 year period following the date of the loan. Complaint ¶¶ 7-8.

Plaintiffs complain that ELIHPA amended the Housing Act of 1949 to place restrictions upon the prepayment options available to housing project owners who had entered into mortgages prior to December 21, 1979, Complaint ¶ 26, and that the 1992 Act extended these prepayment restrictions to loans made between 1979 and 1989, Complaint ¶ 31. Plaintiffs allege that this legislation repudiated the purported right of these program participants to prepay their loans and "terminate" their loan agreements at any time. Complaint ¶ 29. In Count One of their complaint, plaintiffs assert a claim for breach of contract, upon the theory that this legislation "anticipatorily repudiated the contract between the defendant and each of the plaintiffs," and that

this "anticipatory repudiation has deprived and will deprive each plaintiff of its contractual right to terminate its contract at any time at its option . . . ." ¶ 51. In Count Two, plaintiffs allege that "defendant's conduct constitutes a taking of plaintiffs' real and intangible property interests for public use and requires payment to plaintiffs of just compensation under the Fifth Amendment to the U.S. Constitution. ¶ 55.

Even if all of the facts alleged in the complaint are taken as true, however, they are insufficient to establish that any of the plaintiffs have satisfied the jurisdictional requirement of filing suit within the applicable six-year statute of limitations. The complaint is devoid of any facts indicating when any plaintiff's claim accrued. Plaintiffs assert that "[t]he Government's anticipatory repudiation constitutes a breach of each plaintiff's contract as of the date of Government performance required by each contract, i.e., the date that each plaintiff would terminate its contract but for the Government's repudiation." Complaint ¶ 51 (emphasis added). If plaintiffs mean by this that their claims accrued at a hypothetical date unrelated to any actual attempt to prepay, this assertion is legally groundless. And, assuming that a claim would accrue upon the Government's rejection of a tender of prepayment, the fact is that the complaint does not allege when any plaintiff attempted to prepay or when any offer of prepayment was rejected.

The contract language, moreover, does not support a prepayment right as absolute as plaintiffs claim, much less immunize that right from subsequent legislation of the kind at issue here. Indeed, under the unmistakability doctrine, the contracts in question could not be construed to preclude this legislation or its implementation. Further, the legislation did not repudiate the prepayment right actually described in the contracts. Plaintiffs' misconceptions of the contracts and the pertinent statutory provisions are part of the foundation of plaintiffs' contract claims as

well as their takings claims. Therefore, none of these claims can be sustained. Finally, even if plaintiffs' interpretation of the contract and statutes were correct, the takings claim would fail. The Government actions alleged by plaintiffs simply did not interfere with plaintiffs' use of their real property; rather, these actions addressed plaintiffs' prepayment right. These actions affected plaintiffs' use of their real property only to the extent that they limited plaintiffs' ability to terminate existing contractual restrictions upon the use of their real property, through prepayment. If this limitation violated any right, it was a contract right, and the remedy, if any, is for breach of contract only.

STATUTORY AND REGULATORY BACKGROUND

In 1962, Congress amended the Housing Act of 1949 ("the Housing Act") to authorize the FmHA to make direct loans to private nonprofit corporations and consumer cooperatives "to provide rental housing and related facilities for elderly persons and families of low or moderate income in rural areas." Pub. L. No. 87-723, 76 Stat. 670 (1962) (codified, as amended, at 42 U.S.C. § 1485 (1994)). The loans were to be made for terms of up to 50 years, with repayment of principal and interest according to schedules and repayment plans established by the FmHA. Id. In 1966, Congress expanded this loan program to include loans for rental housing for "other persons and families of low income." Pub. L. No. 89-754, § 804, 80 Stat. 1255, 1282 (1966). In 1968, Congress added section 521 to the Housing Act, which expanded the availability of loans made under section 515. Pub. L. No. 90-448, § 1001, 82 Stat. 551 (1968).

In 1979, Congress found that many section 515 participants had started to prepay their mortgages, thus threatening the continued availability of rural low and moderate income housing. Finding that it had been "the clear intent of Congress that these projects be available to low and

moderate income families for the entire original term of the loan," Congress amended the National Housing Act to prevent the loss of low-cost rural housing due to prepayments. H. Rep. No. 96-154, 96th Cong., 1st Sess. 43 (1979), reprinted in 1987 U.S.C.C.A.N. 2317, 2359. In the Housing and Community Development Amendments of 1979, Pub. L. No. 96-153, 93 Stat. 1101 (1979), Congress prohibited the FmHA from accepting prepayment of any loan made before or after the date of enactment unless the owner was required to maintain the low-income cost of the rental housing for either a 15-year or 20-year period from the date of the loan. § 503(b), 93 Stat. 1134-35. This requirement would not be imposed if the FmHA determined that there was no longer a need for the low-cost housing or if Federal or other financial assistance provided to residents would no longer be provided. Id. In 1980, Congress further amended the Housing Act to eliminate retroactive application of the section 515 prepayment changes enacted in the 1979 legislation. Section 514 of the Housing and Community Development Act of 1980, Pub. L. No. 96-399, 94 Stat. 1614 (1980), provided that the prepayment restrictions included in the 1979 legislation would apply only to loans entered into after the date of enactment of that legislation, December 21, 1979. 94 Stat. 1671-72.

By 1987, Congress again had become concerned about the availability of low- and moderate-income rural housing in the face of increasing prepayments of mortgages under section 515. In response, Congress passed ELIHPA, which amended the Housing Act of 1949 to impose restrictions upon prepayment of section 515 mortgages that were entered into before December 21, 1979. This legislation required that, prior to accepting an offer to prepay a mortgage entered into before December 21, 1979, the FmHA

> shall make reasonable efforts to enter into an agreement with the borrower under which the borrower will make a binding

> commitment to extend the low income use of the assisted housing and related facilities for not less than the 20-year period beginning on the date on which the agreement is executed.

Pub. L. No. 100-242, § 241, 101 Stat. 1886. The legislation further provided that the FmHA could include certain enumerated incentives in such an agreement, including an increase in the rate of return on investment, reduction of the interest rate on the loan, and an equity loan. Pub. L. No. 100-242, § 241, 101 Stat. 1886-87.

Under ELIHPA, if the FmHA determined after a "reasonable period" that an agreement would not be reached, and that housing opportunities for minorities would be materially affected by the prepayment, then the FmHA would require the owner to offer to sell the housing to "any qualified nonprofit organization or public agency at a fair market value determined by 2 independent appraisers." Pub. L. No. 100-242, § 241, 101 Stat. 1887. If an offer to purchase was not made within 180 days, the FmHA could accept the offer to prepay or request refinancing. Id. The offer for sale requirement would not apply if the owner agreed to utilize the housing for the purposes set out in section 515 for a period designated by the FmHA and then offer to sell the housing to a nonprofit organization or public agency. If the FmHA determined that housing opportunities for minorities would not be materially affected by prepayment but that tenants either would be displaced by prepayment or that there is not an "adequate supply" of "affordable" housing in the market area available to displaced tenants, then a borrower could prepay as long as the borrower agreed not to raise rents to force out current tenants. Id. at § 241, 101 Stat. at 1889. If the FmHA determined that housing opportunities for minorities would not be materially affected by prepayment and that the tenants either would not be displaced by prepayment or there was an

"adequate supply" of "affordable" housing in the market area available to displaced tenants, then a borrower could prepay without restriction. Id. at § 241, 101 Stat. at 1889.

In the 1992 Act, Congress extended the prepayment restrictions contained in ELIHPA to section 515 loans made from December 21, 1979 until December 15, 1989. Pub. L. No. 102-550, § 712, 106 Stat. 3841 (1992). Thus, beginning in 1992, loans made after December 21, 1979 but before 1989 were subject to the provisions of ELIHPA adopted in 1988 for "pre-1979" loans.

