**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

A.F.T.E.R., Inc., *et al.*,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

**File No. 03-2264C**
**(Judge Braden)**

# PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Jeff H. Eckland
Attorney For Plaintiffs
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Telecopy: (612) 766-1600

Of Counsel:
Mark J. Blando
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Telecopy: (612) 766-1600

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................ iii

QUESTIONS PRESENTED ........................................ 1

STATEMENT OF THE CASE ........................................ 1

I. THE SECTION 515 PROGRAM AND THE TERMS OF THE PARTIES' CONTRACTS ........................................ 1

A. Restrictions Imposed On Owners While In The Section 515 Program ........................................ 1

B. The Termination Option ........................................ 2

II. SUBSEQUENT LEGISLATION ........................................ 5

A. The 1979 Legislation and its Repeal in 1980 ........................................ 5

B. The 1988 Legislation: ELIHPA ........................................ 6

C. The 1992 Legislation and its Implementing Regulations ........................................ 8

III. PLAINTIFFS' FRUSTRATED PREPAYMENT INTENTIONS AND DAMAGES ........................................ 8

ARGUMENT ........................................ 9

I. DEFENDANT'S FACIAL CHALLENGE TO PLAINTIFFS' ASSERTION OF SUBJECT MATTER JURISDICTION MUST BE DENIED. ........................................ 9

II. PLAINTIFFS HAVE STATED A VALID CLAIM FOR BREACH OF CONTRACT ........................................ 15

A. Defendant Has Not Met Its Burden To Establish That Plaintiffs Can Prove No Set of Facts In Support of Their Contract Claims That Would Entitle Them to Relief. ........................................ 15

1. For Purposes of Rule 12(b)(6), The Complaint Is Sufficient to Defeat Defendant's Characterization of Plaintiffs' Contract Rights. ........................................ 16

2. The 1988 And 1992 Legislation Amounted To A Repudiation Of Plaintiffs' Contracts. ........................................ 18

3. Having Repudiated Plaintiffs' Contracts, Defendant Is In No Position To Deny That It Committed A Breach. .................... 19

4. The Government's Power Of Eminent Domain Is Not A License To Breach Its Contracts. ................................................ 21

B. The Government Could Not, As A Matter Of Law, Impose Upon Plaintiffs New Conditions of Prepayment. ............................................. 23

1. The Unmistakability Doctrine, Which Protects The Government Only When It Is Acting In Its Sovereign Capacity, Is Inapplicable Here. .................................................. 23

2. The Court's Recent Decision In Cuyahoga Extinguishes Any Doubt As To The Applicability Of The Unmistakability Doctrine Here. ................................................. 27

3. The Contract Right Here At Issue Is Sufficiently "Unmistakable" To Satisfy The Unmistakability Doctrine In Any Event. ....................................................................... 32

III. PLAINTIFFS' TAKINGS CLAIMS PRESENT FACT ISSUES NOT PROPERLY ADDRESSED ON A RULE 12(B)(6) MOTION. .......................... 33

A. Plaintiffs' Takings Claims Are Independent From Their Contract Claims. ........................................................................... 33

B. Because Defendant's Penn Central Argument Requires the Court to Decide Disputed Facts, It Is Not Properly Considered Under Rule 12(b)(6). ....................................................................... 34

1. Plaintiffs Held A Reasonable Investment-Backed Expectation That They Would Be Able To Prepay And Leave The 515 Program. ........................................................ 35

2. The Economic Impact Of Plaintiffs' Inability To Prepay Without Restrictions And Convert To Market Rate Rents Is Severe. ........................................................................ 39

3. In forcing plaintiffs to continue the low-income use of their properties, the Government unfairly imposed on plaintiffs a burden that should be borne by the public generally. ................... 39

CONCLUSION ............................................................................................... 40

# TABLE OF AUTHORITIES

## Federal Cases

*Acme Inv., Inc. v. Southwest Tracor, Inc.*, 105 F.3d 412 (8th Cir. 1997) .................................. 12

*Adams v. United States*, 42 Fed. Cl. 463 (Fed. Cl. 1998)................................................ 24, 26

*Agins v. Tiburon*, 447 U.S. 255 (1980) .................................................................... 39

*Allenfield Assocs. v. United States*, 40 Fed. Cl. 471 (1998)................................................ 34

*American Heritage Bancorp v. United States*, 56 Fed. Cl. 596 (2003) ................................ 16

*Armstrong v. United States*, 364 U.S. 40 (1960) ........................................................ 40

*Beatty v. United States*, 168 F. Supp. 204 (Ct. Cl. 1958).................................................. 22

*Brown v. United States*, 42 Fed. Cl. 538 (1998) ........................................................... 11

*Buere'-Co v. United States*, 16 Cl. Ct. 42 (1988)........................................................... 12

*NRG Co. v. United States*, 24 Cl. Ct. 51 (1991) ........................................................... 36

*Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573 (Fed. Cir. 1993) ................................ 10

*Chancellor Manor v. United States*, 331 F.3d 891 (Fed. Cir. 2003) ................................ 33, 34

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) ............................................4, 22, 32, 33, 35, 36, 37, 38, 39, 40

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999)......................... 34

*Coast-to-Coast Fin. Corp. v. United States*, 45 Fed. Cl. 796 (2000).................................. 24, 26

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) ...................................... 16

*Conley v. Gibson,* 355 U.S. 41 (1957) ............................................................... 11, 13

*Conoco, Inc. v. United States*, 35 Fed. Cl. 209 (1996) ................................................ 24, 34

*Conti v. United States*, 291 F.3d 1334 (Fed. Cir. 2002)...................................................... 16

*Cuyahoga Metropolitan Housing Authority v. United States*,
57 Fed. Cl. 751 (2003) ........................................................... 20, 21, 22, 23, 27, 28, 29

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999) ............................................ 16, 18

*Devon Energy Corp. v. United States*, 45 Fed. Cl. 519 (1999) ............................................. 14

*Duquesne Light Co. v. Barasch*, 488 U.S. 299 (1989)....................39

*Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591 (1944)....................39

*Florida Rock Indus.Inc. v. United States*, 18 F.3d 1560 (Fed. Cir. 1994) .................... 38, 39, 40

*Franconia Assoc. v. United States*, 536 U.S. 129 (2002)....................12, 13, 15, 18, 19, 28

*General Dynamics v. United States*, 47 Fed. Cl. 514 (2000) ....................23, 25

*Grass Valley Terrace v. United States*, 51 Fed. Cl. 436 (2002) ....................2, 23, 24

*High Star Toys, Inc. v. United States*, 32 Fed. Cl. 176 (1994) ....................10

*Hohri v. United States*, 847 F.2d 779 (Fed. Cir. 1988)....................10

*Horowitz v. United States*, 267 U.S. 458 (1925) ....................23

*Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949)....................34

*Kimberly Associates v. United States*, 261 F.3d 864 (9th Cir. 2001) ....................24, 25

*Koby v. United States*, 53 Fed. Cl. 493 (2002) ....................20

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992).................... 33, 34, 40

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................10, 11

*Lujan v. National Wildlife Fed'n*, 497 U.S. 871 (1990) ....................11

*Marathon Oil Co. v. United States*, 177 F.3d 1331 (Fed. Cir. 1999)....................32

*McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178 (1936)....................11

*Mobil Oil v. United States*, 530 U.S. 604 (2000)....................15, 18, 19, 24, 32

*Nicholson v. United States*, 29 Fed. Cl. 180 (1993)....................17

*Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987)....................40

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001)....................12

*Parkridge Investors Ltd. Partnership v. Farmers Home Admin.*,
13 F.3d 1192 (8th Cir. 1994) ....................35

*Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104 (1978)....................40

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1992)....................34, 40

*Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed. Cl. 174 (1997)....................19

*Prudential Ins. Co. v. United States*, 801 F.2d 1295 (Fed. Cir. 1986)....................................34

*Resolution Trust Corp. v. FSLIC*, 34 F.3d 982 (10th Cir. 1994).............................................24

*Roehm v. Horst*, 178 U.S. 1 (1900).............................................................................................19

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) ....................................................................36

*Scheuer v. Rhodes*, 416 U.S. 232 (1974)................................................................... 10, 11, 16

*Simmons v. United States*, 53 Fed. Cl. 131 (2002) .....................................................................10

*Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725 (1997) .....................................................12

*United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed. Cir. 1990)..............................36, 37

*United States Trust Co. v. New Jersey*, 431 U.S. 1 (1977) ..........................................................33

*United States v. General Motors Corp.*, 323 U.S. 373 (1945) .......................................................34

*United States v. Westlands Water District*, 134 F. Supp. 2d 1111 (E.D. Cal. 2001)....................24

*United States v. Winstar Corp.*, 518 U.S. 839 (1996)...................................20, 25, 26, 28, 31, 32

*Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569 (Fed. Cir. 1997)...............................25

*Yee v. City of Escondido*, 503 U.S. 519 (1992) .............................................................................34

**State Cases**

*Foster v. Bartolomeo*, 581 N.E.2d 1033 (Mass. App. Ct. 1991) ..................................................12

**Federal Statutes**

125 Cong. Rec. 18204 (1979).........................................................................................................2

126 Cong. Rec. 22650 (1980)...............................................................................................29, 31

12 U.S.C. § 1715*l*..................................................................................................................6

12 U.S.C. § 4301(a)(1).............................................................................................................22

24 C.F.R. § 248.111(h).............................................................................................................22

24 C.F.R. § 248.157 .................................................................................................................22

28 U.S.C. §1491.......................................................................................................................14

28 U.S.C. § 2501......................................................................................................................14

28 U.S.C. §2501 .......... 14

42 U.S.C. § 1472 note .......... 6

42 U.S.C. § 1472(b)(3) .......... 4

42 U.S.C. § 1472(b)(4) .......... 3

42 U.S.C. § 1472(c)(4)(A) .......... 18, 30

42 U.S.C. § 1472(c)(5)(A) .......... 7

42 U.S.C. § 1472(c)(5)(A),(B) .......... 7

42 U.S.C. § 1472(c)(5)(A)(ii) .......... 7, 8

42 U.S.C. § 1472(c)(5)(G)(ii) .......... 8, 19

42 U.S.C. § 1485 .......... 1, 2

42 U.S.C.A. § 1437 (1994) .......... 30

42 U.S.C.A. § 1437f (1994) .......... 30

7 C.F.R. § 1822.95(c) (1978) .......... 3, 37

7 C.F.R. § 1865.2(c) (1979) .......... 4

7 C.F.R. § 1866.2 (1978) .......... 18

7 C.F.R. § 1965.90(c) (1983) .......... 37

Emergency Low Income Housing Preservation Act ("ELIHPA"), Pub. L. No. 100-242, tit. II, 101 Stat. 1877 (1988) ("the 1988 Legislation"), *codified in relevant part as amended at* 42 U.S.C. § 1472(c) .......... 6

H.R. Rep. No. 100-122(I), 100th Cong., 1st Sess. at 53 (1987), 1987 U.S.C.C.A.N. at 3369 .......... 2

H.R. Rep. No. 96-154, 96th Cong., 1st Sess. at 43 (1979), 1979 U.S.C.C.A.N. at 2359 .......... 5

Housing and Community Development Act of 1992, Pub. L. No. 102-550, §§ 2, 712, 106 Stat. 3681, 3841 (1992), *codified in relevant part at* 42 U.S.C. § 1472(c) .......... 8

Pub. L. No. 96-153, § 503, 93 Stat. 1134 (1979) .......... 5

**Articles, Books and Treatises**

A. Brownstein, *Constitutional Wish Granting and The Property Rights Genie*, 13 Const. Comm. 7 (Spring 1996) ........ 37

A. Corbin, *Corbin on Contracts* § 977 at 814 (Interim Edition 2002) ........ 12

*Black's Law Dictionary* 1306 (7th ed. 1999) ........ 18

*Corbin on Contracts* 923 (1964) ........ 20

Gifis, *Law Dictionary* 54 (3d ed. 1991) ........ 20

*Murray on Contracts* § 109(C) (3d ed. 1990) ........ 18

Restatement (Second) of Contracts ........ 12, 15, 20, 26, 18, 29, 32

*Williston on Contracts* (3d ed. 1968) ........ 19, 20

Plaintiffs respectfully submit this Opposition to Defendant's Motion to Dismiss. For each of the reasons set forth below, the motion fails as a matter of law under the standard of review applicable to motions brought pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims.

