IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| A.F.T.E.R. INCORPORATED, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 03-2264C |
| | ) | (Judge Braden) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFFS'
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 305-7561
Facsimile: (202) 305-7643

Attorneys for Defendant

April 9, 2004

# TABLE OF CONTENTS


INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Plaintiffs' Claims, as Pleaded in the Original and Amended Complaints, Are Barred by the Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Plaintiffs Have Failed to State a Cause of Action for Breach of Contract . . . . . . . 8

A. Plaintiffs Have Not Satisfied the Requirements for Pleading a Cause of Action for Breach of Contract . . . . . . . . . . . . . . . . . . 8

B. ELIHPA Did Not Repudiate the Contracts in Question . . . . . . . . . . . . . . 11

C. Under the Unmistakability Doctrine, the Contracts Cannot Be Construed to Preclude Congress from Enacting Requirements Such as Those Contained in ELIHPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

1. The Unmistakability Doctrine Applies Here . . . . . . . . . . . . . . . . 13

2. The Contracts in Question Did Not Surrender the Government's Power to Amend the Applicable Statute in Order to Prevent Displacement of Tenants . . . . . . . . . 15

III. The Government's Actions Did Not Constitute an Uncompensated Taking . . . . 17

A. Government Infringement of a Right Arising from a Government Contract Is Not Actionable under the Takings Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

B. The Government Did Not Effect an Uncompensated Taking under The Penn Central Test . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES

### FEDERAL CASES

Advance Construction Services, Inc. v. United States,
51 Fed. Cl. 362 (2002) . . . . . . . . . . 4

Alvin Ltd. v. United States Postal Service,
816 F.2d 1562 (Fed. Cir. 1987) . . . . . . . . . . 17

Brown v. United States,
42 Fed. Cl. 538 (Fed. Cl. 1998), aff'd, 195 F.3d 1334 (Fed. Cir. 1999) . . . . . . . . . . 3

Chancellor Manor v. United States,
331 F.3d 891 (Fed. Cir. 2003) . . . . . . . . . . 17

Cienega Gardens v. United States,
331 F.3d 1319 (Fed. Cir. 2003) . . . . . . . . . . 19, 20

Fireman v. United States,
49 Fed. Cl. 290 (2001) . . . . . . . . . . 5

Fortec Constructors v. United States,
760 F.2d 1288 (Fed. Cir. 1985) . . . . . . . . . . 17

Franconia Associates v. United States,
536 U.S. 129 (2002) . . . . . . . . . . 5, 12

Garcia v. United States,
469 U.S. 70 (1984), reh'g denied, 469 U.S. 1230 (1985) . . . . . . . . . . 14

General Dynamics Corp. v. United States,
47 Fed. Cl. 514 (2000) . . . . . . . . . . 13

Grass Valley Terrace v. United States,
51 Fed. Cl. 436 (2002) . . . . . . . . . . 13

Harlow v. Fitzgerald,
457 U.S. 800 (1982) . . . . . . . . . . 3

Inter-Coastal Xpress, Inc. v. United States,
49 Fed. Cl. 531 (2001), aff'd, 296 F.3d 1357 (Fed. Cir.2002) . . . . . . . . . . 5

Kimberly Associates v. United States,
261 F.3d 864 (9th Cir. 2001) . . . . . . . . . . 13

Kokkonen v. Guardian Life Insurance Company of America,
511 U.S. 375 (1994) . . . . . . . . . . 4

Lujan v. Defenders of Wildlife,
504 U.S. 555 (1992) . . . . . . . . . . 3, 4, 5

Lujan v. National Wildlife Federation,
497 U.S. 871 (1990) . . . . . . . . . . 4

Martinez v. United States,
48 Fed. Cl. 851 (2001) . . . . . . . . . . 5

McNutt v. General Motors Acceptance Corp.,
298 U.S. 178 (1936) . . . . . . . . . . 4

Merrion v. Jicarilla Apache Tribe,
455 U.S. 130 (1982) . . . . . . . . . . 16

Parkridge Investors, Ltd. v. Farmers Home Administration,
13 F.3d 1192 (8th Cir. 1994) . . . . . . . . . . 18

Penn Central Transportation Co. v. New York City,
438 U.S. 104 (1978) . . . . . . . . . . 18

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) . . . . . . . . . . 5

Scheuer v. Rhodes,
416 U.S. 232 (1974) . . . . . . . . . . 3

Spectronics Corp. v. H.B. Fuller Co., Inc.,
940 F.2d 631 (Fed. Cir.1991) . . . . . . . . . . 5

**DOCKETED CASES**

Allegre Villa v. United States,
No. 98-823C (Fed. Cl., March 22, 2004) . . . . . . . . . . 12

**FEDERAL STATUTES**

12 U.S.C. § 1715l . . . . . . . . . . 14

12 U.S.C. § 4101(a) . . . . . . . . . . 19

28 U.S.C. § 2501 . . . . . . . . . . 1, 3, 4, 8

42 U.S.C. § 1472 . . . . . . . . . . 16

42 U.S.C. § 1472(c)(5)(A) . . . . . . . . . . 10

42 U.S.C. § 1472(c)(5)(A)(i) . . . . . . . . . . 19, 20

Emergency Low Income Housing Preservation Act,
Pub. L. No. 100-242, 101 Stat. 1877 (1988) . . . . . . . . . . 2

Housing and Community Development Act of 1992,
Pub. L. No. 102-550, 106 Stat. 3672 (1992) . . . . . . . . . . 2

Housing and Community Development Amendments of 1979,
Pub. L. No. 96-153, 93 Stat. 1101 (1979) . . . . . . . . . . 14