In their present form, the pertinent statutory provisions concerning prepayment of section 515 loans are as follows:

> (A) Agreement by borrower to extend low income use
>
> Before accepting any offer to prepay, or requesting refinancing in accordance with subsection (b)(3) of this section of, any loan made or insured under section 1484 or 1485 of this title pursuant to a contract entered into prior to December 15, 1989, the Secretary shall make reasonable efforts to enter into an agreement with the borrower under which the borrower will make a binding commitment to extend the low income use of the assisted housing and related facilities involved for not less than the 20-year period beginning on the date on which the agreement is executed.
>
> (B) Assistance available to borrower to extend low income use
>
> To the extent of amounts provided in appropriation Acts, the agreement under subparagraph (A) may provide for 1 or more of the following forms of assistance that the Secretary, after taking into account local market conditions, determines to be necessary to extend the low income use of the housing and related facilities involved:
>
> [Subsections (B)(i) through (B)(vi) list the various incentives that may be offered in order to obtain such agreements.]

* * *

42 U.S.C. § 1472(c)(4)(A), (B) (emphasis added). Section 1472(c)(5) goes on to state:

> (A) Offer to sell to nonprofit organizations and public agencies
>
> (i) In general
>
> If the Secretary determines after a reasonable period that an agreement will not be entered into with a borrower under paragraph (4), the Secretary shall require the borrower (except as provided in subparagraph (G)) to offer to sell the assisted housing and related facilities involved to any qualified nonprofit organization or public agency at a fair market value determined by 2 independent appraisers, one of whom shall be selected by the Secretary and one of whom shall be selected by the borrower. If the 2 appraisers fail to agree on the fair market value, the Secretary and the borrower shall jointly select a third appraiser, whose appraisal shall be binding on the Secretary and the borrower.
>
> (ii) Period for which requirement applicable
>
> If, upon the expiration of 180 days after an offer is made to sell housing and related facilities under clause (i), no qualified nonprofit organization or public agency has made a bona fide offer to purchase, the Secretary may accept the offer to prepay, or may request refinancing in accordance with subsection (b)(3) of this section of, the loan. This clause shall apply only when funds are available for purposes of carrying out a transfer under this paragraph.

42 U.S.C. § 1472(c)(5)(A) (emphasis added).[3]

The FmHA promulgated regulations to implement ELIHPA on April 22, 1988, and these regulations became effective on May 23, 1988. 53 Fed. Reg. 13245 (April 22, 1988), codified at 7 C.F.R. § 1965.90 (1989). Current regulations governing section 515 prepayments establish a process by which the FmHA addresses prepayment requests, including procedures for

[3] The statute includes a funding authorization sufficient to finance the transfer of 5,000 units per fiscal year. 42 U.S.C. § 1472(c)(5)(H). According to the complaint, the total number of units involved in this case is less than 3,000. Complaint ¶ 11.

determining whether housing opportunities for minorities will be affected by prepayment and whether other housing is available for tenants displaced by prepayment. 7 C.F.R. § 1965.215. These procedures include a right of borrowers to appeal an agency decision to deny prepayment without restrictive use provisions. 7 C.F.R. § 1965.215(g). Section 1965.215(g) provided that such appeals are to be processed in accordance with the procedures set forth in 7 C.F.R. Part 1900, Subpart B. Pursuant to the latter regulation, appeals are heard by a hearing officer from the National Appeal Staff of the Department of Agriculture, and the hearing officer's decision is subject to review by a separate reviewing officer from that Staff. 7 C.F.R. Part 1900, Subpart B, Exhibit D.

In cases where the borrower opts to offer the property in question for sale to a nonprofit organization or public agency for fair market value (or where doing so is a prerequisite to prepayment because of the effect of prepayment upon minorities), the regulations provide that "the fair market value of the project as unsubsidized conventional housing will be determined." 7 C.F.R. § 1965.216(a) (emphasis added). The regulation further provides:

> The value arrived at will result from two appraisals. One appraisal will be the appraisal contracted and paid for by FmHA or its successor agency under Public Law 103-354 that was used to establish the incentives previously offered. The second appraisal will be obtained and paid for by the borrower. Both appraisals will be conducted by qualified independent appraisers in accordance with FmHA . . . Instruction 1922-B (available in any FmHA . . . office).[4] If the fair market values arrived at are within 10 percent of each other, the Servicing Office and the borrower will negotiate to arrive at a mutually acceptable value. If the values differ by more than 10 percent, the independent appraisers will be asked to review their

[4] Instruction 1922-B is not published in the Code of Federal Regulations, but it is publicly available on the internet at http://rdinit.usda.gov/regs/regs/txt/1922b.txt.

> appraisals to determine if the values can be reconciled to within 10 percent. If FmHA . . . and the borrower are unable to negotiate a mutually acceptable value or the appraisers are unable to reconcile their appraisals within 30 days of the completion of the appraisals, the State Office and the borrower will jointly select a third independent qualified appraiser whose appraisal will be binding on FmHA . . . and the borrower. . . . The cost of the third appraisal shall be divided evenly between FmHA . . . and the borrower.

Id. (emphasis added).

ARGUMENT

I. Plaintiffs' Claims, as Pleaded, Are Barred by the Statute of Limitations

It is the plaintiff's burden to plead and prove the requisite jurisdictional facts to establish the Court's jurisdiction. Kokkonen v. Guardian Life Insurance Company of America, 511 U.S. 375, 377 (1994); McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936).[5] One of the jurisdictional facts that must be established in this Court is that the suit was filed within six years of the accrual of the claim asserted, as required by 28 U.S.C. § 2501, which provides: "Every claim of which the United States Claims Court has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." As the United States Court of Appeals for the Federal Circuit has observed:

> Section 2501 constitutes a jurisdictional limit on the authority of the Court of Federal Claims. In Caguas Central Federal Savings Bank v. United States, we explained why this is so: "[I]n the Court of Federal Claims, the statute of limitations is jurisdictional, because

[5] This Court, like its predecessor, the Court of Claims, is a court of limited jurisdiction. Dynalectron Corp. v. United States, 4 Cl. Ct. 424, 428, aff'd mem., 758 F.2d 655 (Fed. Cir. 1984). Its jurisdiction to entertain claims and to grant relief depends upon, and is circumscribed by, the extent to which the United States has waived its sovereign immunity. United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v. Testan, 424 U.S. 392 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941).

> filing within the six- year period was a condition of the waiver of sovereign immunity in the Tucker Act. . . .

Frazer v. United States, 288 F.3d 1347, 1351 (Fed. Cir. 2002), quoting Caguas Central Federal Savings Bank v. United States, 215 F.3d 1304, 1310 (Fed. Cir. 2000). Therefore, "one seeking to invoke the jurisdiction of this court bears the threshold burden of pleading the essential facts to show that the claim is timely filed." Brown v. United States, 42 Fed. Cl. 538, 556 (Fed. Cl. 1998), aff'd, 195 F.3d 1334, 1340 (Fed. Cir. 1999) (emphasis added).

The complaint in this case is devoid of any facts concerning when any of the claims accrued. Plaintiffs assert that "[t]he Government's anticipatory repudiation constitutes a breach of each plaintiff's contract as of the date of Government performance required by each contract, i.e., the date that each plaintiff would terminate its contract but for the Government's repudiation." Complaint ¶ 51 (emphasis added). The complaint provides no clue, however, about when any plaintiff "would terminate" its contract. Moreover, although we agree that a claim would accrue if and when the Government was required to perform but failed to do so, the "date of Government performance required by each contract" is not so nebulous as "the date that each plaintiff would terminate its contract." Rather, as the Supreme Court held in a case virtually identical to this one, a breach or a taking only occurs "when a borrower tenders prepayment and the Government then dishonors its obligation to accept the tender and release its control over use of the property that secured the loan." Franconia Associates v. United States, 536 U.S. 129, 133 (2002).[6]

[6] Although the Supreme Court's analysis of the statute of limitations issue focused upon the breach of contract claims, the Court reached the same conclusion with respect to the takings claims, stating:

(continued...)