## QUESTIONS PRESENTED

(1) Whether plaintiffs' allegations are sufficient for the Court to exercise subject matter jurisdiction over their claims; (2) Whether the unmistakability doctrine applies in this case to immunize the government from any liability for breaching plaintiffs' contracts; (3) Whether plaintiffs have properly alleged claims for breach of contract; and (4) Whether plaintiffs have properly alleged, distinct from their claims for breach of contract, claims for Fifth Amendment takings of the properties.

## STATEMENT OF THE CASE

### I. THE SECTION 515 PROGRAM AND THE TERMS OF THE PARTIES' CONTRACTS

Beginning in the 1960s, Congress established several programs encouraging private citizens to construct and own federally assisted affordable housing units. *See* Belden & Wiener, HOUSING IN RURAL AMERICA 114 (1999). The Section 515 program at issue here was one such program. Section 515 of the Housing Act of 1949 (codified at 42 U.S.C. § 1485), which was added to the Act in 1962 and then expanded in 1966 and 1968, authorized the Farmer's Home Administration ("FmHA"), an agency of the Department of Agriculture, to enter into contracts with private owners to make loans for the purpose of developing housing in rural areas. The terms of each owner's contract with the FmHA were set forth in three key documents: a loan agreement, a mortgage, and a promissory note. Compl. ¶ 18.

#### A. Restrictions Imposed On Owners While In The Section 515 Program

Owners retained title to their properties while in the program, but were bound to various "regulatory covenants" set forth in the loan agreement. Those covenants imposed significant obligations on owners regarding the tenants to whom they could rent, the rents they could

charge, the profits they could receive, and the maintenance and financial operation of each project. Compl. ¶¶ 17, 19. Chief among the program's restrictions was a "return on investment" limitation which capped the maximum return an owner could receive on its investment. This maximum return remained the same regardless of how much equity the owner built up in the property and regardless of how much the property's market value increased over time. Pursuant to the agreement between the government and the owners, however, the regulatory covenants were to remain in force only during the pendency of the loan obligations, and thus would expire upon prepayment by the owner of its indebtedness. *Id.* ¶¶ 19, 20.

Mortgage loans under the program had terms of up to fifty years.[1] Not surprisingly, none of the plaintiffs intended to stay in the program and abide by its restrictions for that far into the future, by which time few of them would still be alive. An investor who entered into the program in 1979 at age 45, for example, would be 95 by the time the mortgage term expired in 2029. Indeed, given the economic realities of the program, remaining in the program for fifty years would prove to be a "horrendous long term investment." *See Grass Valley Terrace v. United States*, 51 Fed. Cl. 436, 442 (2002). While certain tax benefits initially were available under the program, those benefits ran out as each project's depreciation schedule expired. *See* 125 Cong. Rec. 18204 (1979) ("The tax advantage in this type of project looks toward a maximum term of about 10 years."); H.R. Rep. No. 100-122(I), 100th Cong., 1st Sess. at 53 (1987), 1987 U.S.C.C.A.N. at 3369 (noting that "the exhaustion of many tax benefits available to Section 515 participants was 'driving owners to prepay or refinance their FmHA loans'").

**B. The Termination Option**

The government induced private sector investors to participate in the Section 515 program by offering them a contractual "termination option" – the right to free themselves from the regulatory covenants by prepaying their loans at a time of their own choosing, thereby terminating their participation in the program. As with many commercial real estate mortgage

---

[1] While most of the plaintiffs held mortgages with fifty-year terms, other mortgages had terms of forty years. For simplicity, this brief will refer to the maximum fifty-year term.

loans, the promissory notes that each of the plaintiffs signed included a prepayment clause, which provides as follows:

> Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower.[2]

Compl. ¶ 18. The terms of this clause were also incorporated into contemporaneous FmHA regulations. *See* 7 C.F.R. § 1822.95(c) (1978).

While the prepayment term quoted above was included in both the pre-1979 and post-1979 contracts, the post-1979 owners further agreed not to raise their rents for a period of fifteen or twenty years. This restriction could be avoided during that period of time only where the agency determined that the housing was no longer needed. Thus, owners who entered into the program prior to December 21, 1979, could exercise the termination option at any time, and owners who executed their contracts on or after that date could terminate at the end of twenty years. *See* Compl. ¶ 25.

Because the regulatory covenants imposed by the program remained in effect only for so long as the loan obligations remained unsatisfied, the prepayment clause served as the vehicle for owners to exercise their right to leave the program and be freed of those restrictions. *See* Belden & Wiener at 115 ("Where prepayment occurred, not only was the [FmHA] financing retired, but borrowers were released from enforceable agreements in the Section 515 notes or security instruments that enabled [FmHA] to control the use of the housing"). Upon exercising their termination option, owners could realize the economic potential of their properties by either raising their rents to the rates that the market would bear or selling the properties based on their fair market value as conventional rental properties.

The termination option was a critical component of the Section 515 program from the perspectives of both the owners and the FmHA. As the evidence will show, none of the

---

[2] Congress vested the FmHA with the authority to draft the terms of its agreements with owners. 42 U.S.C. § 1472(b)(4) (loan instrument "shall . . . be in such form and contain such covenants as the Secretary shall prescribe . . . ."). Thus, the FmHA included the prepayment clause in the promissory notes pursuant to the express authority delegated to it by Congress.

plaintiffs would have signed their contracts absent the right to prepay and leave the program at some time before the expiration of the full mortgage term. *See Cienega Gardens v. United States*, 38 Fed. Cl. 64, 75 (1997) (finding that, under parallel HUD housing program, prepayment served as one of the "primary incentives," an "essential aspect" of the program, and an "enticement" without which the owners would not have entered into the program); *accord Cienega Gardens v. United States*, 331 F.3d 1319, 1346-47 (Fed. Cir. 2003). By the same token, from the government's perspective, the ability of owners to prepay and ultimately use their properties as market-rate investments served as a chief inducement to recruit private parties to enter into the program. *Id.*; Belden & Wiener at 122 (noting that the Section 515 program was "predicated on the assumption that private, profit-motivated owners could be enticed to build, own and operate low-income rental housing" and that "prepayment is wholly consistent" with this strategy). Thus, both the plaintiffs and the government understood that plaintiffs entered into the program with specific investment goals that could not be achieved absent the right to prepay and be freed from the program's restrictions.

Indeed, such privatization of properties in the Section 515 program was not only consistent with the parties' agreements, it was in fact the very purpose of the program as originally designed. The Section 515 program was not designed to create an infrastructure of government-subsidized housing projects across the rural United States. Rather, the program was designed to stimulate the development of housing in rural areas where commercial financing might not be available at the time of construction and then to privatize those properties once commercial financing could be obtained on similar terms. *See* Beldon & Wiener, *supra,* at 114.[3]

[3] This privatization of Section 515 properties through prepayment of the government loans was referred to by the FmHA as "graduation" and was critical to the proper functioning and goals of the program. *See* 7 C.F.R. § 1865.2(c) (1979) (graduation of Section 515 loans is "desirable" and "[b]orrowers should by inspired to graduate as a mark of success in their financial affairs.") To enforce the graduation requirement, every contract contained a provision requiring owners to prepay their loans upon FmHA's demand as soon as private financing on similar terms became available. The graduation requirement was echoed in the applicable statute and regulations. *See* 42 U.S.C. § 1472(b)(3) (requiring all section 515 loans instruments to contain this refinancing provision); 7 C.F.R. § 1865.2(c) (1979) ("When voluntary graduation by refinancing cannot be

## II. SUBSEQUENT LEGISLATION

As time passed, many owners began to exercise their termination option, prepaying their loans to realize the investment returns to which their contracts entitled them. *See* H.R. Rep. No. 96-154, 96th Cong., 1st Sess. at 43 (1979), 1979 U.S.C.C.A.N. at 2359. The FmHA maintained that it was obligated to accept such prepayments despite concern that doing so would reduce the supply of affordable housing. *Id.* (noting that FmHA "believes it must honor requests to prepay or refinance these loans").

### A. The 1979 Legislation and its Repeal in 1980

To reduce this potential loss of housing, Congress initially responded by passing a statute in 1979 that specifically prohibited the FmHA from accepting certain prepayments of Section 515 loans. Pub. L. No. 96-153, § 503, 93 Stat. 1134 (1979). During the debates over the 1979 legislation, however, some in Congress "argued that owners' property rights were paramount – that retroactivity was a breach of contract and unconstitutional." Belden & Wiener at 117. In response to the political uproar caused by this repudiation of the owners' rights, Congress repealed the statute in 1980 and restored the termination option for loans issued prior to 1979. The 1980 legislation also required new owners to agree to operate their properties as low-income housing for a minimum of 15 or 20 years. Pub. L. No. 96-399, § 514, 94 Stat. 1671 (1980).[4]

After repeal of the 1979 legislation, prepayments by owners under pre-1979 contracts resumed. FmHA accepted prepayments of pre-1979 loans, as required by the contracts, for the ensuing six years. Then, on October 18, 1986, Congress imposed a moratorium prohibiting, with limited exceptions, the use of appropriated funds to process applications for prepayments under

---

accomplished, there is a legal basis for enforcing the refinancing provisions . . . ."). The monies received through prepayment or graduation could then be used to finance additional affordable housing under the program. *See* 42 Op. Att'y Gen. 417, 419 (Dec. 29, 1969).

[4] This change in the governing law is the basis for the two classes of plaintiffs in this action – owners with claims based on pre-1979 contracts, whose original termination rights were restored by the 1980 legislation, and owners with claims based on post-1979 contracts, whose termination rights always have been exercisable only after a minimum of 20 years.

either pre- or post-1979 contracts. Originally scheduled to expire in mid-1987, this moratorium was twice extended through March 15, 1988. *See* 42 U.S.C. § 1472 note.

**B. The 1988 Legislation: ELIHPA**

Before the last extension of the moratorium expired, on February 5, 1988, Congress enacted the Emergency Low Income Housing Preservation Act ("ELIHPA"), Pub. L. No. 100-242, tit. II, 101 Stat. 1877 (1988) ("the 1988 Legislation"), *codified in relevant part as amended at* 42 U.S.C. § 1472(c) and 12 U.S.C. § 1715*l*.[5] Whereas the pre-1979 contracts provided that the owner could prepay and thereby terminate the low-income restrictions on the property "at any time at [its]option," the 1988 Legislation permits an owner to free itself of those restrictions only if the FmHA determines that (1) sufficient other low-income housing had been built in the market area of the owner's property to assure all of the owner's current tenants of replacement housing, *and*, (2) prepayment would not have an adverse impact upon minorities. *Id.* § 1472(c)(5)(G)(ii)(II). In the absence of such a determination, the 1988 Legislation erected a series of hurdles that make it impossible for an owner to terminate its participation in the Section 515 program without the risk of losing its property.

*First*, the 1988 Legislation prohibits the FmHA from accepting any prepayment until it has made reasonable efforts to secure the owner's agreement to give up its contractual termination option and instead to extend the low-income use of the property for at least twenty years *from the date of execution of the agreement. Id.* § 1472(c)(4)(A). Even after this twenty-year period expires, there is no guarantee that the owner will be permitted to prepay without restrictions. As supposed inducement to owners to accept this extension, the Legislation authorized the FmHA to offer specific limited "incentives," such as an equity loan or increased rental assistance. *Id.* § 1472(c)(4)(B). These "incentives," however, are wholly inconsistent with plaintiffs' original contractual termination option. For example, an equity loan requires an

5 The 1988 Legislation was addressed only to pre-1979 contracts. As explained in the next section, the prepayment restrictions set forth in the 1988 Legislation were extended to post-1979 contracts through further legislation passed in 1992.

owner to take on a new indebtedness as consideration for being "permitted" to borrow funds that, if the owner were permitted to prepay, would have belonged to the owner outright.