Pub. L. No. 96-399, 94 Stat. 1614 (1980) . . . . . . . . . . 14

Pub. L. No. 100-242, § 202(b) . . . . . . . . . . 14

Pub. L. No. 100-242, § 202(b)(2) . . . . . . . . . . 15

Pub. L. No. 100-242, § 221 . . . . . . . . . . 19

Pub. L. No. 101-625, § 601(a), 104 Stat. 4249 (1990) . . . . . . . . . . 19

**FEDERAL REGULATIONS**

24 C.F.R. § 236.30 (1970) . . . . . . . . . . 19

**MISCELLANEOUS**

H. Rep. No. 96-154, at 43 (1979),
reprinted in 1979 U.S.C.C.A.N. 2317, 2359 . . . . . . . . . . 14

H. Rep. No. 100-122(I), at 53-54 (1987),
reprinted in 1987 U.S.C.C.A.N. 3317, 3369-3370 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

126 Cong. Rec. 22651 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| A.F.T.E.R. INCORPORATED, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 03-2264C |
| | ) | (Judge Braden) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFFS'
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

INTRODUCTION

In our moving brief, we established that plaintiffs had failed to plead sufficient facts to satisfy the jurisdictional requirement of filing suit within the six-year period prescribed by 28 U.S.C. § 2501,and that, on the merits, the complaint failed to state a cause of action either for breach of contract or for compensation under the Takings Clause of the Fifth Amendment. Plaintiffs' response fails to demonstrate otherwise.

We demonstrated that the complaint was insufficient to establish that any of the plaintiffs satisfied the jurisdictional requirement of filing suit within the applicable six-year statute of limitations, because the complaint lacked any facts indicating when any plaintiff's claim accrued. In response, plaintiffs argue that factual details need not be alleged in the notice pleading prescribed by the applicable rules, and that their first amended complaint, which they filed (purportedly out of "an abundance of caution") together with their opposition to our motion to dismiss, "specifically alleges that plaintiffs claims have been filed within the six-year time period prescribed by 28 U.S.C. § 2501." Pl. Br. 22, citing First Am. Compl. ¶¶ 42-43. Plaintiffs' argument concerning notice pleading misses the point. The defect in their original complaint was not lack of detail, but lack of any facts at all concerning when their claims accrued. And, the allegations added by the amended pleading do not cure the defect. They do not indicate, even in general terms, whether any particular plaintiff's claim first accrued less than six years before the

complaint was filed.

We also established that the enactment and implementation of the loan prepayment provisions contained in the Emergency Low Income Housing Preservation Act, Pub. L. No. 100-242, 101 Stat. 1877 (1988) ("ELIHPA"), and the Housing and Community Development Act of 1992, Pub. L. No. 102-550, 106 Stat. 3672 (1992), did not constitute a breach of contract or an uncompensated taking. We demonstrated that the contracts in question did not create an absolute prepayment right immune from future legislation regulating the exercise of that right; that ELIHPA did not repudiate the contracts in question; and that the Government did not breach these contracts. We further demonstrated that property rights allegedly invaded arose from a contract with the Government and thus were not protected by the the Fifth Amendment's Takings Clause, and that, in any event, the acts of which plaintiffs complain did not affect the plaintiffs' asserted property interests in such a manner as to constitute an uncompensated taking.

Plaintiffs' response, with respect to both the contract claim and the takings claim, suffers from the same misconceptions of the contracts and the pertinent statutory provisions that infect the complaint. In arguing that the enactment and implementation of the challenged legislation breached a contract right, plaintiffs rely upon contract language that does not state – and should not be construed to state – what plaintiffs read into it, and upon legislative language which, when read in context, does not conflict with the contract terms upon which plaintiffs rely. And, even if plaintiffs' reading of the contract and the challenged legislation were correct, the complaint would fail to state a claim under th Takings Clause, as a matter of law. Plaintiffs' argument to the contrary is based upon inapplicable precedent and upon a misreading applicable precedent.

## ARGUMENT

### I. Plaintiffs' Claims, as Pleaded in the Original and Amended Complaints , Are Barred by the Statute of Limitations

In our moving brief, we demonstrated that it was plaintiffs' burden to plead the requisite

jurisdictional facts to establish the Court's jurisdiction, that filing suit within six years of the accrual of the claim was a jurisdictional requirement in this Court, and that, therefore, plaintiffs bore "the threshold burden of pleading the essential facts to show that the claim is timely filed." Brown v. United States, 42 Fed. Cl. 538, 556 (Fed. Cl. 1998), aff'd, 195 F.3d 1334 (Fed. Cir. 1999). We further demonstrated that plaintiffs' complaint was devoid of any facts concerning when the claims accrued, and thus failed to satisfy this threshold requirement. In response, plaintiffs argue that jurisdictional facts relating to compliance with the statute of limitations need not be pleaded in the complaint, and that, to the extent that there may be such a requirement, they have satisfied it in the first amended complaint that they filed contemporaneously with their opposition. Neither of these arguments is sustainable.

Concerning the requirement to plead facts indicating timeliness under 28 U.S.C. § 2501, plaintiffs argue that, because our motion contests jurisdiction on the face of the complaint, it is subject to the principle that "all allegations in the complaint are [to be] taken as true and construed in a light most favorable to the complainant." Pl. Br. 10, citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982). Plaintiffs further state: "Consistent with the principles of notice pleading embodied in the Federal Rules of Civil Procedure and their RCFC counterpart, general allegations suffice at the pleading stage. Factual detail is not required." Pl. Br. 10. These observations may be true in themselves, but they fall short of the mark. In challenging the jurisdictional sufficiency of the complaint, we expressly assumed that the factual allegations contained in the complaint were true, Def. Br. 13, and we did not challenge the complaint for lack of factual detail. Rather, we argued that the complaint was "devoid of any facts concerning when any of the claims accrued." Id. at 11 (emphasis added).