The complaint does not allege that any particular plaintiff has actually tendered payment; it merely alleges, in general terms, that some plaintiffs have submitted applications for prepayment which the Government did not accept, and that some have not submitted such applications. Complaint ¶ 42. The complaint does not state which plaintiffs submitted applications, when they were submitted, or when the Government rejected them. Even assuming that an actual tender by a plaintiff and rejection by the Government is not essential in a claim based solely upon an anticipatory repudiation,[7] Franconia leaves no room for doubt that, once an

---

[6](...continued)

> [W]e need not separately address petitioners' alternative theory of recovery based on the Takings Clause of the Fifth Amendment. The Federal Circuit's holding that takings relief was time barred hinged entirely on its conclusion that petitioners' contract claims accrued upon passage of ELIHPA. See 240 F.3d, at 1365-1366. Because that conclusion was incorrect, we hold, the Federal Circuit erred in dismissing petitioners' takings theory on grounds of untimeliness.

536 U.S. at 149. One must also keep in mind that, in referring to an "obligation to accept the tender," the Supreme Court was not addressing the merits of the claim. The merits – including the question whether ELIHPA was inconsistent with any contractual rights – were not before the Supreme Court, and were not decided by that court. The only question before the Supreme Court was whether the action was barred by the statute of limitations, as the Government had contended in its motion to dismiss, and the Court assumed the allegations of the complaint to be true for purposes of deciding that question. For the same purposes, the Courts assumed that plaintiffs' contractual rights were what plaintiffs alleged them to be. The Supreme Court was careful, however, to describe these as alleged rights. Thus, the Court stated: "Accepting for purposes of this decision that the loan contracts guaranteed the absolute prepayment right petitioners allege, we reverse the Federal Circuit's judgment," 536 U.S. at 133; "[for purposes of this case, the United States agrees, it may be assumed that petitioners obtained precisely the promise they allege – a promise that permits them an unfettered right to prepay their mortgages any time over the life of the loans, " id. at 141; "[t]he Federal Circuit, we are persuaded, incorrectly characterized the performance allegedly due from the Government under the promissory notes," id. at 142 (emphasis added).

[7] Plaintiffs do not allege that any performance was required of the Government other than acceptance of prepayment; yet, prepayment cannot be accepted if it has not been tendered. Therefore, the claim of any plaintiff who has not tendered prepayment must rest entirely upon the (continued...)

actual tender of prepayment has been made and rejected, the claim has accrued and the statute of limitations has begun to run. Yet, for all that one can discern from the complaint, almost all of the plaintiffs may have tendered prepayment or applied to prepay, and all of these tenders or applications may have been rejected, before September 30, 1997 – more than six years before the complaint was filed, but long after ELIHPA and the 1992 Act came into effect.

Further, although the complaint alleges that various other events occurred as a result of this legislation – such as certain plaintiffs contacting FmHA officials concerning prepayment and being advised by these officials that prepayment would not be accepted – Complaint ¶ 43, plaintiffs do not state when any of these events occurred. In fact, although the complaint sets forth in detail the chronology of the legislation at issue – all of which was enacted by 1992 – the complaint does not state when any of the other events underlying plaintiffs' claims occurred, and does not indicate that any of these events occurred on or after September 30, 1997.

Thus, even if all of the factual allegations contained in the complaint are taken as true, these allegations provide no indication that the complaint was "filed within six years after [plaintiffs']claim[s] first accrue[d]." 28 U.S.C. § 2501. Therefore, plaintiffs have not carried their burden to plead the requisite jurisdictional facts. See Kokkonen, 511 U.S. at 377; McNutt, 298 U.S. at 189; Brown, 42 Fed. Cl. at 556.

---

[7](...continued)
repudiation that ELIHPA and the 1992 Act allegedly constituted, and not upon any actual breach.

## II. The Government Actions Alleged Did Not Constitute a Breach of Contract

### A. The Contracts in Question Did Not Create an Absolute, Unfettered Prepayment Right

As the Federal Circuit has observed, "[w]hat was required by way of contract performance turns on contract interpretation, which is an issue of law." Gilbert v. Department of Justice, 334 F.3d 1065, 1071-72 (Fed. Cir. 2003); accord P.J. Maffei Bldg. Wrecking Corp. v. United States, 732 F.2d 913, 916 (Fed. Cir. 1984). Plaintiffs' claims in this case are based upon an interpretation of the contract that cannot be sustained.

The prepayment right claimed by plaintiffs is based upon a provision contained in the relevant promissory notes, stating: "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower." Complaint ¶ 18. The phrase "at any time," however, does not necessarily mean "under any circumstances." See In re Brown, 293 B.R. 865, 870 (Bankr. W.D. Mich. 2003) ( "the statutory phrase 'at any time' [in 11 U.S.C.A. § 706(a),] does not necessarily mean 'under any circumstances'"), citing In re Ponzini,, 277 B.R. 399, 404 (Bankr. E.D. Ark. 2002). Indeed, if the provision permitting prepayment "at any time" were construed as literally and simplistically as plaintiffs suggest, it would permit borrowers to prepay immediately after completion of construction and before any units have been leased. The result would be that the project would provide no affordable housing at all, even though providing affordable housing was the Government's sole purpose in making the loan.[8] And, although prepayment after an interval of providing affordable housing would not necessarily

[8] This could not occur in the case of loans made after December 21, 1979, because the terms of these loans required borrowers to maintain the low-income affordability of the housing for a 15 or 20 year period following the date of the loan. Complaint ¶¶ 7-8. However, the language contained in the prepayment clause upon which plaintiffs rely cannot mean one thing for pre-December 21, 1979 loans and something else for post-December 21, 1979 loans.

undermine the purpose of these loans, it would undermine that purpose under certain circumstances – particularly if prepayment would result in dislocation of low and moderate income tenants. This is because the intent of the section 515 program was to promote the development of affordable rental housing in a manner that would prevent, rather than create, such dislocation.

The section 515 program was initially enacted as part of the Senior Citizens Housing Act of 1962, Pub. L. No. 87-723, 76 Stat. 670 (1962). The title sentence of this legislation describes it as an Act "to amend title V of the Housing Act of 1949, in order to provide low and moderate cost housing, both urban and rural, for the elderly." Id. Among the congressional findings stated in this Act was a finding that "older citizens face special problems in meeting their housing needs because of the prevalence of modest and limited incomes among the elderly . . . ." Id. More specifically, Congress sought to address the housing needs of the rural modest income elderly in a manner that would permit them to remain in their communities. Thus, after noting that housing suitable for this population might be available in urban areas, the Senate Committee on Banking and Currency observed: "But to expect elderly people who have spent their lives on farms or in small villages to move away from their relatives, neighbors, churches, and other phases of the environment that has been an integral part of their lives would be a poor solution to their housing problems." S. Rep. No. 2049 (1962), reprinted in 1962 U.S.C.C.A.N. 2737, 2741.

The congressional goal of avoiding such dislocation would be undermined by prepayment and conversion of subsidized projects to market-rent conventional housing in communities lacking adequate alternative affordable housing. Neither the prepayment clause in the promissory notes, nor any other contract provision identified by plaintiffs, precludes regulation

of the prepayment process in order to prevent the purpose of the section 515 program from being undermined. In particular, none of these provisions states that the Government cannot take steps to protect tenants from the harm that might result from prepayment. Nothing in these provisions suggests that these steps may not include efforts to persuade the borrower voluntarily to keep the property in question in the section 515 program for a specified period of time, for example, by offering the borrower economic incentives to do so. Such efforts cannot in themselves be deemed a breach of contract. "Those who enter a contract may take steps at any time after its execution to modify it." General Dynamics Corp. v. United States, 214 Ct. Cl. 607, 617, 558 F.2d 985, 990 (1977); accord Alaska American Lumber Co., Inc. v. United States, 25 Cl. Ct. 518, 532 (1992); Montana Power Co. v. United States, 8 Cl. Ct. 730, 736 (1985).