*Second*, if an owner does not surrender the termination option of its original contract and accept an additional 20-year limitation on its earnings from its property, the 1988 Legislation compels the owner, before exercising that option, to offer for six months to sell the property to *any qualified nonprofit organization or public agency*. 42 U.S.C. § 1472(c)(5)(A). The property has to be offered at a "fair market value" determined by a complicated procedure bearing no resemblance to arms-length negotiations between an owner and a prospective purchaser in the conventional housing market. A purchaser can be "qualified" by the FmHA only if it agrees to maintain the low-income use of the property, and no sale can be completed unless the agency approves the purchase price. 42 U.S.C. § 1472(c)(5)(A),(B). Even if the property is not purchased by a third party, the statute does not actually require the agency to permit the owner to prepay. *See* 42 U.S.C. § 1472(c)(5)(A)(ii) (stating that if no buyer comes forward within the 180 day period the agency "may" accept the owners' offer to prepay"). Further, the forced-sale requirement can be avoided only if the owner agrees to extend the low-income use of its property for at least 20 years *from the date on which the loan was made*. *Id.* § 1472(c)(5)(G)(i).[6] And even if it agrees to this extension, the owner still would be subject to a forced sale requirement at the end of the 20-year period of extended low-income use. *Id.*

*Third*, if an owner is unwilling either to extend its Section 515 participation for 20 years or to subject itself to the six-month forced-sale provision, the 1988 Legislation permits the exercise of a <u>restricted</u> termination option if the owner agrees that its units will remain subject to

---

[6] In effect, the forced-sale requirement grants a six-month right of first refusal to "qualified" entities, the exercise of which enables the holder to obtain the subject property at a price that is not determined by the market. Although a hapless owner theoretically could prepay its loan at the end of the six-month forced-sale period if no "qualified" buyer accepts the statutorily compelled offer of sale during that period, and if the agency in its discretion permits it, the owner first has to gamble that its property will not be snatched away from it at what may be an unacceptable price to the owner. The theoretical ability to prepay under these circumstances is obviously an inadequate substitute for the owner's contractual termination rights.

low-income rental rates until the current tenants decide to move out. *Id.* § 1472(c)(5)(G)(ii)(I). Regulations subsequently issued under the Legislation make clear that an owner cannot require a tenant to move out, other than for cause, until "the end of the remaining useful life of the project." *See* 7 C.F.R. Part 1965, Subpart E (1997), Ex. A-4. In addition, this option is available only if the agency determines that prepayment will not have an adverse impact on minorities. *See* 42 U.S.C. § 1472(c)(5)(G)(ii).

**C. The 1992 Legislation and its Implementing Regulations**

While the 1988 legislation imposed prepayment restrictions on pre-1979 loans, post-1979 owners remained free to exercise their prepayment option once their twenty-year anniversaries arrived. In 1992, however, seven years before the twenty-year covenants on any of the post-1979 loans began to expire, and after all of the post-1979 housing was built, Congress extended the prepayment restrictions imposed upon pre-1979 owners to all post-1979 owners. Housing and Community Development Act of 1992, Pub. L. No. 102-550, §§ 2, 712, 106 Stat. 3681, 3841 (1992), *codified in relevant part at* 42 U.S.C. § 1472(c) ("the 1992 legislation").

The FmHA then issued final regulations to implement both the 1988 and 1992 legislation. *See* 7 C.F.R. Pt. 1965-E (2000). The regulations set forth detailed procedures for the agency to follow in responding to prepayment requests. *Id.* § 1965.215(a). Under the regulations, consistent with the 1988 and 1992 legislation, the agency can accept an owner's request to prepay without restriction only if, among other things, (1) there is an adequate supply of alternative affordable housing in the area where the property is located, and (2) prepayment would not have an adverse impact on minorities. *Id.* § 1965.215(c)(1),(3). The regulations candidly refer to the restrictions imposed by the statute as the "Prepayment Prevention" program. *See* 7 C.F.R. Part 1965, Subpart E (1997).

## III. PLAINTIFFS' FRUSTRATED PREPAYMENT INTENTIONS AND DAMAGES

Plaintiffs' contractual right to terminate their contracts at any time at their option was a material term of their contracts. The evidence will show that none of the plaintiffs in this action

would have entered into the section 515 program or agreed to contract with the government without the prepayment right. But for the legislation repudiating plaintiffs' contractual termination right, plaintiffs would have achieved their option of terminating their contracts on dates that would maximize their investment return on their properties, or on such other dates as they might have deemed it appropriate to terminate their participation in the Section 515 program given their individual circumstances. *See* Compl. ¶ 38; *see also id.* ¶¶ 42-49. Notwithstanding the prepayment restrictions imposed by the legislation at issue, many plaintiffs have requested permission from the FmHA to prepay their mortgages without restrictions. None of those requests has been granted. The FmHA expressly has the requests based in part on the lack of sufficient alternative affordable housing where the property is located. Other owners have determined that it would be futile to go through the time and expense of preparing a prepayment application, knowing that any request to prepay without restrictions would be denied.

The prepayment restrictions contained in the legislation at issue, as applied, have completely frustrated the plaintiffs' expectations that they would be able to prepay their mortgages, exit the Section 515 program, and realize the true economic potential of their properties. As will be established at trial, the meager annual returns plaintiffs receive while in the program represent only a miniscule percentage of their equity in the properties – typically below one percent. In plain English, plaintiffs have been stranded in the Section 515 program for their full fifty-year mortgage terms and are incurring, and will continue to incur, substantial financial losses as a result.

## ARGUMENT

### I. DEFENDANT'S FACIAL CHALLENGE TO PLAINTIFFS' ASSERTION OF SUBJECT MATTER JURISDICTION MUST BE DENIED.

Defendant has moved, pursuant to Rule 12(b)(1), to dismiss plaintiffs' complaint for lack of subject matter jurisdiction, asserting that: "Even if all the facts alleged in the complaint are taken as true, … those allegations provide no indication that the complaint was 'filed within six years after [plaintiffs'] claim[s] first accrue[d].' 28 U.S.C. § 2501. Therefore, plaintiffs have not

carried their burden to plead the requisite jurisdictional facts." (Def. Mem. 13). A motion under Rule 12(b)(1) may present either a facial or a factual challenge to subject matter jurisdiction. A facial challenge contests the existence of subject matter jurisdiction on the face of the complaint, while a factual challenge contests the existence of subject matter jurisdiction in fact. Here, the government has not controverted plaintiff's factual allegations; it merely challenges the sufficiency of the pleading's allegations. As a result, defendant's jurisdictional challenge is a facial one. *See Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993).

When a court considers a facial challenge, "its task is necessarily a limited one." *Simmons v. United States*, 53 Fed. Cl. 131, 132 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds, Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727 (1982)). All allegations in the complaint are taken as true and construed in a light most favorable to the complainant. *See Scheuer*, 416 U.S. at 236. The issue before the Court is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* Thus, "even if it 'appear[s] on the face of the pleadings that a recovery is very remote and unlikely,' *id.*, [a Rule 12(b)(1)] motion should not be granted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)); *accord Hohri v. United States*, 847 F.2d 779 (Fed. Cir. 1988); *High Star Toys, Inc. v. United States,* 32 Fed. Cl. 176 (1994) (in considering motion to dismiss, court must indulge all reasonable inferences in favor of nonmovant).

Consistent with the principles of notice pleading embodied in the Federal Rules of Civil Procedure and their RCFC counterpart, general allegations suffice at the pleading stage. Factual detail is not required. As the Supreme Court observed in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice [to establish the "injury in fact" essential to standing], for on a motion to dismiss we 'presume that general allegations embrace those specific facts that are

necessary to support the claim.'" *Id.* at 561 (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 883-89 (1990)); *see also Conley v. Gibson*, 355 U.S. 41, 47-48 (1957).

Here, defendant purports to find support for its motion to dismiss in a quotation from *Brown v. United States*, 42 Fed. Cl. 538, 556 (1998) to the effect that "one seeking to invoke the jurisdiction of this court bears the threshold burden of pleading the essential facts to show that the claim is timely filed." The language in *Brown*, however, derives from *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936), an opinion that predated the adoption of the Federal Rules of Civil Procedure and notice pleading. Clearly, neither *Brown* nor *McNutt* should be construed to run afoul of the more recent pronouncement of the Supreme Court in *Lujan*.[7]

Consistent with the teachings of *Scheuer* and *Lujan*, plaintiffs' Complaint adequately alleges subject matter jurisdiction. The Complaint alleges that, on the facts set forth therein, "the Court has jurisdiction over the subject matter of this action pursuant to U.S.C. § 1491." Compl. ¶ 14. As the Government acknowledges, the fact that the suit "was filed within six years of the accrual of the claim asserted" is one of the factual predicates underlying subject matter jurisdiction. (Def. Mem. 10). And, under *Lujan*, plaintiffs' general allegation of subject matter jurisdiction necessarily "embrace[s] those specific facts that are necessary to support the claim," including, specifically, the fact that suit has been brought within six years of the accrual of plaintiffs' claims. *See Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 883-89 (1990). Certainly, defendant can point to nothing in the Complaint from which the Court could conclude that "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of his claim which would entitle [them] to relief," a finding required for a Rule 12(b)(1) dismissal. *Scheuer,* 416 U.S. at 236 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Thus, defendants' Rule 12(b)(1) motion must be denied.

---

[7] Both *McNutt* and *Brown* are further distinguishable because both involved factual – rather than facial – challenges to the assertion of subject matter jurisdiction. A factual challenge is by definition more fact specific than a facial challenge and typically involves an evidentiary hearing during which the court receives and considers material outside the pleadings.

Defendant complains that, because the complaint does not allege when certain facts concerning the accrual of plaintiffs' claims occur, no determination can be made as to whether this action was commenced within six years of the accrual of plaintiffs' claims. The type of factual allegations that defendant suggests would enable a determination of whether this action was commenced within six years of the accrual of plaintiffs' claims include, but are not limited to, those dates when any particular plaintiff "actually tendered prepayment"[8] (Def. Mem. at 12);

[8] The United States Supreme Court's decision in *Franconia Associates v. United States* ("*Franconia*") makes clear that one incidence under which a breach would occur is "when a borrower tenders prepayment and the Government then dishonors its obligation to accept the tender and release its control over use of the property that secured the loan." 536 U.S. 129, 133 (2002). The Court's decision therefore makes clear that a breach of contract may occur upon the mere tender of prepayment: an owner is not required to submit the voluminous application for prepayment contemplated by the agency's post-contractual, statutory prepayment regime in order for a breach to occur. Instead, a breach occurs, and the relevant time period for calculating plaintiffs' damages commences, upon the date that each plaintiff would have exercised its prepayment option were it not for the government's wrongful repudiation of that right.

Further, while the date of breach may be based on an actual tender of prepayment, it is clear that one need not go through the "sham of a tender" when it is clear that the repudiating party will reject it. Indeed, under the law of anticipatory repudiation, a non-repudiating party need not tender performance at all in order to bring a claim for damages. *See Acme Inv., Inc. v. Southwest Tracor*, Inc., 105 F.3d 412, 415 (8th Cir. 1997); *Foster v. Bartolomeo*, 581 N.E.2d 1033, 1035 (Mass. App. Ct. 1991) (plaintiff did not have to go through the "sham of a tender" where defendant repudiated option contract); Restatement (Second) of Contracts § 253(2) (1981) ("Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance."); A. Corbin, *Corbin on Contracts* § 977 at 814 (Interim Edition 2002) ("A repudiation or other total breach by one party enables the other to get a judgment for damages or for restitution without performing acts that would otherwise have been conditions precedent.").

Similarly, one need not exhaust agency or regulatory procedures in order to maintain a takings claim. While such claims generally are ripe for judicial review once the property owner obtains a final agency decision applying the challenged statute or regulation to the property at issue, an owner need not obtain such a decision in order to ripen its takings claims where it would be futile to do so. *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) (futility exception met where "the permissible uses of the property are known to a reasonable degree of certainty"); *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 739 (1997) (claim is ripe when there is "no question" as to how the regulations apply to the property); *Buere'-Co v. United States*, 16 Cl. Ct. 42, 51 n.11 (1988) (property owner not required to pursue alternatives it does not deem to be economically viable in order to ripen a takings claim).