For the same reason, plaintiffs' reliance upon Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), is misplaced. Plaintiffs quote the Supreme Court's observation in that case that

"'[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice [to establish the "injury in fact" essential to standing], for on a motion to dismiss we "presume that general allegations embrace those specific facts that are necessary to support the claim."'" Pl. Br. 10-11, quoting Lujan, 504 U.S. at 561, quoting Lujan v. National Wildlife Federation, 497 U.S. 871, 883-89 (1990). Applied to the question of compliance with 28 U.S.C. § 2501, the quoted language means that general factual allegations concerning when the claims accrued may suffice, and that if those general factual allegations are made, we may presume that they "embrace those specific facts that are necessary to support the claim." At a minimum, however, general factual allegations concerning the matter must be pleaded. Nothing can be presumed about the specific facts that might be embraced by general facts, when the general facts themselves are missing.

Plaintiffs also fault the Government for relying upon this Court's statement in Brown that "one seeking to invoke the jurisdiction of this court bears the threshold burden of pleading the essential facts to show that the claim is timely filed." 42 Fed. Cl. at 556. Plaintiffs argue that the quoted language derives from McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936), which plaintiffs characterize as "an opinion that predated the adoption of the Federal Rules of Civil Procedure and notice pleading." Pl. Br. 11. Upon this basis, plaintiffs assert that "neither Brown nor McNutt should be construed to run afoul of the more recent pronouncement of the Supreme Court in Lujan." Id. (footnote omitted).

As we have demonstrated, however, Lujan does not support the notion that it is unnecessary to plead facts indicating that the claim is timely filed. Moreover, the principle stated in McNutt has been cited with approval by the Supreme Court in Kokkonen v. Guardian Life Insurance Company of America, 511 U.S. 375, 377 (1994), which was decided after Lujan, and has been reiterated by this Court numerous cases, including recent ones. See, e.g., Advance Construction Services, Inc. v. United States, 51 Fed. Cl. 362, 364 (2002) (citing Kokkonen

and McNutt for the proposition that "[a]s the party invoking federal jurisdiction in the action, plaintiff bears the burden of pleading the facts upon which the Court's jurisdiction depends"); Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 52 (2001); Inter-Coastal Xpress, Inc. v. United States, 49 Fed. Cl. 531, 543 (2001), aff'd, 296 F.3d 1357 (Fed. Cir.2002); Fireman v. United States, 49 Fed. Cl. 290, 292 (2001); see also Spectronics Corp. v. H.B. Fuller Co., Inc., 940 F.2d 631, 635 (Fed. Cir.1991) ("We agree wholeheartedly that in personam and subject matter jurisdictional facts must be pleaded").[1]

In Inter-Coastal Xpress, the Court held that the complaint lacked sufficient jurisdictional facts relating to the statute of limitations. After holding the plaintiff carrier's claims accrued at the time the plaintiff received its initial routine payments rather than when its administrative claims were denied, the Court further ruled that it would "allow plaintiff to amend its complaint . . . by supplementing its allegations of jurisdictional facts, which are deficient at this time. As was mentioned above, approximately 170 of plaintiff's claims do not have a date of initial payment." 49 Fed. Cl. at 543 (emphasis added). In prepayment cases such as this, once an actual tender of prepayment has been made and rejected, the claim has accrued and the statute of limitations begins to run. See Franconia Associates v. United States, 536 U.S. 129, 133 (2002). Thus, the dates of any rejection of a tender of prepayment is as critical a jurisdictional fact as the dates of initial payment required to be pleaded in Inter-Coastal Xpress.

---

[1] Plaintiffs read a contrary conclusion into this Court's opinion in Martinez v. United States, 48 Fed. Cl. 851 (2001), because the Court in that case refusal to dismiss a claim for untimeliness, rejecting an argument that "because 'plaintiff fails to plead the dates of the alleged occurrences, the Court may infer such failure as an admission that the occurrences took place outside of the six-year statute of limitations." Id. at 858. In Martinez , however, the Court did not discuss the requirement to plead jurisdictional facts. The argument it rejected, rather, concerned whether untimeliness could be inferred as a matter of fact from the absence of allegations concerning the dates in question. Further, in Martinez the Court found, from the facts that were alleged in the complaint, that the earliest date the claim could have accrued was a date within the prescribed six-year period. As we have demonstrated, that is not the case here.

The allegations of jurisdictional facts are at least as deficient here as in Inter-Coastal Xpress. This is plainly true of the original complaint, which provides a chronology of the legislation at issue through 1992, but does not state when any of the other events underlying plaintiffs' claims occurred. Plaintiffs suggest that their first amended complaint cures any defect in their original complaint, but it does not. The amended complaint adds a few broad statements purporting to indicate when the claims accrued, but plaintiffs still have not provided any dates of any tender or rejection of a tender of prepayment. And, to the extent that the accrual of any plaintiff's claim may be based upon some event other than a rejection of a tender of prepayment, the amended complaint does not state when that event occurred either. Indeed, plaintiffs suggest that their claims did not accrue upon the occurrence of any particular event, but, instead, upon the existence of their own subjective intentions concerning what they would have done if not for the challenged legislation. And, even the times when each plaintiff would have first performed these allegedly intended actions is not stated in the amended complaint.

The amended complaint alleges that "[a]ll plaintiffs intended, upon entering into their contracts with the FmHA, to exercise their prepayment right and terminate their participation in the Section 515 program prior to the expiration of their full mortgage terms." First Am. Compl. ¶ 42. This pleading states nothing, however, about when any plaintiff entered into the Section 515 program and when any mortgage term expired.