Nor do plaintiffs cite anything in the contract purporting to limit the Government's power of eminent domain. Thus, in the absence of an agreement by the borrower to keep the property in the section 515 program, the Government could have exercised this power in order to protect tenants from the effect of an imminent prepayment, by taking the property (before or after prepayment), transferring it to a nonprofit organization that would operate the project for the benefit of eligible tenants, and compensating the borrower by paying fair market value for the property. Likewise, the contract documents do not preclude less coercive measures, such as the one actually involved here: advising borrowers that if prepayment would have specified adverse effects upon tenants, and if no agreement is reached to prevent these effects, then an offer to sell the property to a public or nonprofit organization for fair market value will be required as a

prerequisite to unconditional prepayment.[9] If no options had been made available, and if the Government had merely accepted prepayment and then immediately forced a sale of the property to a nonprofit organization for fair market value, there would clearly have been no breach of contract; at most, there would have been a taking of the property with just compensation, and, thus, no liability at all. See Cienega Gardens v. United States, 331 F.3d 1319, 1351 (Fed. Cir. 2003) ("the possibility of being forced to sell would actually offer ample compensation, rather than causing injury as the plaintiff suggested"). The fact that the Government did provide plaintiffs with additional options should not make it more liable than it would have been otherwise.[10]

---

[9] An owner's choice of one of these options, or the option of withdrawing a prepayment request, is voluntary, even if that owner did not want to sell the property but wanted to prepay without restrictions. That an action is taken only to avoid a lawful forced sale does not mean that the action is taken under duress. Beatty v. United States, 144 Ct. Cl. 203, 206, 168 F. Supp. 204 (1958). In Beatty, the plaintiffs argues that their ostensibly voluntary sale of their property to the Government occurred under duress, because the Government had threatened to take the property by condemnation. The Court rejected the argument, and observed:

> It is true that plaintiffs say that they were told that if they did not sell their properties to the Government at the appraised price, they would be condemned, and that in that event they would have to pay lawyer's fees, which would eat up the amount awarded them, and that it would take many years, perhaps as many as 25, for them to get any money out of it. That they were told that, if they did not sell, their property would be condemned, was not duress. This was a mere statement of the inevitable consequence of their refusal to sell. It was a frank statement of an intention to seek a remedy which the law gave. . . . .

144 Ct. Cl. at 206 (citations omitted).

[10] In fact, although plaintiffs characterize a sale under ELIHPA as a "forced sale," Complaint ¶¶ 36, 37, the borrow would never literally be "forced" to sell. Rather, the agency may "require the borrower . . . to offer to sell" the property to a nonprofit or public agency, 42 U.S.C. § 1472(c)(5)(A)(i), as a precondition to prepayment without restrictions. Nothing in the statute or its implementing regulations prevents a borrower from avoiding a sale at any time prior

(continued...)

Plaintiffs point to nothing in the contract documents precluding the Government from regulating the prepayment process in this manner. Indeed, plaintiffs' obliquely acknowledge that their right to terminate their obligations under the contracts through prepayment is not quite absolute. Thus, plaintiffs state that, in these contracts, "the Government agreed to allow plaintiffs to free themselves of FmHA's regulatory strictures in accordance with the contractual provisions of the Promissory Notes subject to FmHA's present regulations and to its future regulations not inconsistent with the express provisions of the Notes." Complaint ¶ 19 (emphasis added). Plaintiffs cite no express provision in the notes precluding the Government from seeking borrowers' agreement not to prepay, and from regulating the prepayment process to make such efforts possible, through requirements that give the Government an opportunity to provide incentives not to exercise the prepayment option. Regulation of this kind is not "inconsistent with the express provisions" of the notes, including the prepayment provision itself.

B. Under the Unmistakability Doctrine, the Contracts in Question Cannot Be Construed to Preclude Congress from Subjecting Prepayment to Conditions Such as Those Required by ELIHPA.

Even assuming that the contracts in question would not have permitted the FmHA to regulate the prepayment process upon its own initiative, these contracts cannot be construed to preclude Congress from mandating the protection of tenants from the effects of prepayment through legislation such as ELIHPA. Such an interpretation would be precluded by the unmistakability doctrine.

[10](...continued)
to the execution of a sale contract, simply by withdrawing from the prepayment process.

1. The Unmistakability Doctrine Applies Here

Under the unmistakability doctrine, a long-standing principle of contract interpretation, the Government does not surrender its sovereign power in entering into contracts, unless it does so in unmistakable terms. Bowen v. Public Agencies Opposed To Social Security Entrapment ("POSSE"), 477 U.S. 41 (1986). In other words, "sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148 (1982). Accordingly, the unmistakability doctrine dictates that a contract with a sovereign government "will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an act of Congress) . . . ." Winstar v. United States, 518 U.S. 839, 878 (1996). This doctrine applies here. And, under this doctrine, the contracts in question cannot be construed to preclude the legislation that caused the conduct alleged to constitute a breach of those contracts.

This Court has applied the unmistakability doctrine to claims that are indistinguishable from the claims in this case. See Franconia Associates v. United States, 43 Fed. Cl. 702, 713-15 (1999), aff'd on other grounds, 240 F.3d 1358 (Fed. Cir. 2001), rev'd on other grounds, 536 U.S. 129 (2002); Adam v. United States, 42 Fed. Cl. 463, 477-485 (1998); accord Parkridge Investors, Ltd. v. Farmers Home Administration, 13 F.3d 1192, 1198 (8th Cir. 1994). A number of other decisions involving such claims are to the contrary. See Kimberly Associates v. United States, 261 F.3d 864 (9th Cir. 2001); Grass Valley Terrace v. United States, 51 Fed. Cl. 436 (2002). The reasoning in the latter cases, however, is flawed. These cases, in effect, merge the unmistakability doctrine into the sovereign acts defense, leaving the former available only when

the latter is available. Yet, the unmistakability doctrine and sovereign acts defense, while related, are independent. The sovereign acts defense is an affirmative defense under which the United States, when sued as a contractor, "cannot be liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." Horowitz v. United States, 267 U.S. 458, 461 (1925). No controlling authority holds, however, that the same "public and general acts" that are required for this defense are also required for the unmistakability doctrine to apply.

Indeed, although the Winstar plurality opinion refused to apply the doctrine, a majority of the justices in that case found the unmistakability doctrine applicable, without regard to whether the Government action involved in that case constituted a "public and general act" protected by the sovereign acts defense.[11] When this Court applied the unmistakability doctrine to the section 515 loan agreements in Franconia, it dissected the various Winstar opinions, and correctly found that the "controlling holding on the doctrine" was that articulated by the majority

---

[11] Chief Justice Rehnquist, joined by Justice Ginsburg in dissent, found the unmistakability doctrine to be applicable and to bar the claims in question, without discussing whether the Government action in question – enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 – met the "public and general" test. After reaching this conclusion, the dissenting opinion separately addressed the sovereign acts doctrine, and, in that context, opined that FIRREA was indeed public and general. Justice Scalia, in a concurring opinion joined by Justices Kennedy and Thomas, found that the unmistakability doctrine applied, but that the the requisite unmistakable promise was present. Although Justice Scalia generically characterized "enactment and implementation of provisions of FIRREA" as a "sovereign act," id. at 920, he did not discuss whether FIRREA was "public and general" at all, much less sufficiently public and general to qualify for the sovereign acts defense. (Indeed, he expressed no disagreement with the plurality's conclusion that FIRREA was not sufficiently public and general to qualify for the sovereign acts defense.) Rather, the concurrence's "sovereign act" characterization appears to have been based upon the legislative and regulatory nature of the referenced acts, not their public and general nature. Neither the concurrence not the dissent suggested that the "public and general" test was applicable to the unmistakability doctrine.

of the Court in finding that the unmistakability doctrine "must be used in interpreting all government contracts." 43 Fed. Cl. at 714. Likewise, in Adams, the Court thoroughly analyzed the discussion of the unmistakability doctrine contained in the various Winstar opinions, and determined that five justices believed that the doctrine "applies even if the contract can be reasonably construed as a risk-shifting agreement and the enforcement of the agreement would not effectively bar the exercise of a sovereign power." 42 Fed. Cl. at 482-83. Accordingly, the Court applied the unmistakability doctrine to determine whether the FmHA loan prepayment provisions contained an unmistakable promise precluding the Government from exercising its sovereign power. Id.[12] Under the line of authority represented by Franconia, Adams, and a majority of the justices in Winstar, Government action need not qualify for the sovereign acts defense in order to constitute an exercise sovereign power protected by the unmistakability doctrine. This line of authority should be followed here.