Thus, plaintiffs will establish at trial the date of breach and takings for each property, based on either a request or some other attempt to prepay (including but not limited to an actual tender

those dates when plaintiffs "submitted applications for prepayment"[9] (Def. Mem. at 12); those dates when the government "rejected" such prepayment applications (Def. Mem. at 12); those dates when certain plaintiffs "contacted" agency officials concerning prepayment pursuant to their contracts[10] (Def. Mem. at 13); and those dates when certain plaintiffs were advised by agency officials that prepayment "would not be accepted" (Def. Mem. at 13).

Defendant does not appear to suggest that plaintiffs are actually required to plead, with factual specificity, these plethora of events and the dates that they occurred. Indeed, any notion that this kind of copious factual detail is required at this stage of the litigation would fly in the face of notice pleading. *See Conley v. Gibson*, *supra,* 355 U.S. at 47-48 ("Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."). The Court in *Conley* further noted that that "such simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." Thus, in *Martinez v. United States*, for example, the court rejected the

---

of prepayment or other evidence of their intended prepayment dates), the agency's disposition of such prepayment attempts, and/or evidence of the futility of making said prepayment attempts.

9 The Supreme Court also made clear in *Franconia* that a breach of contract may occur under circumstances other than a mere "tender" of prepayment. Unless a plaintiff treats the statutory repudiation as a present breach by filing suit prior to its intended prepayment date, a "breach would occur when a borrower attempted to prepay, for only at that time would the Government's responsive performance become due." *Franconia*, 536 U.S. 129, 143 (2002). The Court cited to one petitioner (Phoebe J. Perri), as an example of an owner whose contract was breached upon an attempt to prepay, not made merely by tendering prepayment, but by submitting a statutory application for prepayment. *Id.* n.8.

10 The *Franconia* decision described yet another incidence of breach as "the Government's refusal to accept prepayment in accord with the terms of the promissory notes." *Franconia,* 536 U.S. 129, 147 n.10 (2002) Thus, it is clear that a breach of contract will occur upon an attempt to prepay that is not limited to the submission of a prepayment application pursuant to the statutes at issue here. Rather, it encompasses any attempt to prepay pursuant to the terms of the promissory notes containing the contractual prepayment clause.

argument that because "plaintiff fails to plead the dates of the alleged occurrences, the Court may infer such failure as an admission that the occurrences took place outside of the six-year statute of limitations . . . ." 48 Fed. Cl. 851, 858 (2001) (challenge to complaint under, *inter alia,* statute of limitations grounds pursuant to Rule 12(b)(1)).

Rather than argue that these factual events must be pled with detailed specificity, defendant maintains that the failure either (i) to allege <u>when</u> "underlying" events such as these occurred; or (ii) to allege that events such as these "occurred on or after September 30, 1997" (Def. Brief at 3, 13), precludes any determination that the complaint was filed within six years after plaintiffs' claims first accrued. Plaintiffs submit that, as discussed above, their general allegation of subject matter jurisdiction necessarily embraces the fact that events such as these occurred within six years of the filing of their complaint. As such, the Complaint – as originally pled – is adequate to survive a Rule 12(b)(1) motion. As an abundance of caution, however, and in addition to making a general allegation of subject matter jurisdiction pursuant to 28 U.S.C. §1491, plaintiffs have filed a First Amended Complaint[11] which specifically alleges that plaintiffs' claims have been filed within the six-year time period prescribed by 28 U.S.C. § 2501. *See* First Am. Compl. ¶¶ 42-43. In this regard, plaintiffs note that the government does not contest – and indeed could not contest in a facial challenge under Rule 12(b)(1) – the assertions concerning the accrual of plaintiffs' contract and takings claims. Instead, the government contests only plaintiffs' failure to specifically allege that the complaint was filed within six years from the date the claims accrued. Because the First Amended Complaint specifically alleges that plaintiffs' claims have been filed within the six-year time period prescribed by 28 U.S.C. §2501, defendant's Rule 12(b)(1) motion must be denied.

---

[11] Among other things, the First Amended Complaint incorporates three additional plaintiffs and removes one plaintiff. Plaintiffs served and filed their First Amended Complaint as of right on February 27, 2004 pursuant to RCFC Rule 15(a). *See Devon Energy Corp. v. United States*, 45 Fed. Cl. 519, 525-26 (1999) (government's motion to dismiss complaint was not a "response" within meaning of rule that party may amend its pleadings without leave of court "any time before a response is served," and thus plaintiffs were entitled to file their amended complaint as a matter of course).

## II. PLAINTIFFS HAVE STATED A VALID CLAIM FOR BREACH OF CONTRACT.

### A. Defendant Has Not Met Its Burden To Establish That Plaintiffs Can Prove No Set of Facts In Support of Their Contract Claims That Would Entitle Them to Relief.

The decision of the U.S. Supreme Court in *Franconia Assoc. v. United States*, 536 U.S. 129 (2002) makes clear that the legislation at issue "effected a repudiation of the FmHA loan contracts." As the Court explained:

> The Act conveyed an announcement by the Government that it would not perform as represented in the promissory notes if and when, at some point in the future, petitioners attempted to prepay their mortgages. *See* Restatement §250, Comment *b* ("[A] statement of intention not to perform except on conditions which go beyond the contract constitutes a repudiation." (internal quotation marks omitted)); Murray, *supra*, §208, at 421.

*Id.* at 143. The Court applied standard contract law principles to reach its conclusion:

> We comprehend no reason why an Act of Congress may not constitute a repudiation of a contract to which the United States is a party. . . . "Hence, . . . the fact that [the Government's] repudiation rested upon the enactment of a new statute makes no significant difference." *Mobil Oil,* 530 U. S. at 620; *see id.* at 619 ("If legislation passed by Congress and signed by the President is not a 'statement by the obligor'" capable of triggering a repudiation, "it is difficult to imagine what would constitute such a statement.").

*Id.* at 148 (citing Restatement (Second) of Contracts § 250 (1981)).

Notwithstanding the Supreme Court's holding in *Franconia,*[12] defendant contends that it cannot be held liable for breach as a matter of law because: (1) notwithstanding the unambiguous language of those contracts, plaintiffs never had an "absolute, unfettered prepayment right" (Def.

---

[12] Defendant seeks to avoid the impact of the Supreme Court's decision by asserting that the Court only assumed for the sake of argument that plaintiffs possessed the rights they allege. However, the fact that a repudiation occurred here can easily be gleaned from a review of just two documents: the prepayment provision and the repudiating legislation. The Supreme Court had both of these before it when it held that the 1988 legislation effected a repudiation of plaintiffs' contracts. The Court quoted all of the key provisions in its decision, including the terms of the statute regarding incentives and sales to non-profit organizations. Thus, there is no basis for the government's assertion that the Court was not properly presented with the question whether the government's conduct constituted a repudiation.

Mem. 10), and (2) plaintiffs' contracts were never repudiated or breached because the prepayment restrictions set forth in the legislation here at issue left plaintiffs with a set of options which, taken as a whole, were "close enough" to the original prepayment right. As explained in detail below, neither of these arguments hold up under standard contract law.

Moreover, because defendant's motion necessarily requires the Court to consider evidence outside the pleadings – the terms of the loan documents at issue in this case, for example, are central to defendant's motion – defendant's arguments are not properly before the Court. A Rule 12(b)(6) motion is decided on the basis of the pleadings. In reviewing the sufficiency of a challenged complaint, the court must presume that all factual allegations are true and construe them in the light most favorable to the non-movant. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 654 (1999); *accord Conti v. United States*, 291 F.3d 1334, 1338 (Fed. Cir. 2002); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 655 (2003); *American Heritage Bancorp v. United States,* 56 Fed. Cl. 596, 604 (2003). Defendant has failed to apply this standard of review in the arguments it makes.[13]

*1. For Purposes of Rule 12(b)(6), The Complaint Is Sufficient to Defeat Defendant's Characterization of Plaintiffs' Contract Rights.*

In an argument reminiscent of Humpty Dumpty's assertion in *Through the Looking Glass* that "when I use a word, it means just what I choose it to mean," defendant contends that the provision of the loan agreements affording plaintiffs the right to prepay "at any time at the option

[13] That defendant's motion requires consideration of evidence beyond the pleadings is clear. Defendant essentially concedes as much, arguing at page 26 of its brief, for example, that "Plaintiffs point to no language <u>in the loan documents at issue here</u> containing an unmistakable promise to insulate plaintiffs from the effects of future legislation, or otherwise surrendering the Government's power to amend the applicable statute …" (Def. Mem. 26). Similarly, at page 16, defendant argues that plaintiffs have not "<u>cite[d] anything in the contract</u> purporting to limit the Government's power to eminent domain. (Def. Mem. 16). And the argument continues: "Likewise, <u>the contract documents</u> do not preclude less coercive measures . . . ." (*Id.*).

of Borrower" does not really mean what the plain meaning of the words indicate but instead means "at such time and under such conditions as the government may subsequently choose to impose." It is hornbook law that unambiguous words in a contract are to be given their plain and ordinary meaning.[14] The plain and unambiguous meaning of the provision here at issue is that owners of Section 515 housing had an unrestricted right "to terminate their contracts by prepaying their mortgages at any time at their option to enable them to go to market and maximize their return on investment." Compl. ¶ 22. The restrictions imposed after the fact by the legislation at issue clearly interfered with this right and were never part of any contractual bargain. Defendant notes that "[t]hose who enter a contract may take steps at any time after its execution to modify it." (Def. Mem. 16) But, of course, a contract can only be modified with the consent of all contracting parties, and here there is no evidence – and certainly nothing in the First Amended Complaint – to suggest that plaintiffs ever agreed to a modification of their original unrestricted right of prepayment. The evidence at trial will establish that plaintiffs would not have participated in the Section 515 housing program had they not been assured that they were being afforded an unrestricted right of prepayment. For purposes of this motion, however, it is sufficient to defeat defendant's argument that it cannot establish beyond doubt plaintiffs' inability to prove "a set of facts in support of [their] claim that would entitle [them] to relief." *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 654 (1999).

---

[14] *See, e.g., Nicholson v. United States*, 29 Fed. Cl. 180, 190 (1993). The government's reliance upon a bankruptcy case in which the court observed that "the statutory phrase 'at any time' does not *necessarily* mean 'under any circumstances'" (emphasis supplied) is misplaced. The reality – as stated in the Complaint and as will be established by the evidence at trial – is that the restrictions on prepayment imposed by the legislation at issue here clearly affected the timing as well as the "circumstances" surrounding prepayment, fundamentally interfering with the ability of the property owners to prepay at the time of their choosing. *See* Compl.¶ 40 ("The statutory scheme under the 1988 and 1992 legislation and FmHA's implementing regulations repudiate the contractual right of FmHA project owners to terminate their contracts at any time at their option in part by (i) compelling them to extend the low-income use of their projects; and (ii) subjecting them to forced sales of their properties.").

*2. The 1988 And 1992 Legislation Amounted To A Repudiation Of Plaintiffs' Contracts.*

A repudiation is defined as a "statement by the obligor to the obligee indicating that the obligor *will commit a breach* that would of itself give the obligee a claim for damages for total breach." Restatement (Second) of Contracts § 250 (emphasis added); *quoted in Franconia*, 536 U.S. at 143; *Mobil Oil v. United States*, 530 U.S. 604, 608 (2000); *see also Black's Law Dictionary* 1306 (7th ed. 1999) ("repudiation" defined as "words or actions that indicate an intention not to perform the contract in the future; a threatened breach of contract"); *Murray on Contracts* § 109(C) (3d ed. 1990) (statement of "intention not to perform except on conditions going beyond the contract" constitutes a repudiation). As explained above, the Supreme Court has held that the prepayment restrictions set forth in the legislation at issue here constituted just such a statement. *See Franconia Assoc.*, 536 U.S. at 143.