The amended complaint alleges that "[a]ll of the pre-1979 plaintiffs intended to prepay within six years prior to the filing of this amended complaint on February 27, 2004, and would have done so within said six-year period of time but for the government's wrongful repudiation." Id. This statement conveys no information about any particular plaintiff, however, because the pleading does not indicate which of the plaintiffs are "pre-1979 plaintiffs." Nor does this statement state or imply whether or not any plaintiffs in this category tendered prepayment in any manner, and, if so, when they did so and how and when the Government responded. Presumably,

any plaintiff who wished to prepay in 1997 would wish to do so in 1998 as well; alleging the mere existence of a desire to do so within six years prior to the filing the complaint does not indicate when the claim accrued.

The amended complaint alleges that "[a]ll of the post-1979 plaintiffs, who constitute the great majority of owners in this action, intended to prepay upon the expiration of the twenty-year restrictive use clause applicable to their properties (none of which expired prior to December 1999), and would have done so but for the government's wrongful repudiation." Id. This allegation, like the one quoted above, conveys no information about any particular plaintiff, because the amended complaint does not indicate which of the plaintiffs are "post-1979 plaintiffs."

Finally, the amended complaint alleges that "all plaintiffs who submitted written prepayment applications to the agency under the repudiating legislation filed suit within six years after receiving a final decision from the agency rejecting their requests to prepay without restrictions." First Am. Compl. ¶ 43. This allegation, like those quoted above, conveys no information about any particular plaintiff, because the amended complaint does not indicate which of the plaintiffs "submitted written prepayment applications to the agency under the repudiating legislation."[2]

The information missing from the amended complaint does not constitute mere details. Nor is it unreasonable to expect the pleadings to contain this information about each plaintiff, rather than merely to make generalizations about broad categories of plaintiffs. This is not a class action. Plaintiffs do not allege that they were all parties to a single contract, or that they possess a

[2] Plaintiffs themselves insist that "a breach of contract may occur upon the mere tender of prepayment: an owner is not required to submit the voluminous application for prepayment contemplated by the agency s post-contractual, statutory prepayment regime in order for a breach to occur." Pl. Br. 12 n.8. Thus, under plaintiffs' own theory, if an owner tendered prepayment but was then told by the agency that a full, written prepayment application would have to be submitted before prepayment could be accepted, and if the owner then submitted an application and it was subsequently rejected, the claim would accrue no later than at the time the agency expressed its refusal to accept the tender without the application, regardless when the full application was submitted and rejected. Yet, the amended complaint is silent about whether and when any plaintiff first tendered prepayment, and whether and when the agency expressed its refusal to accept the tender.

common claim based upon a collective breach. Each named plaintiff purports to assert an independent claim, based upon its own separate contract. The time of contract formation varied from plaintiff to plaintiff, and the time when the Government's alleged obligation to accept prepayment arose likewise varied from plaintiff to plaintiff. The complaint contains less important details concerning each plaintiff, including the name of each housing project owned by that plaintiff for which the plaintiff entered into a Section 515 contract, and the number of housing units contained in each such project. To plead the basic jurisdictional facts relating to compliance with 28 U.S.C. § 2501, the complaint should have stated, at a minimum, whether and when the Government rejected a tender of prepayment of each of the Section 515 loans in question, or, if an event other than such a rejection is alleged to have triggered accrual of a particular claim, then the complaint should have stated what that event was and when it occurred. Plaintiffs surely could have stated such basic facts in their pleadings; a sentence or two for each claim might have sufficed. The fact that they have not done so, even after they had an opportunity to cure their pleadings through their amended complaint, justifies dismissal of this action for failure to plead necessary jurisdictional facts indicating compliance with the statute of limitations.[3]

## II. Plaintiffs Have Failed to State a Cause of Action for Breach of Contract

### A. Plaintiffs Have Not Satisfied the Requirements for Pleading a Cause of Action for Breach of Contract

The contract provision alleged to have been breached is a clause contained in plaintiffs' promissory notes, stating: "Prepayments of scheduled installments, or any portion thereof, may be

---

[3] In the alternative, the Court could give plaintiffs yet another opportunity to plead the requisite jurisdictional facts through another amended complaint, as the Court did in Inter-Coastal Xpress. In that case, however, the pleadings might not have been found inadequate at all if the Court had not held, after the complaint was filed, that the denial of the carrier's administrative claims was not the correct point of reference. Here, the shortcoming in the pleadings is not the result of a ruling that the plaintiffs might not have anticipated when they filed the complaint. The principles governing accrual of claims such as those asserted here were declared by the Supreme Court long before this action was commenced, in Franconia.

made at any time at the option of Borrower." Amended Complaint ¶ 18. In our moving brief, we demonstrated that the phrase "at any time" does not necessarily mean "under any circumstances," and that to construe this phrase in this manner here would allow frustration of the very purpose for which Congress authorized the loans in question to be made.

In response, plaintiffs argue, essentially, that "at any time" is indeed synonymous with "under any circumstances." Plaintiffs tacitly acknowledge the cases cited in our moving brief in which courts have expressly stated otherwise, but argue that "the restrictions on prepayment imposed by the legislation at issue here clearly affected the timing as well as the 'circumstances' surrounding prepayment . . . ." Pl. Br. 17 n.14. Yet, plaintiffs point to nothing in the challenged legislation that imposes time restrictions upon prepayment. Plaintiffs complain, rather, that the procedures required by the legislation can affect when prepayment will occur in a given case. This effect, however, is also a function of when a borrower initiates the prepayment process. The legislation does not prevent a borrower from initiating the process early enough so that, if the borrower goes through with prepayment, the loan is prepaid at the time originally intended by the borrower.

We also demonstrated that the challenged legislation did not prohibit prepayment; rather, it required, in certain circumstances, that the Government offer borrowers incentives to agree extend their participation in the Section 515 program or otherwise to protect low and moderate income tenants threatened with dislocation as a result of prepayment. Plaintiffs' response entirely misses the point. Plaintiffs state:

> Defendant notes that "[t]hose who enter a contract may take steps at any time after its execution to modify it." (Def. Mem. 16) But, of course, a contract can only be modified with the consent of all contracting parties, and here there is no evidence – and certainly nothing in the First Amended Complaint – to suggest that plaintiffs ever agreed to a modification of their original unrestricted right of prepayment. . . .