Finally, even assuming that the sovereign acts doctrine and the unmistakability doctrine are closely linked, and that the applicability of the latter to legislation depends upon the nature and purpose of the legislation, the unmistakability doctrine still applies here. If ELIHPA was too directly related to section 515 loans to constitute a "public and general" act for purposes of the sovereign acts defense, the statute's purpose was nevertheless sufficiently public, and sufficiently

[12] The Federal Circuit has similarly assessed the impact of the various Winstar opinions on the applicability of the unmistakability doctrine. In Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1578-79 (Fed. Cir. 1997), cert. denied, 524 U.S. 951 (1998), the appellate court applied the unmistakability doctrine to a challenge to application of a special decommissioning assessment to prior purchasers of enriched uranium. The Court stated that application of the doctrine under those circumstances "respect[ed] the views of the five [Winstar] justices who stated that the application of the doctrine is unrelated to the nature of the underlying contracts." Id. at 1579. Moreover, the court considered the sovereign acts defense and the unmistakability doctrine separately.

distinct from the Government's proprietary interests, to qualify the legislation an exercise of sovereign power for purposes of the unmistakability doctrine.

This is evident from a comparison of ELIHPA to the legislation involved in Cuyahoga Metropolitan Housing Authority v. United States, 57 Fed. Cl. 751 (2003), the most recent decision of this Court adopting the view that the unmistakability and sovereign acts doctrines intersect. In Cuyahoga, the plaintiff housing authority alleged that the Government breached Housing Assistance Payments ("HAP") contracts with the Department of Housing and Urban Development ("HUD") under the Section 8 housing program, see 42 U.S.C. § 1437f, through legislation limiting owners' rights to automatic annual rent adjustments required by the HAP contracts. The Court concluded that the legislation was inconsistent with the language of the HAP contracts. The Court then addressed the Government's argument that, under the unmistakability doctrine, the Government reserved the right to amend the statute in this manner. The Court reviewed the history of cases through which this doctrine developed, and distilled from these cases a set of principles which the Court summarized as follows:

> [A]t least in the context of legislation, the unmistakability doctrine applies only when the Congress invokes one of the sovereign powers protected by the doctrine . . . . Winstar, as well as its progenitors and progeny, teach that the orbit of this doctrine significantly intersects that of the sovereign acts doctrine – both apply when the Congress acts to protect public safety, morals or the economy; neither applies when the Congress instead targets the government's contractual obligations in an effort to obtain a better deal. . . . .

Id. at 774. Applying these principles to the facts before it, the Court held that the unmistakability doctrine was unavailable, explaining:

> In passing the 1994 amendments, the Congress did not act to protect public safety, morals or the economy, through the exercise, for example, of its police powers. Rather, in an appropriations measure, it deliberately targeted,

> at HUD's behest, that agency's contractual obligations under preexisting HAP contracts in an effort to reduce outlays under the Section 8 program. . . .

Id. at 777 (emphasis added).

Assuming that this reasoning is correct, the legislation involved in this case did not have either the purpose or the effect of reducing Government outlays. It did the opposite. To the extent that ELIHPA limited borrowers' ability to prepay their loans, it ensured the continuation of program subsidies, which would be terminated upon prepayment. And, the stated purpose of ELIHPA and other congressional efforts to regulate the prepayment process was not to reduce program costs, but to protect low income tenants from displacement.

Thus, in explaining the first such legislative effort (the Housing and Community Development Amendments of 1979, Pub. L. No. 96-153, 93 Stat. 1101 (1979)), the House Banking, Finance and Urban Affairs Committee stated:

> The Committee took these actions because it believes that the current procedures being followed by the [Agriculture] Department are in direct conflict with the intent of the statutes creating the section 514 and 515 programs. It was the clear intent of Congress that these projects be available to low and moderate income families for the entire original term of the loan. . . . In permitting prepayment and refinancing the Congress never intended that the basic purpose of the program be frustrated. The committee has taken care to maintain the ability of a borrower to prepay or refinance the loan; it has only acted to assure that the housing continues to be available for the important public purpose for which it was financed. Therefore, the Committee believes its actions are both responsible and compelled by an overwhelming public interest.

H. Rep. No. 96-154, at 43 (1979), reprinted in 1979 U.S.C.C.A.N. 2317, 2359 (emphasis added).

In 1987, the same House Committee discussed the developments in the intervening years which led to the adoption of the bill that became ELIHPA. The Committee stated that it "became seriously concerned about the loss of the federally assisted stock of housing to low income

families, including the elderly, under programs of HUD and the U.S. Department of Agriculture." H. Rep. No. 100-122(I), at 53 (1987), reprinted in 1987 U.S.C.C.A.N. 3317, 3369. The Committee identified an accelerating rate of prepayments of section 515 loans as a principal reason for this loss of low-income housing, and concluded: "The facts clearly indicate to the Committee that elderly and low-income tenants have no alternative but to be thrown in the street without further action by the Congress." H. Rep. No. 100-122(I), at 54 , reprinted in 1987 U.S.C.C.A.N. at 3370 (emphasis added).

Finally, the purpose of ELIHPA, and the findings upon which ELIHPA was based, are stated in section 202 of the statute itself:

> (a) FINDINGS. -- The Congress finds that –
>
> * * *
>
> (3) some 150,000 units of rural low income housing financed under section 515 of the Housing Act of 1949 are threatened with loss as a result of the prepayment of mortgages by owners;
>
> (4) the loss of this privately owned and federally assisted housing, which would occur in a period of sharply rising rents on unassisted housing and extremely low production of additional low rent housing, would inflict unacceptable harm on current tenants and would precipitate a grave national crisis in the supply of low income housing . . . ;
>
> (5) the loss of this affordable housing . . . would irreparably damage hard-won progress toward such important and long-established national objectives . . . .
>
> * * *
>
> (10) until the Congress can act on recommendations that will emerge from [a review of alternative responses], interim measures are needed to avoid the irreplaceable loss of low income housing and irrevocable displacement of current tenants.
>
> (b) PURPOSE. -- It is the purpose of this title –

(1) to preserve and retain to the maximum extent practicable as housing affordable to low income families or persons those privately owned dwelling units that were produced for such purpose with Federal assistance;

(2) to minimize the involuntary displacement of tenants currently residing in such housing; . . . .

* * *

Pub. L. No. 100-242, § 202(b), codified at 12 U.S.C. § 1715l note (emphasis added).

In terms of the standard articulated by this Court in Cuyahoga, it is plain from this legislative history and from the quoted statement of congressional findings and statutory purpose that ELIHPA was an effort by Congress "to protect public safety, morals or the economy;" not "an effort to obtain a better deal." 57 Fed. Cl. at 774. Nor is this a case of "target[ing] the government's contractual obligations . . . ." Id. It is true that the property owners affected by this legislation were those who had received federally subsidized loans, not property owners generally. The socio-economic problem that confronted Congress, however, was one that existed specifically in housing financed by federally-subsidized loans. This was the housing that was leaving the affordable housing market at an accelerating pace, through prepayment, and the tenants of this housing were the ones threatened with displacement.