Prior to enactment of ELIHPA, plaintiffs could leave the program and raise rents by doing little more than writing defendant a check for the remaining mortgage balance. Upon receipt of prepayment, the agency would execute the necessary releases and return the owner's security. 7 C.F.R. § 1866.2 (1978). Under the repudiating legislation, however, the agency can no longer perform as promised in the contracts. Among other things, no prepayment can be made unless the owner complies with the detailed procedures set forth in the statute and its implementing regulations. *See* 42 U.S.C. § 1472(c)(4)(A); 7 C.F.R. Pt. 1965-E. The prepayment scheme requires the submission of an extensive application followed by a protracted evaluation process by the agency. *Id.* Even if an owner decides to partake in this process, prepayment can be granted only under very narrow circumstances. *See* 42 U.S.C. § 1472(c)(5)(G)(ii).

Thus, by their very terms, the statutes renounced the government's obligation to accept prepayment without any restrictions. In enacting the legislation, defendant communicated to

plaintiffs that it would not perform as promised in the future when plaintiffs attempted to prepay. *Franconia Assoc.,* 530 U.S. at 143, 148; *see also Mobil*, 530 U.S. at 619, 621; *Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed. Cl. 174, 183 (1997) (holding that "FIRREA was essentially a legally binding forecast of a future breach").

*3. Having Repudiated Plaintiffs' Contracts, Defendant Is In No Position To Deny That It Committed A Breach.*

Once a repudiation occurs, it is generally only a matter of time before that repudiation ripens into a breach. In particular, a repudiating party becomes liable for breach when the non-repudiating party either (1) files suit, or (2) demands performance under the contract. *Franconia*, 536 U.S. at 143; *Roehm v. Horst*, 178 U.S. 1, 10 (1900) (finding it "reasonable to allow an option to the injured party, either to sue immediately, or to wait till the time when the act was to be done"); *Williston on Contracts* § 1337 (3d ed. 1968). In this case, plaintiffs' complaint was filed on September 30, 2003 and then amended on February 27, 2004. Moreover, many plaintiffs demanded performance from the government prior to the commencement of this suit. Compl. ¶ 45. Defendant did not, as of that time, take any action to retract its repudiation. As a result, defendant now stands liable for breach of contract.

Defendant's argument that no breach occurred here misperceives the meaning of a breach of contract. The crux of defendant's argument is that the prepayment restrictions imposed by the repudiating legislation are not sufficiently egregious to amount to a breach of contract due to the various options to unrestricted prepayment set forth in the repudiating legislation. A breach of contract, however, is a failure to perform as promised. Restatement (Second) of Contracts § 237 cmt. a (breach of contract defined as a "failure of performance"); *see also Williston on Contracts* § 2027B; *Corbin on Contracts* 923 (1964); Gifis, *Law Dictionary* 54 (3d ed. 1991) (defining "breach" as "a party's failure to perform some contracted-for or agreed-upon act"). Thus, it is

not a defense to contract liability to state that the breaching party, in failing to perform, gave the victim of the breach certain options in place of the promised performance.[15]

Plaintiffs' contracts granted them the right to prepay without any restrictions. Under the repudiating legislation, the government was disabled from honoring this option. Thus, under the common law of contracts, this case becomes one of impossibility of performance. *Winstar*, 518 U.S. at 920-21 ("Generally, contract law imposes upon a party to a contract liability for any impossibility of performance that is attributable to that party's own actions . . . .") (Scalia, J. concurring). As this Court held in *Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751 (2003) ("*Cuyahoga*"), where the government targets particular contracts, "the general rule regarding impossibility of performance applies and, to the extent the government renders its own performance impossible, it is liable." Here, too, the government's actions in making its performance impossible renders it liable for breach.

While the government suggests that "prepayment" is still permitted under the repudiating legislation, that is a misnomer. The only "prepayment" that is possible under the current regime is (1) prepayment subject to severe restrictions on the use of the property (the "G-4" option), (2) prepayment under a narrow exception that none of the plaintiffs can satisfy (the "no need" exception), or (3) the theoretical possibility of prepayment following the agency's "forced sale" process.[16] Apart from numerous factual issues regarding the defects and risks that these options

---

[15] To the extent that defendant argues that plaintiffs could have minimized their damages by accepting one of the lesser alternatives provided by the repudiating legislation, that goes to mitigation of damages, not to whether there was a breach in the first instance. *See Koby v. United States*, 53 Fed. Cl. 493 (2002).

[16] Defendant relies heavily on the agency's forced sale process, arguing that under those procedures, plaintiffs could have obtained a full fair market value for their properties in just six month's time, or even been permitted to prepay without any restrictions. However, the reality of the regulations governing the process is a far cry from the picture that defendant paints. Long before the sale process can even begin, the owner must submit an extensive prepayment

may present, they differ markedly from the prepayment option set forth in plaintiffs' contracts. Indeed, the agency itself refers to its prepayment regime as the "Prepayment Prevention" program. *See* 7 C.F.R. Part 1965, Subpart E. Thus, no matter what the result of the agency's procedures may be, the fact remains that performance under the original contract is simply not a possibility for any of the plaintiffs. Accordingly, defendant cannot avoid liability for breach by pointing to its proposed substitute performance. Just as a deal is a deal, a breach is a breach. *See Cuyahoga*, 57 Fed. Cl. at 779 ("*pacta sunt servanda.*").

*4. The Government's Power Of Eminent Domain Is Not A License To Breach Its Contracts.*

As an ancillary to its "no breach" argument, defendant introduces another novel and unprecedented theory: what may be termed the "we could have confiscated your property so you should be glad that all we did was breach your contract" defense. Defendant asserts that because it could have exercised its power of eminent domain to condemn plaintiffs' properties, the fact that it provided plaintiffs with additional options should not make it more liable than it would have been otherwise. Def. Mem. at 16. Defendant points to no authority in the law of contracts, the law of takings, or otherwise, to support this theory. Indeed, there is none.

Defendant's argument also muddles the requirements for establishing a breach of contract with the requirements for a takings claim. The question whether a breach occurred looks to

---

application, and the agency then must prepare an incentive offer and determine the need for the housing. 7 C.F.R. §§ 1965.204, 1965.205(c), 1965.213(c), 1965.214(b), 1965.215(b),(f). After the property is appraised (a process that could involve as many as three appraisers and take several months to complete, *see id.* § 1965.216), any qualified purchaser can obtain the property by making a "bona fide offer." 42 U.S.C. § 1472(c)(5)(A)(ii). Importantly, a "bona fide offer" does not equate to a "bona fide purchase" – *i.e.*, once an offer is made, there is no telling when the owner will actually receive a payment. *See id.*; 7 C.F.R. § 1965.218(a)(4). Before any sale is completed, years could pass while the agency reviews the qualifications of potential buyers, the offeror files an extensive application the offeror appeals any decision on its eligibility, the transfer is approved by the national office, and, last but not least, the owner awaits the funding of any loan or other FmHA assistance to facilitate the sale. *Id.* §§ 1965.216(c),(d), 1965.217, 1965.65(f), 1965.217(b), 1965.217(c),(d); *see also id.* § 1965.218(a)(4) (an offer is bona fide, and the owner is obligated to sell "even if the offer is contingent on Rural Development funding *when no funding is available*") (emphasis added).

whether the government failed to perform its contract obligations; not to whether it could have achieved a similar result through the exercise of one of its sovereign powers. Regardless of what result defendant might have achieved by exercising its power of eminent domain over plaintiffs' properties, that power does not in any way allow defendant to escape its contract liability. *Cuyahoga*, 57 Fed. Cl. at 776-77 (explaining that some government actions, while constituting a taking of property, also amount to a breach of contract).[17]

Further, defendant's argument, if accepted, would grant the government limitless powers to dishonor its contract obligations. The government could always avoid undesirable contracts by simply exercising its power of eminent domain to take the property interests contained within the contract. *Cf. id.* at 776 (finding "no logical limit" to the government's view of its ability to pass legislation relieving itself of its contractual obligations). In short, the government is once again seeking an exemption from the contract law that applies between private parties.[18]

---

[17] Defendant's reference to *Beatty v. United States*, 168 F. Supp. 204 (Ct. Cl. 1958) is also misplaced. *Beatty* was a takings case that addressed the property owner's claims that it acted under duress from the government in deciding to sell its properties. Thus, it is difficult to comprehend what relevance *Beatty* has to plaintiffs' contract claims. Indeed, defendant's continued reliance on takings cases in support of its "no breach" argument confirms its unwillingness to stand accountable to standard contract principles.

[18] In propounding this new theory, defendant relies on statements made by the Federal Circuit in *Cienega Gardens*, 331 F.3d 1192 (Fed. Cir. 2003), to the effect that the FmHA prepayment scheme is more favorable to owners because it allows for a forced sale. The excerpts from *Cienega Gardens* that defendant points to, however, were directed to the owners' takings claims, and not to any contract claims. More fundamentally, defendant's attempt to distinguish the HUD and FmHA prepayment schemes rests on a false premise. While defendant suggests that FmHA owners are in a much better position because they can sell their properties to a non-profit organization for an alleged fair market value, the HUD regulations, in fact, provide precisely that option as well. *To wit*, the HUD prepayment scheme includes a "voluntary sale" provision that virtually mirrors the FmHA process. 24 C.F.R. § 248.157; 12 U.S.C. § 4301(a)(1); 24 C.F.R. § 248.111(h). Thus, the FmHA owners in this case stand in no better a position that the HUD owners who prevailed in *Cienega Gardens.*

**B. The Government Could Not, As A Matter Of Law, Impose Upon Plaintiffs New Conditions of Prepayment.**

Defendant contends that, under the unmistakability doctrine, plaintiffs' contracts cannot be construed to preclude Congress from subjecting prepayment to conditions such as those required by ELIHPA. But the unmistakability doctrine has no applicability to this case because the government was not acting in its sovereign capacity when it repudiated plaintiffs' contracts.

*1. The Unmistakability Doctrine, Which Protects The Government Only When It Is Acting In Its Sovereign Capacity, Is Inapplicable Here.*

Defendant concedes, as it must, that the unmistakability doctrine applies only to the exercise of sovereign power. (Def. Mem. 19). It argues, however, that "sovereign power" for purposes of the unmistakability doctrine should not be restricted to the meaning accorded "sovereign acts" for purposes of the sovereign acts defense. (Def. Mem. 21). Under the sovereign acts defense, the United States, when sued, is protected from liability for obstructing the performance of a particular contract as a result of "its public and general acts as a sovereign." *Horowitz v. United States*, 267 U.S. 458, 461 (1925). Defendant does not propose an alternative to the "public and general acts" definition of sovereign acts, but the thrust of its position seems to be the same as that taken by the government, and rejected recently by this Court, in *Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751 (2003): that because the statute at issue has a general purpose of preserving a federally-subsidized housing program, it should be deemed an exercise of sovereign power under the unmistakability doctrine. As in *Cuyohoga*, that argument should be rejected here. The test of whether the unmistakability doctrine applies cannot be whether the government acted with a public purpose in passing the law – it presumably does so in all cases. The issue is whether the government achieved that purpose in a manner that targets its own prior contractual obligations. In this respect, the linkage between the sovereign acts defense and the unmistakability doctrine is clear. The protection accorded by both doctrines depends on whether the government is acting as sovereign or whether, instead, it is acting in the capacity of an ordinary contractor.

Two recent decisions of the Court of Federal Claims squarely address the issue whether the unmistakability doctrine applies where the legislation at issue is not a sovereign act. *See General Dynamics v. United States*, 47 Fed. Cl. 514 (2000); *Grass Valley Terrace v. United States*, 51 Fed. Cl. 436 (2002) (holding that the 1988 and 1992 legislation here at issue did not qualify as sovereign acts because they specifically targeted the critical prepayment option contained in owners' contracts). After considering the issue at length, both held that the unmistakability doctrine does not apply under the circumstances at issue here. Two other decisions of this Court previously reached the same conclusion. *Conoco, Inc. v. United States*, 35 Fed. Cl. 209, 255 (1996) ("The unmistakability doctrine stands or falls with the sovereign acts doctrine.");[19] *Coast-to-Coast Fin. Corp. v. United States*, 45 Fed. Cl. 796, 803 (2000) ("The issue of unmistakability *vel non*, in other words, cannot be resolved in isolation from the question of whether the alleged breaching statute is a sovereign act").