Pl. Br. 17. However, the point of our argument – and of the statement that plaintiffs quote from our brief – was not that any plaintiff agreed to any modification of the prepayment clause. Our

point, rather, was that it was not a breach of contract for the Government to attempt to obtain borrowers' agreement to refrain from prepaying in a manner harmful to tenants, and that efforts to obtain such agreements is essentially what the challenged legislation required.[4]

Plaintiffs also argue that "because defendant's motion necessarily requires the Court to consider evidence outside the pleadings – the terms of the loan documents at issue in this case, for example, are central to defendant's motion – defendant's arguments are not properly before the Court. A Rule 12(b)(6) motion is decided on the basis of the pleadings." Pl. Br. 16. Our motion does not, however, require the Court to consider evidence outside the pleadings. The thrust of our argument is that the contract language cited in the complaint does not preclude the Government actions that are alleged to constitute a breach.[5] The Rules of this Court require that, in a complaint asserting a claim founded upon a contract with the United States, "the plaintiff shall plead the substance of those portions of the contract . . . on which the plaintiff relies or shall annex to the complaint a copy of the contract . . . , indicating the provisions thereof on which the

[4] We do not dispute that the statutorily-required efforts to obtain such agreements might present certain borrowers with choices all of which the borrowers might find unappealing. Specifically, a borrower with a pending prepayment application who does not enters into such an agreement could be required, under the statute, "to offer to sell the assisted housing and related facilities involved to any qualified nonprofit organization or public agency at a fair market value determined by 2 independent appraisers." 42 U.S.C. § 1472(c)(5)(A). As we have demonstrated, however, a borrower's choice to enter into an agreement extending participation in the Section 515 program (or to withdraw the prepayment application) is not involuntary merely because the alternative would be a transfer of the property that the Government may require under its power of eminent domain. Def. Br. 16-17. Plaintiffs misconstrue this point, and argue, in response, that the Government's power of eminent domain is not a license to breach its contracts. Pl. Br. 21-22. In making this argument, plaintiffs must assume either that it is a breach of contract for the Government to persuade a borrower voluntarily to forego prepayment, or that foregoing prepayment is involuntary if the alternative is a transfer of the project pursuant to the Government's power of eminent domain. Neither assumption is correct.

[5] Plaintiffs correctly note that, at various points in our moving brief, we cite plaintiffs' failure to point to any language in the contract documents precluding the legislation in question. Pl. Br. 16 n.13, citing Def. Br. 16, 26. This does not mean, however, that the Court must scour the contract documents to verify our observations. To the extent that the contract contains any language supporting plaintiffs' claim, it is plaintiffs' burden to cite that language.

plaintiff relies." RCFC 9(h)(3). We have demonstrated that the portions of the contract pleaded by plaintiffs do not preclude the challenged Government actions, and that plaintiffs have failed to plead any other portions of the contract that do prohibit these actions. We have thus demonstrated that the pleadings fail to state a claim for breach of contract. A Rule 12(b)(6) motion is exactly the right procedural vehicle for presenting this defense to the Court.

B. ELIHPA Did Not Repudiate the Contracts in Question

Plaintiffs' argument that ELIHPA repudiated the contracts depends entirely upon the erroneous premise that the contracts gave them an absolute right to prepay not only at any time, but also under any circumstances, and that the Government was contractually obligated immediately to accept all tenders of prepayment and immediately to release the borrower from all obligations with no questions asked, without even attempting to reach an agreement with the borrower that might protect low income tenants from displacement. Plaintiffs state:

> Prior to enactment of ELIHPA, plaintiffs could leave the program and raise rents by doing little more than writing defendant a check for the remaining mortgage balance. . . . Under the repudiating legislation, however, the agency can no longer perform as promised in the contracts. Among other things, no prepayment can be made unless the owner complies with the detailed procedures set forth in the statute and its implementing regulations. . . .

Pl. Br. 18. As we have demonstrated, however, the contract provision upon which plaintiffs rely does not state that the process of prepayment will never involve more than "writing defendant a check for the remaining mortgage balance." Therefore, requiring compliance with "the detailed procedures set forth in the statute and its implementing regulations" does not constitute repudiation of this provision.

Plaintiffs seek support for their characterization of ELIHPA as a repudiation of their contracts by attributing to the same characterization to the Supreme Court's decision in Franconia. As we established in our moving brief, however, in Franconia the Supreme Court assumed, without deciding, that the plaintiffs characterization of ELIHPA was correct, because the issue

presented was whether the claims in question were time-barred, not whether they stated a cause of action. Def. Br. 11-12 n.6. Plaintiffs respond by stating that "[t]he Supreme Court had [the prepayment provision and the legislation] before it when it held that the 1988 legislation effected a repudiation of plaintiffs' contracts," that "[t]he Court quoted all of the key provisions in its decision," and that, therefore, "there is no basis for the government's assertion that the Court was not properly presented with the question whether the government's conduct constituted a repudiation." Pl. Br. 15 n.12. We do not argue, however, that the Supreme Court lacked sufficient information with which to decide whether the statute constituted a repudiation of the prepayment provision. Rather, we have demonstrated that the Supreme Court in fact did not decide this issue, because the only question presented was the statute of limitations question. To address this question, the Supreme Court had to explore the nature of the claim being asserted, not whether it was a legally sufficient claim on the merits.[6] Plaintiffs' reliance upon Franconia, therefore, is misplaced.