We are aware of no case holding that the sovereign powers protected by the unmistakability doctrine do not include the power to ensure that the poor people have decent housing.[13] Nor do the cases hold that the exercise of this power must be applied to a target

[13] Even protection of animal habitats has been held to constitute an exercise of sovereign power. In Croman v. United States, 44 Fed. Cl. 796 (1999), the Court held that the sovereign acts doctrine was applicable to preclude a timber purchaser's breach of contract claim for damages suffered as a result of Forest Service's suspension of timber operations when a bird species affected by the sale was listed as an endangered species. The Court subsequently reconsidered and held that the sovereign acts doctrine was not available as a defense because "the (continued...)

broader than the source of the problem to be addressed. The fact that the source of the problem addressed by ELIHPA was the segment of the low income housing market that was abandoning that market though prepayment, and that ELIHPA addressed this source, does not mean that the enactment and implementation of ELIHPA were any less sovereign than they would have been if their target had been broader. These actions were exercises of sovereign power, and were thus subject to the unmistakability doctrine.

2. The Contracts in Question Did Not Surrender the Government's Power to Amend the Applicable Statute in Order to Prevent Displacement of Tenants

Plaintiffs point to no language in the loan documents at issue here containing an unmistakable promise to insulate plaintiffs from the effects of future legislation, or otherwise surrendering the Government's power to amend the applicable statute, through legislation such as ELIHPA, in order to prevent displacement of tenants. Further, this Court has specifically held that the FmHA loan documents utilized in the section 515 loans did not contain an unmistakable promise to insulate plaintiffs from the effects of future legislation. Franconia, 43 Fed. Cl. at 714. The Court then found that the language addressing prepayments contained no unmistakable language "that waives the government's right to modify the prepayment terms through future legislation." Id. The Court further found that the language in the plaintiffs' notes

[13](...continued)
risk of 'acts of Government' was addressed and allocated by the contract . . . ." Croman v. United States, 49 Fed. Cl. 776, 782 (2001). The court did not, however, withdraw its conclusion that the Government's actions to protect the birds in question constituted sovereign acts. If sovereign power extends to protecting the habitat of birds, then it certainly extends to protecting the habitat of low income people.

addressing future regulations did not apply to the effects of subsequent legislation. Id., citing Parkridge, 13 F.3d at 1198.[14] This Court explained:

> From the plain words of the contract, we must conclude that this clause protects the contract from subsequent changes by the Farmers Home Administration. We cannot conclude however, that this protection extends to future changes in law by Congress. Indeed, under the unmistakability doctrine, such an expansion of a contractual clause is prohibited.

43 Fed. Cl. at 715 (emphasis added). As the Eighth Circuit stated in Parkridge, future regulations "are not synonymous with future acts of Congress." 13 F.3d at 1198.

Similarly, in Adams and Grass Valley Terrace v. United States, 46 Fed. Cl. 629, 640 (2000) ("Grass Valley I"),[15] the Court found that the section 515 loan contract language was not an unmistakable promise that the prepayment terms of the plaintiffs' promissory notes would be shielded from future legislation. The Adams Court stated:

> The prepayment terms in the FHA contract do not constitute a promise by the government in unmistakable terms that it will not exercise its sovereign right to enact legislation to improve the section 515 program in order to promote the statutory purposes of the act, even if such legislation might frustrate future performance under the contract. . . .

42 Fed. Cl. at 483. The Adams Court also found that no provisions of the promissory note addressed the impact of future legislation, explaining, that the note term addressing future regulations did not address the effect of legislation. Id. at 485, citing Parkridge, 13 F.3d at 1198. See also Grass Valley I, 46 Fed. Cl. at 640 ("the Government did not promise in unmistakable

[14] The complaint in this case does not directly quote, but paraphrases, the language in the notes concerning future regulations. See Complaint ¶ 19.

[15] Although the Grass Valley Court later held that the unmistakability doctrine did not apply, it re-affirmed that if this doctrine did apply, no unmistakable promise existed. Grass Valley Terrace II, 51 Fed. Cl. at 436.

terms that it would not exercise its sovereign power to enact subsequent legislation to carry out the purpose of FHA loans").[16]

In sum, the complaint fails to identify an unmistakable promise surrendering the Government's power to amend the applicable statute, through legislation such as ELIHPA, to prevent the purpose of the section 515 program from being undermined, and applicable case law establishes that the section 515 loan contracts contain no such promise.

C. ELIHPA Did Not Repudiate the Contracts in Question

If the Government had truly promised immediately to accept all tenders of prepayment and immediately to release the borrower from all obligations with no questions asked – without even attempting to reach an agreement with the borrower that might protect low income tenants from displacement – then the enactment of ELIHPA would have constituted a repudiation of that promise. As we have demonstrated, however, the Government's promise was not so far reaching. The right to prepay at any time does not entail a promise to accept prepayment under any

---

[16] In both Franconia and Adams, the Court also distinguished section 515 contracts from the contracts at issue in Winstar. In Franconia, the Court noted that the Winstar concurrence had found an unmistakable promise, reasoning that the nature and "essential quid pro quo" of the Government promise in the three contracts at issue in Winstar was to regulate supervisory goodwill favorably in exchange for the savings and loan institutions' acquisition of failing thrifts. Id. at 715. In the case of section 515 loan contracts, however, the Court stated that the essence of the bargain "was for the borrower to receive a low-interest loan in exchange for agreeing to rent the property to low-income tenants," and that the prepayment provision therefore could not be the reason for, or constitute the nature of, the agreement. Id. Thus, the Court found that, unlike in the Winstar concurrence, the section 515 contracts contained no unmistakable promise concerning future regulatory action. In Adams, the Court noted that, unlike the Winstar agreements, holders of FmHA loans continued to derive value from the contracts even without an unfettered prepayment option. Id. at 485. Accordingly, reasoned the Court, the prepayment term of the section 515 promissory notes was not "'essential to the contract between the parties,'" and therefore the contracts were distinguishable from the contracts at issue in Winstar. Id., quoting Winstar, 518 U.S. at 909.

circumstances. As we have also demonstrated, ELIHPA did not abrogate the prepayment right itself. See Cienega Gardens, 331 F.3d at 1351 ("Under ELIHPA . . . , the FmHA was not prohibited from accepting prepayment"). The statute specifically recognizes the borrowers' right to prepay, and, for this very reason, requires the agency to attempt to avoid prepayment or its adverse consequences through agreements with borrowers. 42 U.S.C. § 1472(c)(4)(A), (B).

Even where such agreements cannot be reached, the statute does not preclude prepayment. True, it requires that the borrower first to offer the project in question for sale to a public agency or nonprofit entity at fair market value. 42 U.S.C. § 1472(c)(5)(A)(i). However, such a sale, if consummated, would render prepayment moot, and if there were no qualified offer to purchase within 180 days, the borrower would be able to prepay. 42 U.S.C. § 1472(c)(5)(A)(ii). In no event does ELIHPA compel a borrower to remain subject to section 515 loan obligations. Nor does it impose new obligations upon borrowers as a prerequisite to prepayment, with one exception. Rather, the statute requires the Government to take certain steps prior to accepting prepayment. ("Before accepting any offer to prepay . . . , the Secretary shall make reasonable efforts to enter into an agreement with the borrower . . . ." 42 U.S.C. § 1472(c)(4)(A).) The only provision in ELIHPA that imposes a prerequisite upon borrowers is the provision requiring an offer of sale to a nonprofit organization or public agency if agreement cannot be reached. As we have demonstrated, however, the prepayment clause in the note has nothing to do with this requirement. The Government could have required such a transfer for fair

market value under its power of eminent domain, to protect tenants from displacement, even if it had first accepted prepayment.[17]

Because ELIHPA did not repudiate plaintiffs' contracts, plaintiffs err in contending that a breach occurred as of "the date that each plaintiff would terminate its contract but for the Government's repudiation." Complaint ¶ 51 (emphasis added). Even if plaintiffs' interpretation of the contract is correct, a breach occurs only if and when performance becomes due but is denied – i.e., if and when prepayment is tendered and the Government fails to "accept the tender and release its control over use of the property that secured the loan." Franconia Associates v. United States, 536 U.S. at 133. Yet, the complaint does not allege that any particular plaintiff has actually tendered payment; it merely alleges, in general terms, that "certain plaintiffs have submitted applications for prepayment and/or an offer of incentives from the Government." Complaint ¶ 42 (emphasis added).