Other federal courts have also reached the same conclusion. *See Kimberly Associates v. United States*, 261 F.3d 864, 869 (9th Cir. 2001) (addressing interplay of sovereign acts defense and unmistakability doctrine and concluding that, because the government "was not acting in a sovereign capacity" when it passed ELIHPA and altered the terms of its contracts with Section 515 owners, the court "need not reach the second question" of whether the contracts waived the government's sovereign authority in unmistakable terms); *accord United States v. Westlands Water District*, 134 F.Supp.2d 1111, 1151 (E.D. Cal. 2001) ("Where no sovereign power is implicated . . . , it is unnecessary to determine whether the government unmistakably waived its power to legislate as to those contracts."); *Resolution Trust Corp. v. FSLIC*, 34 F.3d 982, 984 (10th Cir. 1994) ("Only if the sovereign acts doctrine applied would we be required to address the issue of unmistakability.").[20] In short, the great weight of authority – including

---

[19] The Government did not challenge this holding on appeal in *Conoco*, which culminated in the Supreme Court's decision in *Mobil Oil v. United States*, 530 U.S. 604 (2000).

[20] There is no dispute that the government's conduct did not qualify as a "sovereign act" within the meaning of the sovereign acts defense. In *Adams v. United States*, 42 Fed. Cl. 463, 479 (Fed. Cl. 1998), Judge Horn squarely held that the 1988 and 1992 Legislation at issue do not qualify as

several cases addressing the precise statutes and government program at issue here – establishes firmly that the sovereign acts defense and the unmistakability doctrine are inextricably linked.

Contrary to defendant's assertions, the Supreme Court's decision in *United States v. Winstar Corp.*, 518 U.S. 839 (1996) ("*Winstar*"), while not directly addressing the issue,[21] supports a link between the doctrine and the defense. Thus, for example, courts construing *Winstar* have found confirmation of the interrelationship between the doctrine and the defense in the opinion's statement that "the application of the [unmistakability] doctrine thus turns on whether enforcement of the contractual obligation alleged would block the exercise of a

---

acts protected by the sovereign acts defense because the legislation was specifically targeted at repudiating the government's own contractual obligations with plaintiffs as holders of Section 515 contracts. The Court found that the legislation "specifically targeted the termination options found in FmHA's contracts." After a review of the contracts, the repudiating legislation, and the legislative history, the Court concluded as follows:

> "First, the statutes substantially effect the FmHA loanholders' prepayment options. The statutes have minimal general impacts because they repudiate contracts with FmHA loanholders . . . that had prepayment option terms. Second, the legislative history behind the statutes reflects Congress' concern with such contracts and the repudiation of such prepayment terms. Thus, neither ELIHPA nor the 1992 legislation is a public and general act to which the sovereign acts defense applies." *Id.* at 480.

*Accord Kimberly Associates. v. United States*, 261 F.3d 864, 869-70 (9th Cir. 2001); *Grass Valley Terrace v. United States*, 51 Fed. Cl. 436, 441-43 (Fed. Cl. 2002). Indeed, the government does not raise the sovereign acts defense in this case.

[21] The Federal Circuit in *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569 (Fed. Cir. 1997), similarly was not presented with the issue of whether the unmistakability doctrine applies when the sovereign acts defense is unavailable, and in fact found that both applied in that case. Thus, the Court had no occasion to consider the interplay between the two. Although the court found that the applicability of the unmistakability doctrine "is unrelated to the nature of the underlying contracts," *see* 112 F.3d at 1579, it made no express determination as to whether the doctrine's application is related to the nature of the government's conduct or the legislation at issue. The Court did find it significant that the plurality in *Winstar* stated that "application of the unmistakability doctrine turns on whether enforcement of the contractual obligation would effectively block the exercise of a sovereign power of the Government." *Id.* The Federal Circuit had no need to determine whether the unmistakability doctrine applied in the absence of the exercise of such a sovereign power, however, because the claim before it sought to limit the government's authority to tax, which the *Winstar* plurality had expressly cited as a classic sovereign act within the scope of the unmistakability doctrine. *Id.*

*sovereign power* of the Government." 518 U.S. at 879 (emphasis added); *see Kimberly Assoc.*, 261 F.3d at 869 ("It seems clear … that what the Supreme Court had in mind when [it] referred to sovereign power was the power exercised by the government for 'public and general' purposes, as opposed to releasing [the] government from its contractual obligations."); *General Dynamics*, 47 Fed. Cl. at 542. The plurality in *Winstar* went on to explain that "sovereign power" as used in this context does not encompass efforts by the government to target a particular government contract or class of government contracts, *i.e.*, acts that fall beyond the scope of the sovereign acts defense:

> "Sovereign power" as used here must be understood as a power that could otherwise affect the Government's obligation under the contract. The Government could not, for example, abrogate one of its contracts by a statute abrogating the legal enforceability of that contract, Government contracts of a class including that one, or simply all Government contracts. No such legislation would provide the Government with a defense under the sovereign acts doctrine, *see infra* at 891-899 [referring to discussion of the sovereign acts defense].

518 U.S. at 879 n.22. The plurality also distinguished examples of claims that would implicate sovereign authority, such as claims implicating the power to tax or control navigation. *Id.* at 879-80. The opinion then makes clear that the unmistakability doctrine does not apply when the government engages in a targeted repudiation of certain contracts such that no "sovereign power" of the government, within the meaning of the sovereign acts defense, is implicated.[22]

---

[22] As explained in *Coast-to-Coast,* 45 Fed. Cl. at 796, this view accords with the three-justice concurrence in *Winstar* authored by Justice Scalia, which held that the unmistakability doctrine "has little if any independent legal force beyond what would be dictated by normal principles of contract interpretation" and that "the 'sovereign acts' doctrine adds little, if anything at all, to the 'unmistakability' doctrine, and is avoided whenever that one would be." 518 U.S. at 920, 923 (Scalia, J., concurring); *see also id.* at 911 (Breyer, J., concurring) (noting that the unmistakability doctrine "was not intended to displace the rules of contract interpretation applicable to" ordinary contract cases). These concurring opinions agree that the unmistakability doctrine does not act as a bar to contract claims against the government that would be enforceable under ordinary principles of contract law. Thus, the key point is that both the four-justice plurality and the three-justice concurrence agree that where no sovereign act is implicated, ordinary contract principles apply.

Neither the Supreme Court in *Winstar* nor the Federal Circuit in *Yankee Atomic* has explicitly addressed the central question presented here: whether courts need to apply the unmistakability doctrine at all where no sovereign act of the government is at stake. Of the nine cases that *have* directly addressed that issue, however, only *Adams* and *Franconia* (which recently went to trial on all claims) have held that the two doctrines apply in isolation from one another.[23] The great weight of authority and the clear trend in the case law, including two federal appellate court decisions (*Kimberly Associates* and *Resolution Trust Corp.)* and five Court of Federal Claims decisions (*Grass Valley Terrace, General Dynamics, Conoco, Coast-to-Coast*, and *Cuyahoga*, discussed in the next section), have held that the unmistakability doctrine does not apply where the sovereign acts defense cannot be met. In addition, these decisions were handed down both before and after *Winstar*, creating a clear and continuous line of precedent in support of plaintiffs' claims.

Accordingly, because the offending legislation does not qualify for protection as a sovereign act, the government cannot rely on the unmistakability doctrine to immunize itself from liability for breaching plaintiffs' contracts.

*2. The Court's Recent Decision In Cuyahoga Extinguishes Any Doubt As To The Applicability Of The Unmistakability Doctrine Here.*

Plaintiffs' position regarding the unmistakability doctrine was resoundingly confirmed by the Court's recent decision in *Cuyahoga Metropolitan Housing Auth. v. United States*, 57 Fed. Cl. 751 (2003) ("*Cuyahoga*"). Based on an extensive review of the roots of the doctrine and its legal interpretation, the Court concluded that "the unmistakability doctrine applies only when the Congress invokes one of the sovereign powers protected by the doctrine." 57 Fed. Cl. at 774; *see also id*. at 769 ("[W]here, for example, the challenged legislation represents a bald 'repudiation' of a contractual obligation prompted by Congress' desire to correct what it perceives to be an overly generous deal – the unmistakability doctrine will avail the government naught.").

[23] Further, the court in *Adams* pointed to the lack of certainty in its conclusion, explicitly welcoming "further clarification" on the issue. 42 Fed. Cl. at 482.

In reaching this holding, the Court found that there was "no logical limit" to the government's desired interpretation of the doctrine, which "would transform the unmistakability doctrine from a shield into a meat axe that would allow the Congress to reserve the choicest portions of the government's contracts and discard the rest." *Id.* at 776. In an example directly relevant to this case, the Court noted that "if those willing to offer goods or services under a given program were . . . eligible to leave the program, Congress could simply extend the agreements already in force . . . ." *Id.* The Court also observed the dire consequences that could result if the government's view of the doctrine were to prevail:

> . . . private parties should not have to guard against the possibility that the government would target essential provisions of their contract for later unilateral revision, thereby obtaining a second promise from the government not to do what it should not do in the first instance. . . . One can only speculate what would happen in the marketplace if prominently displayed in every contract were a provision explicitly indicating that the government reserved the right to change unilaterally any provision subsequently deemed by the Congress or executive agency to be unduly expensive or otherwise ill-advised. *Id.* at 776 n.35.

*See also id.* at 775 (concluding that "the unmistakability doctrine protects only certain forms of legislation, *to wit*, those truly invoking 'sovereign powers'"). Accordingly, *Cuyahoga* confirms that the government's liability for breach must be adjudged according to the same standard contract principles that apply in disputes between private parties. *Id.* at 774 ("neither [the unmistakability doctrine nor the sovereign acts defense] applies when the Congress instead targets the government's contractual obligations in an effort to obtain a better deal"); *see also United States v. Winstar Corp*, 518 U.S. 839, 895 (1996); *Franconia Assoc.,* 536 U.S. at 141.

Remarkably, defendant asserts that *Cuyahoga* actually supports its argument that its actions are protected by the unmistakability doctrine. In particular, it attempts to distinguish the legislation at issue in *Cuyahoga* from the legislation in this case, contending that because the legislation here did not "have either the purpose or the effect of reducing Government outlays" (Def. Mem. 23), the reasoning of *Cuyahoga* is not applicable. Based on this purported

distinction, the Government concludes that ELIHPA, unlike the statute in *Cuyahoga*, constitutes an exercise of sovereign power within the protection of the unmistakability doctrine.

Defendant's argument rests on several false premises. First, the notion that a "sovereign act" under the sovereign acts defense is somehow distinct from an "exercise of sovereign power" under the unmistakability doctrine is mistaken. There is no basis, in *Cuyahoga* or any of the other decisions addressing the relationship between the two doctrines, to support such a distinction. On the contrary, all of the cases treat the concept of sovereign power as the same under both doctrines. Indeed, that is precisely the reason why those cases have concluded that where the sovereign acts defense is inapplicable, the unmistakability doctrine is inapplicable as well. *See* pp. 23-27, *supra; see also Cuyahoga*, 57 Fed. Cl. at 770 (explaining that *Winstar* "suggests a nexus between the two doctrines that hinges on whether a given enactment truly represents the exercise of a 'sovereign power'").