Because ELIHPA did not repudiate plaintiffs' contracts, plaintiffs also gain nothing by arguing that "a repudiating party becomes liable for breach when the nonrepudiating party either (1) files suit, or (2) demands performance under the contract." Pl. Br. 19. There can be no liability here unless and until performance becomes due but is denied. If there were specific instances in which the Government refused to accept tenders of prepayment in a manner inconsistent with the

[6] Supreme Court plainly indicated that it was merely assuming, and not deciding, that the plaintiffs' characterization of the prepayment clause was correct: "Accepting for purposes of this decision that the loan contracts guaranteed the absolute prepayment right petitioners allege, we reverse the Federal Circuit's judgment," 536 U.S. at 133; "[f]or purposes of this case, the United States agrees, it may be assumed that petitioners obtained precisely the promise they allege – a promise that permits them an unfettered right to prepay their mortgages any time over the life of the loans, " id. at 141; "[t]he Federal Circuit, we are persuaded, incorrectly characterized the performance allegedly due from the Government under the promissory notes," id. at 142 (emphasis added). We acknowledge that, in a recent decision in a similar case, this Court construed these assumptions as suggesting that the Supreme Court "would not be receptive" to the argument that no breach occurred. Allegre Villa v. United States, No. 98-823C, slip op. at 5 (Fed. Cl., March 22, 2004). We respectfully suggest that the Court in Allegre Villa misread Franconia.

terms of the contract, then the tendering plaintiffs would have become entitled to sue as of the time of that refusal. No such instances, however, are alleged in the complaint.

C. Under the Unmistakability Doctrine, the Contracts Cannot Be Construed to Preclude Congress from Enacting Requirements Such as Those Contained in ELIHPA

In our moving brief, we demonstrated that, according to the unmistakability doctrine, the contracts in question cannot be construed to preclude Congress from mandating the protection of tenants from the effects of prepayment through legislation such as ELIHPA. In their response, plaintiffs contend that this doctrine does not apply here. Plaintiffs also contend that the contracts in question in any event contain promises that are sufficiently unmistakable to satisfy the doctrine. Both of these contentions should be rejected. The unmistakability doctrine applies to the contracts in question, and precludes liability.

1. The Unmistakability Doctrine Applies Here

As we demonstrated in our moving brief, the unmistakability doctrine is a principle of contract interpretation, under which a contract with the Government will not be construed to exempt the other contracting party from the exercise of the Government's sovereign power, unless it does so in unmistakable terms. The gist of plaintiffs' argument against applying the unmistakability doctrine here is that Congress's enactment of ELIHPA was not sufficiently public and general to qualify for the sovereign acts defense, and that, therefore, it also was not an exercise of sovereign power for purposes of the unmistakability doctrine. In so arguing, plaintiffs rely upon the weaker of two diverging lines of authority.

Plaintiffs cite cases – none of them controlling – which do, in effect, merge the unmistakability doctrine into the sovereign acts defense, leaving the former available only when the latter is available. See. e.g., Kimberly Associates v. United States, 261 F.3d 864 (9th Cir. 2001); Grass Valley Terrace v. United States, 51 Fed. Cl. 436 (2002); General Dynamics Corp. v. United States, 47 Fed. Cl. 514, 542 (2000). This Court's recent decision in Allegre Villa follows this line of

cases. The reasoning in these cases is flawed, for the reasons stated in our moving brief, at 19-21.

We also established that, even assuming that the sovereign acts doctrine and the unmistakability doctrine are closely linked, they are not identical, and that, if ELIHPA was too directly related to section 515 loans to constitute a "public and general" act for purposes of the sovereign acts defense, the statute's purpose was nevertheless sufficiently public, and sufficiently distinct from the Government's proprietary interests, to qualify the legislation an exercise of sovereign power for purposes of the unmistakability doctrine. See Def. Br. 21-26. In particular, we demonstrated that the purpose of this legislation was not to save the Government money or to obtain for the Government a better deal than that contained in existing contracts, but to protect low and moderate income tenants from displacement. Plaintiffs have failed to demonstrate otherwise.[7]

[7] This legislative purpose, we demonstrated, was plainly expressed by Congress both in the text of the statute and in the relevant legislative reports. See Def. Br. 23-25, quoting Pub. L. No. 100-242, § 202(b), codified at 12 U.S.C. § 1715l note; H. Rep. No. 96-154, at 43 (1979), reprinted in 1979 U.S.C.C.A.N. 2317, 2359; H. Rep. No. 100-122(I), at 53-54 (1987), reprinted in 1987 U.S.C.C.A.N. 3317, 3369-3370. In their response, plaintiffs attempt to prove otherwise by quoting a comment of Congressman Ashley made in opposition to the proposed 1980 amendment (subsequently enacted as Pub. L. No. 96-399, 94 Stat. 1614 (1980)) eliminating the retroactive application of the section 515 prepayment changes that had been enacted in the Housing and Community Development Amendments of 1979, Pub. L. No. 96-153, 93 Stat. 1101 (1979). In the quoted comment, Congressman Ashley stated that "if this amendment is agreed to, three quarters of the rental housing units produced by Farmers Home in the last 8 years will be in danger of being removed from the rural, low- and moderate-income housing market. As much as $3.3 billion in additional funding would be required to replace them." Pl. Br. 31, quoting 126 Cong. Rec. 22651 (1980) (emphasis added in Pl. Br.). Plaintiffs' reliance upon this comment is misplaced for several reasons. First, "the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation,' " Garcia v. United States, 469 U.S. 70, 76 (1984) (quoting Zuber v. Allen, 396 U.S. 168, 186 (1969)), reh'g denied 469 U.S. 1230 (1985). The Supreme Court has "eschewed reliance on the passing comments of one Member . . . , and casual statements from the floor debates." Garcia, 469 U.S. at 76 (citations omitted). Second, whenever Congress considers legislation, the cost of alternative ways to achieve the legislative purpose is always a relevant consideration; the fact that it is considered, therefore, is no indication of the legislation's purpose. Third, despite plaintiffs' emphasis upon the second sentence of the comment that they quote, the comment does not suggest that saving money was the primary purpose even of

(continued...)