---

[17] It is also clear, from the legislative history, that Congress initially conceived of the sale of subsidized projects to nonprofit or public entities as the primary vehicle for protecting tenants from being displaced as a result of prepayment, and that the statute's provisions relating to agreements and incentives were added to provide options to owners wishing to avoid a sale. Thus, the pertinent House Conference Report states:

> The House amendment contained a provision . . . requiring owners of projects with contracts that were entered into prior to December 21, 1979, that are no longer willing to operate rural rental housing for low income use, to sell their projects, at fair market value, to a nonprofit or public agency. The conference report contains the House provision with an amendment to make the provision effective only after the Secretary offers owners the option to extend the housing's affordability restrictions in exchange for various incentives.

H.R. Conf. Rep. No. 100-426, at 198 (1987), reprinted in 1987 U.S.C.C.A.N. 3458, 3496 (emphasis added).

D. The Government's Alleged Actions In Implementing ELIHPA Did Not Breach the Contracts

For the same reasons that ELIHPA itself did not repudiate the contracts, the Government did not breach the contracts merely by complying with ELIHPA. Nor did the agency's implementing regulations, and the application of those regulations to the plaintiffs, breach the contracts. It is true that the regulations impose specific obligations upon borrowers as a prerequisite to prepayment, but, as we have established, the contracts do not preclude prerequisites that are based upon circumstances rather than time. Moreover, the prepayment prerequisites prescribed in the regulations are generally not substantive. Rather, they consist of an application process, in which the borrower must give notice to tenants of the intent to prepay, and provide the Government with information concerning the likely effect of prepayment upon tenants and other information relevant to determining what to offer the borrower as an incentive to remain in the section 515 program.

The only substantive prerequisite, which is applicable where no agreement with the borrower is achieved, is the requirement to offer to sell the housing in question to a nonprofit organization or public agency at a fair market value. Even assuming that, in cases where such an offer produces a sale, the resulting preemption of prepayment constitutes a technical breach, it is one that involves no economic harm to the borrower. And, where such an offer does not produce a qualified purchaser within 180 days, prepayment without restrictions is permitted. 42 U.S.C. § 1472(c)(5)(A)(ii). In such a case, there is, at most, a brief delay in the Government's performance of the contractual obligation under plaintiffs' interpretation of the contract. Such a delay cannot be considered a material breach. See Cienega Gardens, 331 F.3d at 1351 (characterizing this delay as "minor and short-term").

Finally, even if such a delay would constitute a material breach, the complaint fails to allege that any plaintiff actually offered to sell any of the projects in question pursuant to section 1472(c)(5)(A)(i). For all that one can discern from the complaint, every plaintiff who was interested in prepayment opted instead to seek incentives under section 1472(c)(4)(B). As we have demonstrated, the contract does not preclude the Government from offering incentives to induce borrowers to remain in the section 515 program. The allegations in the complaint, therefore, fall short of describing a breach of contract.

## III. The Alleged Governmental Actions Did Not Constitute an Uncompensated Taking

### A. Government Infringement of a Right Arising from a Government Contract Is Not Actionable under the Takings Clause

The rights alleged to have been infringed by the Government were plaintiffs' right, under the applicable promissory notes, to prepay their FmHA loans. This is a right arising from a contract between plaintiffs and the Government. Although plaintiffs frame their action in terms of a taking of their housing projects through restrictions upon the use of these projects, Complaint ¶ 41, the restrictions themselves were not unilaterally imposed upon plaintiffs by the Government, but were agreed to by plaintiffs in return for subsidized FmHA loans. Plaintiffs agreed to comply with these restrictions as long as any portion of their loans remained unpaid. If plaintiffs possessed a right to terminate these restrictions by prepaying their loans, then that right was based strictly upon the terms of the promissory notes, and was thus a contract right. If the contracts required the Government to accept prepayments offered by plaintiffs under the circumstances involved here and the Government refused to do so, then the contract was breached. If the contracts did not require the Government to accept prepayment under these

circumstances, then there was not only no breach of contract, but also no taking. Plaintiffs' rights as owners of the properties in question did not, after all, include a right to use the property in a manner prohibited by valid and existing contracts signed by the owners.

Under these circumstances, plaintiffs cannot maintain a takings claim. "[T]he concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract." Sun Oil Co. v. United States, 215 Ct. Cl. 716, 572 F.2d 786, 818 (1978). Remedies for alleged infringement of any contractually-established rights generally lie in contract, not the Fifth Amendment. Id.; accord Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001); Baggett Transportation Co. v. United States, 969 F.2d 1028, 1034 (Fed. Cir. 1992); Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 656 (2003); Home Sav. of Am., F.S.B. v. United States, 51 Fed. Cl. 487, 494 (2002); Scan-Tech Sec., L.P. v. United States, 46 Fed. Cl. 326, 342 (2000).[18] Although rights existing independently of a contract are not necessarily restricted to contractual remedies, see Integrated Logistics Support Sys. Int'l, Inc. v. United States, 42 Fed. Cl. 30, 34-35 (1998), such rights cannot give rise to a takings claim if the

---

[18] The Federal Circuit has recently rejected a takings claim based upon an alleged infringement of a Winstar-related contract in Castle v. United States, 301 F.3d 1328, 1342 (Fed. Cir. 2002). The appellate court agreed with this Court's reasoning that a contract entitles a party to performance or to seek contract damages, and that, therefore, there can be no taking of a contract where the party alleging the taking retains the remedies available for a breach of the contract. Here, contract damages are available to plaintiffs if the Court concludes that the Government's actions constituted a breach of the prepayment clause contained in the promissory notes. And, if the Court concludes that the Government's actions did not breach that clause, then these actions were within the Government's contractual rights against the plaintiffs, and, as such, could not have constituted a taking.

claim depends upon rights and obligations created by a contract with the Government. Commonwealth Edison, 56 Fed. Cl. at 656.

Plaintiffs cannot rely upon the Federal Circuit's recent decisions in Chancellor Manor v. United States, 331 F.3d 891 (Fed. Cir. 2003), and Cienega Gardens, to support an argument that the Government effected a taking of a property interest independent of the contract right alleged to have been breached. It is true that in those cases, the Federal Circuit treated the Government's denial of the plaintiffs' right to prepay their loans as a taking. Those cases, however, involved HUD-insured loans issued by private lenders. Because the Government was not the lender, the court held that the plaintiffs could not maintain a breach of contract claim for lack of privity, but that the Government's denial of the plaintiffs' right to prepay the loan might constitute a taking.[19] Here, the asserted right to prepay arose from a contract with the Government, and was stated in notes issued to the Government.

Further, the reasoning of the Supreme Court in Franconia (which involved the same breach of contract and takings theories as in this case) confirms that plaintiffs' takings claims depend upon their breach of contract claims. The Supreme Court focused upon the breach of contract claims in addressing the statute of limitations issue, but reached the same conclusion with respect to the takings claims without any separate analysis. The Court observed:

> [We need not separately address petitioners' alternative theory of recovery based on the Takings Clause of the Fifth Amendment. The Federal Circuit's holding that takings relief was time barred hinged entirely on its conclusion that petitioners' contract claims accrued upon passage of

[19] In Cienega Gardens, the court held that a taking had occurred in the case of several plaintiffs as to whom a sufficient evidentiary record had been developed. In Chancellor Manor, the court merely held that the trial court should not have granted summary judgment rejecting the plaintiffs' takings claim based upon the record developed.

> ELIHPA. See 240 F.3d, at 1365-1366. Because that conclusion was incorrect, we hold, the Federal Circuit erred in dismissing petitioners' takings theory on grounds of untimeliness.

536 U.S. at 149. (Because the statute of limitations was the only issue, the Court did not address whether a takings claim could be maintained based upon an infringement of a right arising from a Government contract.) Implicit in the quoted statement is the assumption that the takings claim could not have accrued before the breach of contract claim; yet, this assumption could not have been made if there were a basis for the takings claim independent of the contract claim.