Second, defendant is also mistaken in suggesting that the determination of whether a government action qualifies as an exercise of sovereign power under the unmistakability doctrine hinges on whether it is aimed at "reducing Government outlays." Def. Mem. 23. The *Cuyahoga* court nowhere suggested that the only situation in which the unmistakability doctrine can be avoided is where the legislation is geared toward reducing expenditures. The proper inquiry, as articulated in *Winstar* and all of its progeny, is whether the government action is "public and general" in nature or is targeted at prior government contracts. Again, the courts unanimously have held that ELIHPA falls into the latter category. Contrary to defendant's assertions, the relevant legislative history squarely confirms this conclusion.[24] Indeed, the text of the statute

[24] *See, e.g.,* 126 Cong. Rec 22650 (1980) (". . . it is a bargained for consideration and important part of a contract of borrowing, the right to prepay an indebtedness at the option of the borrower."); *id.* at 22650 ("[A]pplying such a provision retroactively is morally and legally wrong. Individuals have relied upon their contractual rights, they have made personal and economic decisions based on those rights. To change the terms of the contract, a contract, I might add that was written by the Government itself, to prohibit that which not only it encouraged but was required before, cannot be justified. . . . This section of the law has within it the seeds of prolonged litigation. . . . The Federal Government should honor its own contracts."); *id.* at 22651 ("What we are deciding is whether or not one party should honor its

itself refers directly to section 515 owners, their contracts, and their prepayment rights. 42 U.S.C. § 1472(c)(4)(A) ("Before accepting any offer to prepay . . . any loan made or insured under section 514 or 515 pursuant to a contract entered into before December 15, 1989, the Secretary shall make reasonable efforts to enter into an agreement with the borrower . . . .").

Finally, apart from espousing incorrect standards, defendant's attempt to contrast the legislation at issue in *Cuyahoga* from the statutes at issue here is in vain. While the government argues that the legislation in this case was intended to preserve a program designed to provide low-income housing, both the enabling legislation and the challenged amendments involved in *Cuyahoga* carried the same purpose.[25] At the same time, the two legislative measures share the common purpose and effect of reducing the cost to the government in administering each program. Prior to enacting ELIPHA, Congress had become concerned with the increasing rate of prepayments of 515 loans, and the impact that the resulting loss of housing would have on its

---

contractual agreements. The law says yes. The question then, basically is whether the Government is above the law. I say it is not."); *id.* (". . . and it makes no difference whether you call it in legal language an abrogation of terms or whether you call it changing the rules in the middle of the game – it was wrong."); *id.* at 22653 ("We certainly are not encouraging participation by private enterprise when we change the rules of the game retroactively."); *id.* (". . . what is really at stake here is whether Congress should pass a law abrogating the right of contract."); ("What we are addressing here is not only the sanctity of a contract and the overriding necessity of avoiding the abrogation of a contract. We are talking about the stability and credibility of the actions and contracts of the Federal Government. If we take this stability and credibility away, we provide a tremendous disincentive for people to deal with the Federal Government.); 133 Cong. Rec. 31381 (1987) (". . . it will be remarkable if we escape serious law suits challenging this approach.").

[25] *See* 42 U.S.C.A. § 1437 (1994) ("It is the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this chapter, to assist the several States . . . to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income"); 42 U.S.C.A. § 1437f (1994) ("For the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made . . . in accordance with the provisions of this section."); Senate Report No. 103-311 at 34 (1994 amendments, describing HUD as an organization that "administers . . . rental and homeownership subsidy programs for low-income families who otherwise could not afford decent housing . . .").

budget.[26] Obviously, if the program continued to lose needed housing, the government would have to finance the construction of replacement housing at the taxpayer's expense. Even as early as 1980, during the debate over the repeal of the 1979 legislation, Congress noted the enormous expense that would be required to replace the housing that could be lost due to prepayment:

> Mr. Chairman, I want to point out that if this amendment is agreed to, three-quarters of the rental housing units produced by Farmers Home in the last 8 years will be in danger of being removed from the rural, low- and moderate-income housing market. *As much as $3.3 billion in additional funding would be required to replace them.* This, Mr. Chairman, could well be the cost of adopting this amendment.

126 Cong. Rec. 22651 (1980) (emphasis added); *see also id.* at 22653 ("In a case of prepayment and displacement it is the taxpayer who will then be asked to provide new public-assisted housing for those very same people who were displaced."). Thus, by enacting ELIHPA, the government was able to avoid spending billions of dollars to construct or finance new housing. Instead of burdening the public fisc with this enormous obligation, the government shifted the financial burden of maintaining the section 515 portfolio onto the owners by restricting their right to prepay and compelling them to remain in the program. As a result, ELIHPA, like the legislation at issue in *Cuyahoga*, had the purpose and effect of reducing government outlays – and no doubt has provided the government far greater savings.

Consistent with *Cuyahoga,* the fact that Congress acted with a public purpose in passing ELIHPA is not enough to entitle it to the protection of the unmistakability doctrine. The proper

---

[26] *See Rural Rental Housing: Cost Information on FmHA's Section 515 Program and Other Housing Options*, GAO, at 86 (Aug. 1987) (comparing the cost to the federal government of the section 515 program to "other federal housing subsidy options" and concluding that "the section 515 program was generally the least expensive way to serve very low-income households."); *Rental Housing: Potential Reduction in the Privately Owned and Federally Assisted Inventory*, GAO, at 27 (June 1986) (estimating potential reduction in FmHA portfolio in response to Congressional concern about potential loss of subsidized rental housing); *Rural Rental Housing:*

inquiry is whether the government achieved its public purpose in a manner that targeted its own prior contractual obligations. There can be no dispute that ELIHPA did just that, thereby placing the government's actions beyond the protection of the unmistakability doctrine.

### *3. The Contract Right Here At Issue Is Sufficiently "Unmistakable" To Satisfy The Unmistakability Doctrine In Any Event.*

Even if the unmistakability doctrine did apply here, the contract rights at issue are sufficiently "unmistakable" to satisfy the doctrine. Under *United States v. Winstar Corp*, 518 U.S. 839 (1996), the doctrine requires at most only a clear promise to regulate in a certain fashion into the future. *See id.* at 922 (Scalia, J., concurring). Plaintiffs' contracts contain such a clear promise, unambiguously affording property owners the right to terminate their participation in the 515 housing program by prepaying at any time at their option. The government's promise in this case is as clear and unmistakable as in *Winstar*. The unmistakability doctrine demands nothing more. *See Cienega Gardens v. United States*, 331 F.3d 1319, 1334 (Fed. Cir. 2003) (finding that under similar affordable housing program administered by HUD, "[t]he Owners prepayment rights are such clear, unqualified rights" as the contract terms at issue in *Winstar*); *id*. at 1348 (holding that the plaintiffs "agreed to enter the programs in reliance on prepayment as the consideration for signing" the agreements).[27]

---

*Impact of Section 515 Loan Prepayments on Tenants and Housing Availability*, GAO, at 30-35 (Feb. 1988) (analyzing potential for future section 515 prepayments).

[27] Other terms of plaintiffs' contract confirm an unmistakable promise on the government's part. In addition to the Promissory Note language guaranteeing the right to prepay "at any time at the [owner's] option," plaintiffs' contracts also specify that they cannot be modified absent a written agreement signed by both parties. Also, the loan agreements state that "any loan made or insured will be administered subject to the limitations of the authorizing act of Congress and related regulations." The contracts do not state that the loans will be administered subject to any and all future acts such as the 1988 legislation or the 1992 legislation. Thus, the only legislation that the contracts were made subject to is the authorizing act of Congress, *i.e.*, Section 515 of Title V of the National Housing Act. *See Marathon Oil v. United States*, 177 F.3d 1331, 1337 (Fed. Cir. 1999) (contract made subject to "all other applicable statutes and regulations" did *not* include either (1) subsequent legislation or (2) subsequent changes in regulations as a result of subsequent legislation; to interpret the contract otherwise would "raise serious questions about illusory contracts, and perhaps questions of due process and other constitutional concerns"); *see also Mobil*, 530 U.S. at 616-17; *Winstar*, 518 U.S. at 921 (government contracts should not be

The fact that defendant may disagree with plaintiffs' characterization of the promise made property owners is irrelevant for purposes of a Rule 12(b)(6) motion. The Court must accept as true plaintiffs' factual allegations and must construe the record in the light most favorable to plaintiffs. Applying this standard, the Government's motion to dismiss on the basis of the unmistakability doctrine must be denied.[28]

## III. PLAINTIFFS' TAKINGS CLAIMS PRESENT FACT ISSUES NOT PROPERLY ADDRESSED ON A RULE 12(B)(6) MOTION.

### A. Plaintiffs' Takings Claims Are Independent From Their Contract Claims.

After arguing that it should be exempted from contract liability based on its power of eminent domain, defendant asserts that plaintiffs cannot maintain takings claims because their rights arise from a contract.[29] Stated otherwise, defendant claims that plaintiffs' takings claim are really contract claims at heart, but any such contract claims cannot survive in light of the government's authority to commit a taking. While the government attempts to have it both ways, the fact of the matter is that it is liable for both a breach of contract and a taking of plaintiffs' properties. *See Cuyahoga*, slip op. at 34 (explaining that where the government unilaterally extends agreements entered into under a regulated program, the government's action

---

read in a manner that renders government obligations "illusory"). Similarly, the reference to legislation in the loan agreements here should be read to include only the legislation in existence at the time of the contract; not *future* legislation. Otherwise, the promise in the contracts that contract terms could be changed only by written mutual agreement would become illusory.

[28] The prepayment right was in fact the *quid pro quo* of the parties' agreement. *See Winstar,* 518 U.S. at 921. In this regard, the evidence at trial will be that: (1) none of the plaintiffs would have entered into their Section 515 contracts absent the right to prepay and exit the program; (2) the contracts are not economically viable absent the ability to prepay without restrictions; and (3) the FmHA itself recognized the fundamental importance of the prepayment provision to plaintiffs' contracts, using it as a key selling point to potential owners. *See* pp.3-4, 8-9, *supra*.

[29] Defendant does not appear to challenge whether plaintiffs possessed a property interest cognizable under the Fifth Amendment. Plaintiffs assert both a taking of their real estate interests (*see Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1016 n.7 (1992); *Cienega Gardens*, 331 F.2d at 1328) and their contractual prepayment rights (*see United States Trust Co. v. New Jersey*, 431 U.S. 1, 19 n.16 (1977); *Cienega Gardens*, 331 F.3d at 1329-30).

can constitute both a taking of property and a breach of contract). Having engaged in conduct that resulted in both a breach of plaintiffs' contracts and a taking of their properties, defendant is in no position to force plaintiffs into an election of remedies.

The Federal Circuit's recent decisions in *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) and *Chancellor Manor v. United States*, 331 F.3d 891 (Fed. Cir. 2003) erase any doubt as to whether plaintiffs can maintain takings claims independent from their contract claims. Those cases presented the takings claims of owners in housing programs administered HUD. The owners' claims were based on the application of the 1988 legislation and a subsequent statute enacted in 1990, both of which restricted their contractual rights to prepay and exit the housing programs. The courts in both cases held that the owners enjoyed vested property interests protected by the Fifth Amendment, notwithstanding the fact that their asserted property interests were triggered by their contractual right to prepay. *Cienega Gardens*, 331 F.3d at 1330 ("The significance of the contract right here lies not in the right to prepay as such, but the exercise of the contract right as a prerequisite of the Owner's right to exit the program."). Further, there is no indication that the fact that the HUD owners' loan agreements were with private lenders and insured by HUD, as opposed to direct government loans, was material to the Court's finding of a protected property interest.[30]

### B. Because Defendant's *Penn Central* Argument Requires the Court to Decide Disputed Facts, It Is Not Properly Considered Under Rule 12(b)(6).

By definition, application of the three *Penn Central* factors to assess whether government regulatory action effects a taking under the Fifth Amendment requires consideration of the

---

[30] Further, the fact that plaintiffs agreed to dedicate their properties to housing low-income tenants for a limited period of time does not in any way negate the validity of their property rights. As the Federal Circuit held in *Cienega Gardens,* 331 F.3d at 1329, "[t]he owners are not somehow deprived of their Fifth Amendment rights merely because they temporarily relinquished some of their rights of fee simple ownership." *See also Prudential Ins. Co. v. United States*, 801 F.2d 1295, 1300, n.13 (Fed. Cir. 1986); *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949); *United States v. General Motors Corp.*, 323 U.S. 373 (1945); *Allenfield Assocs. v. United States*, 40 Fed. Cl. 471, 487 (1998).

specific facts of the case.[31] Plaintiffs submit that the facts in this case tilt overwhelmingly in their direction and establish beyond any reasonable doubt that a taking has occurred. To the extent that defendant disagrees with plaintiffs' characterization of the facts, however, its argument is not properly the subject of a Rule 12(b)(6) motion. Such motions require the Court both to assume the truth of plaintiffs' factual allegations and to construe them in the light most favorable to plaintiffs.