Finally, the unmistakability doctrine applies here even if, as plaintiffs argue, "[t]he proper inquiry is whether the government achieved its public purpose in a manner that targeted its own prior contractual obligations." Pl. Br. 31-32. ELIHPA did not regulate prepayment only in connection with loans made by the Government. It also imposed restrictions upon prepayment of Government-insured loans made by private lenders. See Pub. L. No. 100-242, § 221. It is true that ELIHPA did not apply to owners of rental housing generally, but low income tenants were not being threatened with displacement by owners of rental housing generally. Plaintiffs do not appear to dispute that the sovereign powers protected by the unmistakability doctrine include the power to ensure that the poor people have decent housing and to protect them from displacement. The enactment of ELIHPA was an exercise of that power, and was thus subject to the unmistakability doctrine.

2. The Contracts in Question Did Not Surrender the Government's Power to Amend the Applicable Statute in Order to Prevent Displacement of Tenants

We established in our moving brief that the loan documents at issue here contained no unmistakable promise to insulate plaintiffs from the effects of future legislation, and did not surrender the Government's power to amend the applicable statute, through legislation such as ELIHPA, in order to prevent displacement of tenants. In response, plaintiffs assert that their contracts contain "a clear promise, unambiguously affording property owners the right to terminate their participation in the 515 housing program by prepaying at any time at their option." Pl. Br. 32. This assertion, however, misses the point. The question is not whether the contract

[7](...continued)
Congressman Ashley in opposing the amendment of the 1979 legislation. Indeed, the congressman's comments, taken as a whole, reflect a concern primarily for protecting low and moderate income tenants. Fourth, appropriating additional funds to replace housing lost to the low income market as a result of prepayment would not accomplish the stated purpose of ELIHPA "to minimize the involuntary displacement of tenants currently residing in such housing . . . ." Pub. L. No. 100-242, § 202(b)(2). At most, it would merely help assure that displaced tenants would eventually find other housing.

contains unmistakable promises of some kind; all Government contracts do. Rather, what must be unmistakable is the claimed surrender of the sovereign's power to act in a manner that might affect a promise contained in a contract. The gist of the unmistakability doctrine is, after all, that "sovereign power . . . governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148 (1982) (emphasis added). Therefore, the question is not whether unmistakable promises were made, but whether the promises in question were unmistakably made exempt from future limitation as a result of legislation or other exercises of the Government's sovereign power.[8]

Finally, plaintiffs attempt to avoid the unmistakability doctrine by arguing that "[t]he fact that defendant may disagree with plaintiffs' characterization of the promise made property owners is irrelevant for purposes of a Rule 12(b)(6) motion. The Court must accept as true plaintiffs' factual allegations and must construe the record in the light most favorable to plaintiffs." Pl. Br. 33. In so arguing, plaintiffs overlook the fundamental principle that interpretation of the the

---

[8] In a footnote, plaintiffs attempt to buttress their unmistakability argument by invoking other contract provisions that are not mentioned in the pleadings. Plaintiffs paraphrase an unidentified contract provision as specifying that the contracts "cannot be modified absent a written agreement signed by both parties." Pl. Br. 32 n. 27. This argument is beside the point, because this case does not involve a change in the terms of the agreement; it involves changes in the governing statute, Government actions pursuant to the new statute, and whether those actions breached the original terms of the agreement. Plaintiffs also quote an unidentified loan agreement provision as stating that "'any loan made or insured will be administered subject to the limitations of the authorizing act of Congress and related regulations,'" and argue that "[t]he contracts do not state that the loans will be administered subject to any and all future acts such as the 1988 legislation or the 1992 legislation. Thus, the only legislation that the contracts are made subject to is the authorizing act of Congress, i.e., Section 515 of Title V of the National Housing Act." Pl. Br. 32 n. 27. This argument simply does not follow. The language plaintiffs cite says nothing one way or the other about future amendments to the authorizing statute, nor is this language inconsistent with the conclusion that the loans were to be administered in accordance with the statutory terms in effect at the times during which the loans would be administered. And, plaintiffs' interpretation of "the authorizing act of Congress" as meaning only "Section 515 of Title V of the National Housing Act" is arbitrarily narrow. The original language of section 515, like the current language, incorporated by reference other sections of the Act, including section 502, which is codified at 42 U.S.C. § 1472, and these and other sections of the Act were amended numerous times, both before plaintiffs' obtained the loans in question.

terms of a contract is a question of law. Alvin Ltd. v. United States Postal Service, 816 F.2d 1562, 1565 (Fed. Cir. 1987); Fortec Constructors v. United States, 760 F.2d 1288, 1291 (Fed. Cir. 1985). Thus, the proper standard is not for the Court to accept as true plaintiffs' characterization of the promise made in the contracts in question, but to determine, from the actual contract terms referenced or incorporated in the pleadings, what that promise was. As we have demonstrated, the contract terms cited by plaintiffs do not contain the requisite unmistakable promise.

## III. The Government's Actions Did Not Constitute an Uncompensated Taking

### A. Government Infringement of a Right Arising from a Government Contract Is Not Actionable under the Takings Clause

In our moving brief, at 32-35, we demonstrated that the rights claimed to have been infringed in this case were rights arising from contracts between plaintiffs and the Government, and that infringements of this kind are actionable only as contract claims, and not as takings claims. In response, plaintiffs state that "[t]he Federal Circuit's recent decisions in Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003) and Chancellor Manor v. United States, 331 F.3d 891 (Fed. Cir. 2003) erase any doubt as to whether plaintiffs can maintain takings claims independent from their contract claims." Pl. Br. 34. As we demonstrated in our moving brief, however, those cases involved loans insured by the Department of Housing and Urban Development ("HUD"), but made by private lenders. The prepayment clause in those cases was contained in promissory notes issued to those lenders, not from a contract with the Government. Thus, these cases say nothing about whether a takings claim may be maintained where, as here, the takings claim is based upon allegations that the Government's actions violated rights arising under a contract with the Government. See Allegre Villa, slip op. at 10 (distinguishing Cienega Gardens and Chancellor Manor upon the same basis).