Finally, the Government actions of which plaintiffs complain simply did not interfere with plaintiffs' use of their real property; rather, these actions addressed plaintiffs' prepayment right. These actions affected plaintiffs' use of their real property only to the extent that they limited plaintiffs' ability to terminate existing contractual restrictions upon the use of their real property, through prepayment. If this limitation violated any right, it was a contract right, and the remedy, if any, is for breach of contract.

### B. The Government Did Not Effect an Uncompensated Taking under The Penn Central Test

Assuming that plaintiffs' takings claims are not precluded by their dependence upon their contracts with the Government, they should nevertheless be rejected. The Supreme Court has identified several factors to be utilized in assessing whether Government regulatory action effects a taking under the Fifth Amendment. These factors include: (1) the extent to which the regulation has interfered with distinct investment-backed expectations; (2) the economic impact of the regulation upon the claimant; and (3) the character of the governmental action. Penn Central Transportation Co. v. New York City, 438 U.S. 104, 124 (1978). As a matter of law, plaintiffs cannot established a taking based upon these factors.

1. The Government's Actions Did Not Interfere with Reasonable Investment-backed Expectations

The absence of a reasonable investment-backed expectations concerning the allegedly-invaded property interest can itself be a sufficient basis for denying a takings claim. See California Housing Sec., Inc. v. United States, 959 F.2d 955, 958 (Fed. Cir. 1992) (dismissing takings claim of savings and loan institution because institution had "voluntarily subjected itself to an expansive statutory regulatory system," and, therefore, could not have developed a "historically rooted expectation of compensation" for seizure of institution pursuant to that regulatory scheme); accord Golden Pac. Bancorp v. United States, 15 F.3d 1066, 1073-74 (Fed. Cir.1994).

In Parkridge, the Eighth Circuit had held that the ELIHPA restrictions upon prepayment of section 515 loans did not constitute a taking of plaintiff's property under the Fifth Amendment. 13 F.3d at 1198-99. Assessing the borrower’s investment-backed expectations, the court had reasoned that "it was foreseeable that the government might impair the partnership’s contractual options in order to prevent the program's purposes from being foiled. Therefore, we cannot agree that Parkridge’s expectation of a continued, unrestricted right to prepay was 'reasonable.'" Id. Accordingly, the Court concluded, no compensable taking had occurred.

In Cienega Gardens, the Federal Circuit faulted the trial court for relying upon Parkridge to reject a takings claim involving HUD-insured private loans. The Federal Circuit distinguished Parkridge, upon the ground, among others, that "in Parkridge, the plaintiff's mortgage loan was directly from the FmHA, not from a private lender under a separate contract." 331 F.3d at 1351. This case – like Parkridge and unlike Cienega Gardens – involves direct loans from FmHA. With respect to the Government's argument that there could be no investment-backed expectations of being free from the challenged restrictions in view of the highly regulated nature of the field involved, the Federal Circuit noted that "the field of private mortgage lending is one which

cannot be considered highly regulated." Id. at n.45. This case, however, involves direct Government lending, not private mortgage lending.

2. The Economic Impact of the Government's Action Was Not Sufficient to Constitute a Taking

The economic impact of which plaintiffs complain consists of the effects of being unable to leave the section 515 program. Complaint ¶¶ 46-49. As we have demonstrated, however, none of the plaintiffs has been forced to remain in the program. First, plaintiffs have been, and still are, able to free themselves of the program's restrictions by offering their properties for sale to a public or nonprofit organization. 42 U.S.C. § 1472(c)(5)(A)(i); 7 C.F.R. § 1965.216. Second, where housing opportunities for minorities would not be materially affected by prepayment, plaintiffs have the option of prepaying as long as they agree not to raise rents to force out current tenants. 42 U.S.C. § 1472(c)(5)(G)(ii)(I); 7 C.F.R. § 1965.215(c)(1)(ii). Third, whenever it can be established that housing opportunities for minorities would not be materially affected by prepayment and that the tenants either would not be displaced by prepayment or there is an adequate supply of affordable housing in the market area available to displaced tenants, plaintiffs can prepay without restrictions and without any prior offer to sell to a public or nonprofit organization. 42 U.S.C. § 1472(c)(5)(G)(ii)(II); 7 C.F.R. § 1965.215(c)(1)(iii).

Finally, the fact that plaintiffs have always had the option of selling their properties to a public or nonprofit entity for market value in itself defeats plaintiffs' economic impact argument. Pursuant to 7 C.F.R. § 1965.216, such a sale must be for "fair market value of the project as unsubsidized conventional housing," as determined based upon appraisal by two appraisers, one chosen by the owner and one by the Government (and a third appraiser chosen by the first two in case of significant disagreement). If plaintiffs can sell their properties for their full market value under the ELIHPA restrictions, then the restrictions have not decreased the value of the property

at all and have had no adverse economic impact upon plaintiffs. And, if plaintiffs do not succeed in their attempt to find a qualified purchaser at fair market value, then they will be permitted to prepay without restrictions, and the value of the property at that point will be the same as it would have been if there had never been any restrictions. Thus, the Government's actions cannot have caused any significant decrease in the value of plaintiffs' property.

3. The Character of the Government's Actions Does Not Indicate a Taking

In distinguishing the ELIHPA prepayment restrictions relating to FmHA loans under section 515 – which were held not to constitute a taking in Parkridge – from those pertaining to HUD-insured loans involved in Cienega Gardens, the Federal Circuit stated:

> Under ELIHPA . . . , the FmHA was not prohibited from accepting prepayment; rather the FmHA could "accept prepayment only at the end of an intricate, six-month-long (or longer) procedure," and the party desiring to prepay could be forced to sell the property instead if a willing non-profit or public agency offered to buy the property at market value. Id. While this six-month delay undoubtedly caused some inconvenience to the Parkridge plaintiff, the economic effect was minor and short-term. Here, the effect was major and the deferral was for up to twenty years. . . . Moreover, the possibility of being forced to sell would actually offer ample compensation, rather than causing injury as the plaintiff suggested. . . .

331 F. 3d at 1351 (emphasis added), quoting Parkridge, 13 F.3d at 1195.

Further, the Government actions involved here cannot be characterized as "forcing some owners to keep accepting below-market rents, " Cienega Gardens, 331 F.3d at 1319, because all owners can free themselves of this burden by offering to sell their properties to a nonprofit organization or public agency at a fair market value, pursuant to 42 U.S.C. § 1472(c)(5)(A)(i). Such a course would enable the owner to either to obtain the value of the property appraised as a conventional property, or, in the absence of a purchaser, to prepay with no restrictions. If the sale were consummated, the owner could, if he wished, reinvest the proceeds in a conventional

housing project, at which market rents could be charged. If there were no offer to purchase, the owner would be free to charge market rents at the same property, after prepaying the loan.

Finally, the danger sought to be averted by the challenged prepayment restrictions is the danger of displacement of low-income tenants residing in subsidized housing. This danger arose because in the section 515 program sought to prepay their loans in order to raise rents. The limited regulation of the prepayment process under ELIHPA was narrowly tailored to protect tenants whose housing was endangered by the prospect of prepayment, while also protecting the economic interests of borrowers. Under these circumstances, the character of this legislation does not support a takings claim.

In sum, plaintiffs have only been prevented from converting section 515 housing to conventional, market-rent housing while the housing is occupied by tenants who cannot afford to pay market rents and there is an inadequate supply of affordable housing in the market area available to displaced tenants or housing opportunities for minorities would be materially affected, and there is a possibility of avoiding these problems at no cost to the plaintiffs through a sale of the property at fair market value to a public or nonprofit organization that would preserve the availability of the property to low-income tenants.

## CONCLUSION

For the foregoing reasons, plaintiffs' claims should be dismissed with prejudice.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

s/Shalom Brilliant
SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 305-7561
Facsimile: (202) 305-7643

Attorneys for Defendant

December 1, 2003