*1. Plaintiffs Held A Reasonable Investment-Backed Expectation That They Would Be Able To Prepay And Leave The 515 Program.*

The opinions of this Court and the Federal Circuit in *Cienega Gardens* and *Chancellor Manor* dispose of the Government's argument that plaintiffs' takings claims are defeated by the "highly regulated" nature of the government's housing program. Defendant essentially argues, as it did in *Cienega Gardens*, that because plaintiffs entered into a regulated housing program, they should have expected that the government might pass legislation abrogating their contract rights and property interests. The Federal Circuit forcefully rejected this argument:

> The government, essentially, asks us to hold that *nothing* in the Owners' private mortgage agreements has any force and effect. The government, thus, advocates a legal regime that eviscerates century-old understandings of the stable and enduring nature of contract and real property rights. . . . The government's contention is, in effect, that Congress could retroactively alter the Owners' mortgage contracts in any way it chose without any recourse for the Owners. This cannot be, and is not, the law.

331 F.3d at 1330-31.

---

[31] *See Yee v. City of Escondido*, 503 U.S. 519, 523 (1992) (the determination of whether regulations effect a taking of property "necessarily entails complex factual assessments of the purposes and economic effects of government actions"); *Lucas*, 505 U.S. at 1015; *Pennsylvania Coal Co.*, 260 U.S. at 413; *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999) (holding that various findings necessary to determine whether government regulation effects a taking are questions for the finder of fact); *Chancellor Manor v. United States*, 331 F.3d 891, 904 (Fed. Cir. 2003) (takings analysis involves "essentially an *ad hoc* factual inquiry"); *Conoco Inc. v. United States*, 35 Fed. Cl. 309, 337 (1996) (refusing to dismiss appellants' takings claims on summary judgment, even where the appellants failed to offer any response whatsoever to the government's motion on that issue).

The trial court in *Cienega Gardens*, 33 Fed. Cl. at 222, similarly dismissed the government's contention that the plaintiffs "operate in a highly regulated field, and, therefore, they should have expected that the government might change its mind about allowing plaintiffs to exercise the rights set forth in their deed of trust notes." Expressly disagreeing with the Eighth Circuit's decision in *Parkridge Investors Ltd. Partnership v. Farmers Home Admin.*, 13 F.3d 1192 (8th Cir. 1994) the *Cienega Gardens* court reasoned as follows:

> Plaintiffs' prepayment expectations were based on express language contained in their deed of trust notes and authorized by HUD. The prepayment clauses were consistent, moreover, with contemporaneous HUD regulations, and those regulations remained in force for the better part of the first 20 years of plaintiffs' mortgages. On that basis, the court cannot conclude that plaintiffs' expectations were "unreasonable."

33 Fed. Cl. at 222. Thus, the decisions held that the owners' expectations that they would be permitted to prepay their mortgages, in accordance with assurances made by the government through the mortgage notes and applicable regulations, were reasonable.

The Federal Circuit similarly held in *United Nuclear Corp. v. United States*, 912 F.2d 1432, 1436 (Fed. Cir. 1990), that even though the plaintiff had "voluntarily submitted" itself to a regulatory scheme, it did not reasonably expect that the government might change the basic rules under that scheme. There, the court found a taking based on the government's refusal to permit mining in accordance with leases it had approved allowing the plaintiff to mine uranium on land within an Indian reservation. *Id*. at 1438. With respect to the reasonableness of the plaintiff's investment-backed expectations, the court rejected the holding below that "it would have been reasonable and prudent for [the plaintiff] to question at the outset whether rules, regulations and requirements under the existing scheme, to which it voluntarily submitted itself, would change during the 10-year term of its lease." *Id.* at 1436 (plaintiff "justifiably believed and expected" that it would be permitted to mine in accordance with the leases).

Significantly, the Court was not persuaded by language in the leases subjecting them to "all regulations of the [Secretary] now or hereafter in force and relative to such leases . . . .'" *Id.*

The Federal Circuit found that even though the plaintiff "agreed that the leases would be subject to future regulations," it reasonably did not contemplate that the government would change its policies and thereby frustrate the plaintiff's investment-backed expectations. *Id.*; *accord NRG Co. v. United States*, 24 Cl. Ct. 51, 62 (1991) (following *United Nuclear Corp.* to hold that it "certainly was not reasonably foreseeable at the time [certain] permits were signed that the government would enact legislation canceling them"); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1008, 1101 (1984) (finding a taking based on an "explicit governmental guarantee" notwithstanding the fact that pesticide manufacturing is "an industry that long has been the focus of great public concern and significant government regulation").

In short, the cases make clear that the mere fact that property is subject to government regulation, no matter how pervasive, does not render the property owner's investment-backed expectations unreasonable where the government itself expressly created those expectations, whether by agreement or through its regulations. By the same token, the fact that a property owner submits to a regulatory regime does not put the property owner on notice that the Government may change the rules under that regime in a manner that reneges on prior assurances it made to the property owner. A. Brownstein, *Constitutional Wish Granting and The Property Rights Genie*, 13 Const. Comm. 7, 43 n.112 (Spring 1996) ("Courts are particularly likely to ignore the significance of on-going and substantial regulation of an industry in evaluating owner expectations when plaintiffs can identify specific government conduct that led to the development of their investment-backed expectations.").

Here, the government expressly stated in the promissory notes executed for each of the pre-1979 projects that the owners were able to prepay their mortgages, thereby terminating their participation in the Section 515 program and permitting them to rent to market-rate tenants, "at any time at [their] option." This commitment was reiterated in contemporaneous FmHA regulations. 7 C.F.R. § 1822.95(c) (1978). Similarly, for the post-1979 projects, the loan agreements, mortgages and contemporaneous regulations provided that the owners would be permitted to terminate their program participation, upon prepayment, at the end of twenty years.

7 C.F.R. § 1965.90(c) (1983). The prepayment right of all plaintiffs was also confirmed by the 1980 legislation, which restored the right of the pre-1979 plaintiffs to terminate their participation at any time at their option, and ensured that the post-1979 plaintiffs could terminate their participation after twenty years. Pub. L. No. 96-399, § 514, 94 Stat. 1671 (1980). [32]

The plaintiffs' expectation that they would be able to prepay and leave the Section 515 program was also essential to their decision to participate in the program in the first instance. None of the plaintiffs would have entered the Section 515 program absent the government's assurance of an unrestricted right of prepayment. Indeed, the importance of the right to plaintiffs will be confirmed by evidence to be offered at trial establishing that none of their properties would be economically feasible without the right to prepay and begin charging market rents. As this Court and the Federal Circuit found in *Cienega Gardens*, the prepayment right at issue in that case was "[o]ne of the primary incentives offered by HUD to the property owners to encourage the construction and development of low-income housing" and "an essential aspect" of the program, without which the plaintiffs never would have entered into the program. 38 Fed. Cl. at 75; *accord* 331 F.3d at 1346-47. The Court went on to find it "clear that without the ability to charge market level rents upon prepayment and conversion to conventional [market properties], plaintiffs' anticipated prepayment rights would have been meaningless and purposeless." *Id.* In short, the takings clause simply does not permit the government to frustrate investment-backed expectations that were developed in reasonable reliance on its representations and regulatory and statutory assurances.

---

[32] The government not only created plaintiffs' expectations by expressly agreeing that they would be able to prepay their mortgages and leave the Section 515 program, the evidence will show that it actually went a step further by promising the plaintiffs in their promissory notes that they would not be subject to inconsistent regulations, either present or future. Thus, plaintiffs' expectation that they would be permitted to prepay their mortgages in accordance with the express terms of the contracts, contemporaneous regulations, and the 1980 Legislation, clearly was reasonable. *See Cienega Gardens*, 331 F.3d at 1348-49 (expectations found reasonable notwithstanding fact that referenced regulations were expressly subject to amendment); *United Nuclear Corp.*, 912 F.2d at 1436 (expectations found reasonable even where leases at issue were, by their terms, subject to both existing *and future* regulations).

*2. The Economic Impact Of Plaintiffs' Inability To Prepay Without Restrictions And Convert To Market Rate Rents Is Severe.*

Defendant's challenge to plaintiffs' takings claims fails under the second of the *Penn Central* factors as well. In analyzing the economic impact of a regulation, the Federal Circuit has held that "the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored." *Florida Rock Indus.Inc. v. United States*, 18 F.3d 1560, 1567 (Fed. Cir. 1994); *see also Florida Rock Indus. v. United States*, 45 Fed. Cl. 21, 41 (1999) (finding a taking where the plaintiff, "which relied on the regulatory regime in place to support [its intended use of the property], has been treated to only one immediate use for the property: resale at a loss"). Here, plaintiffs will present evidence at trial regarding (1) their inability to recoup their initial investment in their projects, (2) whether any sale of their properties would be at a loss, and/or (3) the diminution in the fair market value of their properties.

The severe economic impact of being forced to remain in the Section 515 program is also demonstrated by the meager returns plaintiffs are currently receiving on their equity. As plaintiffs will establish at trial, their current returns on their equity are generally below 1%.[33] *See Cienega Gardens*, 331 F.3d at 1342-44 (analyzing economic impact based on the owners' annual return as a percentage of their equity in the properties); *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 308 (1989); *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944) (holding that "return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks").

*3. In forcing plaintiffs to continue the low-income use of their properties, the Government unfairly imposed on plaintiffs a burden that should be borne by the public generally.*

Consideration of the final prong of the taking inquiry, the character of the government action, involves a balancing of the public and private interests at stake. *Agins v. Tiburon*, 447

[33] While owners are permitted an 8% return on their initial investment, this figure stays the same regardless of how much equity the owner has built up in the project. Thus, as the plaintiffs continue to pay down their mortgages, and the fair market value of their properties continues to rise, their annual return represents a smaller and smaller percentage of their equity.

U.S. 255, 261 (1980). At trial, several factors will be proven to militate in favor of placing the financial burden of continuing the Section 515 program on the public generally rather than targeting plaintiffs. First, plaintiffs did not cause or contribute to the need for low-income housing in rural areas. *See Nollan v. California Coastal Comm'n*, 483 U.S. 825, 837-42 (1987) (finding a taking where government action was not reasonably related to a problem that the property owner created or to which it contributed). In addition, the owners receive no reciprocity of advantage from the continued low-income use of their properties. *See Penn Cenrtal Transp. Co v. New York City*, 438 U.S. 104, 134 (1978); *Florida Rock Indus.*, 18 F.3d at 1570. Finally, the 1988 and 1992 Legislation cannot be characterized as an effort to abate a public nuisance. *See Lucas*, 505 U.S. at 1027.

Under these circumstances, the government's desire to maintain affordable housing does not justify its decision to burden plaintiffs with the financial brunt of that goal. *Cienega Gardens*, 331 F.3d at 1338-39 ("Congress' objective in passing ELIHPA and LIHPRHA – preserving low-income housing – and method – forcing some owners to keep accepting below-market rents – is the kind of expense-shifting to a few persons that amounts to a taking."); *see also Armstrong v. United States*, 364 U.S. 40, 49 (1960) (takings clause is intended to "bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole"); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416 (1992) (a "strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change"); *Florida Rock Indus.*, 18 F.3d at 1571 ("The Government, in a word, must act fairly and reasonably, so that private parties can pursue their interests."). Under the Fifth Amendment, the United States Government must pay for what it takes.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court deny defendant's motion to dismiss in its entirety and permit this action to proceed to discovery and trial.

Dated: February 27, 2004

**Filed Electronically**

Respectfully submitted,

**s/ Jeff H. Eckland**

Mark J. Blando, Of Counsel
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Telecopy: (612) 766-1600

M2:20606464.03