Nor can there be any question that the rights involved in plaintiffs' takings claim arose from their contracts with the Government. The Government actions of which plaintiffs complain deprived plaintiffs of no right except their alleged contractual right to prepay their loans without

restriction. If, as a consequence, other rights associated with plaintiffs' properties were affected, this was only because restrictions upon prepayment limited plaintiffs' ability to terminate its existing contractual obligations relating to these properties. If this limitation violated any right, it was a contract right, and the remedy, if any, is for breach of contract.

### B. The Government Did Not Effect an Uncompensated Taking under The Penn Central Test

In our moving brief, we demonstrated that plaintiffs' takings claim also failed under the criteria identified by the Supreme Court in Penn Central Transportation Co. v. New York City, 438 U.S. 104, 124 (1978), for assessing whether Government regulatory action effects a taking under the Fifth Amendment: (1) the extent to which the regulation has interfered with distinct investment-backed expectations; (2) the economic impact of the regulation upon the claimant; and (3) the character of the governmental action. In their response, plaintiffs have failed to demonstrate otherwise.

We established in our moving brief that the enactment and implementation of ELIHPA did not interfere with distinct investment-backed expectations essentially for the reasons stated by the United States Court of Appeals for the Eighth Circuit in Parkridge Investors, Ltd. v. Farmers Home Administration, 13 F.3d 1192, 1198 (8th Cir. 1994). In their response, plaintiffs argue that the Federal Circuit disagreed with Parkridge in Cienega Gardens. Pl. Br. 36. This is not so. Rather, as we demonstrated in our moving brief, the court in Cienega Gardens distinguished Parkridge for reasons that make this case equally distinguishable from Cienega Gardens. It bears particular emphasis that the expectations that might be reasonable here differ from those in Cienega Gardens and Chancellor Manor in the following respect. The prepayment clause involved in those cases explicitly addressed the Government's regulatory authority, stating: "A mortgage indebtedness may be prepaid in full and the [Federal Housing] Commissioner's controls terminated without the prior consent of the Commissioner where . . . the prepayment occurs after the

expiration of 20 years from the date of final insurance endorsement of the mortgage . . . ." 24 C.F.R. § 236.30 (1970) (emphasis added), quoted in Cienega Gardens, 331 F.3d at 1325 n.8. The prepayment clause involved here, however, does not mention prepayment "in full" or termination of any agency controls. Further, contrary to any expectations that might have arisen from the "without the prior consent of the Commissioner" clause, ELIHPA expressly conditioned the right to prepay HUD-insured private loans upon compliance with "a plan of action approved by the Secretary . . . . " See Pub. L. No. 100-242, § 221. See also Pub. L. No. 101-625, § 601(a), 104 Stat. 4249 (1990); 12 U.S.C. § 4101(a). The ELIHPA provisions at issue here, however, did not impose conditions contrary to expectations explicitly articulated in the applicable prepayment clause.

Concerning the economic impact of the challenged Government action, plaintiffs state that, at trial, they will prove the "severe economic impact of being forced to remain in the Section 515 program . . . ." Pl. Br. 39. As we have demonstrated in our moving brief, however, any such economic impact would be irrelevant, because none of the plaintiffs has been forced to remain in the program. In particular, all plaintiffs have been, and still are, able to leave the program pursuant to the sale provisions of 42 U.S.C. § 1472(c)(5)(A)(i).[9]

Finally, concerning the character of the Government's actions, plaintiffs argue that ELIHPA improperly places upon them a financial burden that should be borne by the public generally, because "plaintiffs did not cause or contribute to the need for low-income housing in rural areas." Pl. Br. 40. Plaintiffs did, however, create a danger of displacement of low-income tenants residing in housing owned by plaintiffs, when they sought to prepay their loans in order to raise rents.

Plaintiffs also quote a comment of the Federal Circuit in Cienega Gardens concerning the

---

[9] This avenue leads either to a sale for fair market value or to prepayment without restrictions. The Court need not address whether a takings claim would arise if a borrower were to sell a project pursuant to this provision but then contend that the price received was actually less than fair market value. None of the plaintiffs claims that this has occurred.

ELIHPA provisions applicable to private loans insured by HUD, that "'Congress' objective in passing ELIHPA and LIHPRHA – preserving low-income housing – and method – forcing some owners to keep accepting below-market rents – is the kind of expense-shifting to a few persons that amounts to a taking.'" Pl. Br. 40, quoting Cienega Gardens, 331 F.3d at 1319. As we demonstrated in our moving brief, however, reliance upon this language is misplaced here because of the distinctions drawn in that case between the HUD-insured private loans involved there and Government loans such as those involved here. Further, the Government actions involved here cannot be characterized as "forcing some owners to keep accepting below-market rents, " Cienega Gardens, 331 F.3d at 1319, because all owners can free themselves of this burden by offering to sell their properties to a nonprofit organization or public agency at a fair market value, pursuant to 42 U.S.C. § 1472(c)(5)(A)(i).

CONCLUSION

For the foregoing reasons, and for the reasons stated in our moving brief, plaintiffs' claims should be dismissed with prejudice.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

Filed electronically

s/Shalom Brilliant
SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 305-7561
Facsimile: (202) 305-7643

Attorneys for Defendant

April 9, 2004